Julie E. Schwartz, Bar No. 260624
JSchwartz@perkinscoie.com
Perkins Coie LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300
Facsimile: 650.838.4350

Todd M. Hinnen (*pro hac vice* application pending)
THinnen@perkinscoie.com
Ryan Spear (*pro hac vice* application pending)
RSpear@perkinscoie.com
Perkins Coie LLP
1201 Third Ave., Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for Plaintiff Niantic, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NIANTIC, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>GLOBAL++, an unincorporated association; RYAN HUNT, a.k.a. "ELLIOTROBOT," an individual; ALEN HUNDUR, a.k.a. "IOS N00B," an individual; and DOES 1-20,<br><br>Defendants. | Case No. 19-cv-3425<br><br>**NIANTIC, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**<br><br>**Date:** July 19, 2019<br>**Hearing Time:** TBD<br>**Courtroom:** TBD<br>**Judge:** TBD |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on July 19, 2019, or as soon as the matter may be heard, in the United States District Court for the Northern District of California, San Francisco Division, plaintiff Niantic, Inc. ("Niantic") will and hereby does move the Court for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rule 65-2, restraining and enjoining defendants and defendants' officers, agents, servants, and employees, and all persons in active concert or participation with them who receive actual notice of the Court's order, from:

1.     Acquiring or copying without authorization any portion of the mobile applications ("apps") developed and published by Niantic and used to play Niantic's location-based augmented reality games, including certain binary computer code incorporated in Niantic's mobile apps (Niantic's "Client Code");

2.     Reverse engineering, decompiling, or disassembling Niantic's mobile apps;

3.     Creating derivative works based on any portion of Niantic's games, mobile apps, and Client Code, including without limitation the programs titled *Potter++* (or *Unite++*), *PokeGo++*, and *Ingress++* (the "Cheating Programs");

4.     Distributing, selling, renting, leasing, or otherwise trafficking in copies of Niantic's Client Code or any apps or computer programs that include any portion of Niantic's Client Code, including without limitation the Cheating Programs;

5.     Cheating or enabling cheating within Niantic's mobile games, including through the Cheating Programs;

6.     Accessing Niantic's network, computers, and servers, including the computers and servers that enable users to play Niantic's games via Niantic's mobile apps, by any direct or indirect means or method;

1    7.    Extracting, scraping, or indexing data about points of interest or spawning

2 locations within Niantic's games, including names, descriptions, photographs, game states, and

3 precise coordinates for those points of interest and locations;

4    8.    Using Niantic's Client Code or any other aspect of Niantic's mobile apps, mobile

5 games, or other services or content, for any commercial purpose;

6    9.    Violating Niantic's Terms of Service; and

7    10.    Participating or assisting in any such activity.

8    Niantic also respectfully requests that the Court schedule a hearing on this motion at the

9 Court's earliest convenience. In addition, after the hearing on this motion, Niantic respectfully

10 requests that the Court order defendants to provide notice of the Court's order to defendants'

11 officers, agents, servants, and employees, and all persons in active concert or participation with

12 defendants.

13    Niantic's motion is based on this notice of motion and the accompanying memorandum of

14 points and authorities; the supporting declarations of Scot Frank, Phil Keslin, Eric Lanz, Steven

15 VanDeBogart, and Julie Schwartz, with exhibits; all pleadings and papers on file in this action;

16 and such other and further matters as the Court may consider.

17

18 DATED:  June 14, 2019                    **PERKINS COIE LLP**

19

20                                        By:   */s/ Julie E. Schwartz*
                                            Julie E. Schwartz, Bar No. 260624
                                            JSchwartz@perkinscoie.com

21                                        Attorneys for Plaintiff Niantic, Inc.

22

23

24

25

26

27

28

- 2 -

1

**TABLE OF CONTENTS**

2

**Page**

3   I.    INTRODUCTION ................................................................................................. 1

4   II.   ISSUE TO BE DECIDED ..................................................................................... 4

5   III.  STATEMENT OF FACTS .................................................................................... 4

6         A.    Niantic's Mobile Games and Applications ............................................... 4

7         B.    Defendants' Unlawful Conduct................................................................. 7

8         C.    Harm to Niantic ...................................................................................... 10

9   IV.   ARGUMENT...................................................................................................... 10

10        A.    Niantic Is Likely to Succeed on the Merits of Its Claims ...................... 11

11              1.    Niantic is likely to succeed on its claim under the Copyright Act ........... 11

12              2.    Niantic is likely to succeed on its claim under the Computer Fraud
                        and Abuse Act ....................................................................................... 13

13
                3.    Niantic is likely to succeed on its claim under Niantic's Terms of
14                      Service................................................................................................... 15

15        B.    Niantic Will Suffer Irreparable Harm Absent a Preliminary Injunction............... 16

16        C.    The Balance of Hardships Tips Sharply in Niantic's Favor ................... 19

17        D.    The Public Interest Favors Preliminary Injunctive Relief...................... 20

18        E.    No Bond Should Be Required.................................................................. 20

19   V.   CONCLUSION ................................................................................................... 21

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

CASES

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011)................................................................................19

*All. for the Wild Rockies v. Pena*,
   865 F.3d 1211 (9th Cir. 2017)................................................................................19

*adidas Am., Inc. v. Skechers USA, Inc.*,
   890 F.3d 747 (9th Cir. 2018)..................................................................................17

*Apple, Inc. v. Psystar Corp.*,
   673 F. Supp. 2d 931 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011)...........13

*Blackberry Ltd. v. Typo Prods. LLC*,
   No. 14-cv-00023-WHO, 2014 WL 1318689 (N.D. Cal. Mar. 28, 2014)..................19

*BladeRoom Grp. Ltd. v. Facebook, Inc.*,
   219 F. Supp. 3d 984 (N.D. Cal. 2017) ..................................................................16

*Blizzard Entm't Inc. v. Ceiling Fan Software LLC*,
   28 F. Supp. 3d 1006 (C.D. Cal. 2013) ...................................................................17

*Boardman v. Pac. Seafood Grp.*,
   822 F.3d 1011 (9th Cir. 2016)................................................................................20

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
   766 F.2d 1319 (9th Cir. 1985)................................................................................20

*Caraccioli v. Facebook, Inc.*,
   700 F. App'x 588 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1027 (2018)................15

*Caribbean Marine Servs. Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988)..................................................................................17

*Comet Techs. U.S. of Am. Inc. v. Beuerman*,
   No. 18-CV-01441-LHK, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ................20

*Disney Enters., Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017)..................................................................11, 17, 19

*Domain Name Comm'n Ltd. v. DomainTools, LLC*,
   No. C18-0874RSL, 2018 WL 4353266 (W.D. Wash. Sept. 12, 2018), *appeal
   filed*, No. 18-35850 (9th Cir. Oct. 12, 2018)..........................................................20

# TABLE OF CONTENTS
(continued)

Page

*Facebook, Inc. v. Power Ventures, Inc.*,
    844 F.3d 1058 (9th Cir. 2016)................................................................14

*Feldman v. Ariz. Sec'y of State's Office*,
    843 F.3d 366 (9th Cir. 2016)................................................................11

*Fox Broad. Co. v. Dish Network, L.C.C.*,
    No. CV 12-04529 DMG, 2013 WL 11238486 (C.D. Cal. Sept. 23, 2013) ..............18

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013)................................................................17

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009)................................................................20

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
    634 F.2d 1197 (9th Cir. 1980)................................................................19

*LVRC Holdings LLC v. Brekka*,
    581 F.3d 1127 (9th Cir. 2009)................................................................13

*Micro Star v. Formgen Inc.*,
    154 F.3d 1107 (9th Cir. 1998)................................................................13

*MySpace, Inc. v. Wallace*,
    498 F. Supp. 2d 1293 (C.D. Cal. 2007) ...................................................17

*Nexon Am., Inc. v. S.H.*,
    No. CV 10-9689 PA (JCX), 2011 WL 13217951 (C.D. Cal. Dec. 13, 2011)............13

*Optinrealbig.com, LLC v. Ironport Sys., Inc.*,
    323 F. Supp. 2d 1037 (N.D. Cal. 2004) ...................................................17

*Red.com, Inc. v. Jinni Tech Ltd.*,
    No. SA-CV-17-00382-CJC, 2017 WL 8223610 (C.D. Cal. Nov. 29, 2017) ............16

*Sega Enters. Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992)................................................................11

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
    846 F. Supp. 2d 1063 (N.D. Cal. 2012) ...................................................17

*Take-Two Interactive Software, Inc. v. Zipperer*,
    No. 18 CIV. 2608 (LLS), 2018 WL 4347796 (S.D.N.Y. Aug. 16, 2018) ..........12, 13

**TABLE OF CONTENTS**
(continued)

Page

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
    507 F. Supp. 2d 1096 (C.D. Cal. 2007) ...............................................................16

*Triad Sys. Corp. v. Se. Express Co.*,
    64 F.3d 1330 (9th Cir. 1995).............................................................................19

*Twitter, Inc. v. Skootle Corp.*,
    No. C 12-1721 SI, 2012 WL 2375486 (N.D. Cal. June 22, 2012)...........................15

*United States v. Nosal*,
    676 F.3d 854 (9th Cir. 2012).............................................................................14

*Waymo LLC v. Uber Techs., Inc.*,
    No. C 17-00939 WHA, 2017 WL 2123560 (N.D. Cal. May 15, 2017)....................20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).......................................................................................10, 11

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012) .............................................18, 20

**STATUTES**

17 U.S.C. § 101 ...................................................................................2, 11, 12

18 U.S.C. § 1030 ............................................................................... passim

- iv -

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Niantic, Inc. moves this Court for a preliminary injunction to enjoin defendants from misappropriating Niantic's intellectual property and engaging in other illegal acts that harm Niantic and its users. Specifically, Niantic respectfully requests that the Court enjoin defendants from (1) infringing Niantic's copyrighted computer code; (2) accessing Niantic's protected computers without authorization; and (3) breaching Niantic's Terms of Service.

Niantic publishes the augmented-reality mobile games *Harry Potter: Wizards Unite* ("*Harry Potter*"), *Pokémon GO*, and *Ingress*, which have been downloaded and played by millions of people. Niantic files this motion on the eve of the United States launch of *Harry Potter*, the culmination of a multi-year, multi-million dollar investment by Niantic, the success of which is threatened by defendants' unlawful conduct.

To play Niantic's games, users install Niantic's mobile applications ("apps") on their smartphones or other mobile devices. Niantic's apps are the only authorized way for players to access Niantic's computer servers and play Niantic's games. Niantic's apps are made up, in part, of innovative and proprietary software code that Niantic refers to as its Client Code.[1] Niantic protects its Client Code via technical measures designed to prevent users from viewing the code while still enabling users to access and play Niantic's games via their mobile devices.

As explained in more detail below, defendants make money by stealing Niantic's Client Code and using it to make their own apps. Specifically, defendants hack Niantic's apps to access and copy Niantic's Client Code, then modify and adulterate the Client Code to create what they call "tweaks"—i.e., unauthorized, hacked versions of Niantic's apps. Defendants then market their hacked apps under the titles *Potter++* (or, in some cases, *Unite++*), *PokeGo++*, and

---

[1] For purposes of this motion, the term "client code" refers to code that users install on their mobile devices when they install apps. Client code is distinguished from "server code," which exists on a remote computer server. Niantic's games utilize client code and server code. When players use Niantic's mobile apps on their mobile devices, the client code in Niantic's mobile apps interacts with the server code on Niantic's servers to create the game-playing experience. *See* Decl. of Eric Lanz in Supp. of Niantic's Mot. for Preliminary Injunctive Relief ("Lanz Decl.") ¶ 13.

*Ingress++* (the "Cheating Programs"). The Cheating Programs allow defendants' customers to access Niantic's servers and perform unauthorized actions in Niantic's games, including "spoofing" (faking) their locations, obtaining information that is not available to players using Niantic's legitimate apps, and automating key features of game play. The Cheating Programs thereby degrade the gaming experience for honest players, undermine Niantic's reputation and goodwill, and interfere with Niantic's business. It also appears that defendants use the Cheating Programs to steal valuable and proprietary game-related information and convert it for their own commercial purposes.

Defendants are not modest about their misconduct. They often boast about enabling cheating in Niantic's games. And they have distributed the Cheating Programs to hundreds of thousands of people, reaping massive profits. Niantic has informed defendants that their conduct is illegal and demanded that they stop. Defendants simply ignored Niantic.

Injunctive relief is clearly warranted under these circumstances.

**First,** Niantic is likely to prevail on the merits of its claims under the Copyright Act, the Computer Fraud and Abuse Act, and Niantic's Terms of Service.[2]

With respect to the Copyright Act, the evidence shows that defendants copied versions of Niantic's Client Code that have been registered with the U.S. Copyright Office and in which Niantic has valid and subsisting copyrights; created derivative versions of Niantic's copyrighted Client Code to develop the Cheating Programs; and then distributed their Cheating Programs to hundreds of thousands of users. Each of those acts, standing alone, violates Niantic's rights.

Niantic's claim under the Computer Fraud and Abuse Act is also straightforward. Players must access Niantic's computer servers to play Niantic's games, and Niantic authorizes players to access its servers *only* through Niantic's legitimate apps. Requiring users to access Niantic's servers through legitimate apps provides an authentication system that limits access to authorized users. But that is not how defendants access Niantic's servers. Rather, defendants access Niantic's

---

[2] Niantic is confident that it will succeed on the merits of all its claims—not just those discussed in this motion. For the sake of brevity, however, this motion focuses on Niantic's claims under the Copyright Act, the Computer Fraud and Abuse Act, and Niantic's Terms of Service.

MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

servers through unauthorized, hacked versions of Niantic's apps—the Cheating Programs—and enable their customers to do the same. Defendants then use that unauthorized access to collect information, including valuable and proprietary game-related information, from Niantic's servers. Moreover, defendants have continued to access Niantic's servers and obtain information even after Niantic expressly informed them, in writing, that their access was unauthorized. Defendants therefore violated the Computer Fraud and Abuse Act.

Finally, defendants are Niantic account holders. That means they agreed to be bound by Niantic's Terms of Service, which provide that users may not, among other things, copy Niantic's code or misappropriate Niantic's code for any commercial purpose. Defendants' misconduct plainly violates those prohibitions, and others.

**Second,** Niantic can establish irreparable harm. As an initial matter, the Cheating Programs degrade the gaming experience for honest players and drive users away from Niantic's games. By depressing Niantic's user base and user engagement, the Cheating Programs undermine Niantic's reputation and goodwill and interfere with Niantic's ability to make money from in-game purchases—an essential element of Niantic's business model. Equally important, defendants' misconduct threatens to interfere with the impending domestic launch of Niantic's highly anticipated new game, *Harry Potter*, which would impact Niantic's business for years to come. And, finally, Niantic's investigation indicates that defendants use the Cheating Programs to scrape valuable and proprietary game-related information from Niantic's servers—information that required great cost and effort to develop. All these harms are difficult to quantify in monetary terms and are therefore irreparable.

**Third,** the balance of hardships tips sharply in Niantic's favor. Absent an injunction, defendants' misconduct will interfere with the approaching domestic launch of *Harry Potter*, an important milestone in Niantic's ongoing success and growth. Defendants will also continue hijacking Niantic's valuable intellectual property for their own commercial purposes and driving customers away from Niantic's games. On the other side of the ledger, a preliminary injunction would cause no cognizable hardship for defendants. Defendants would simply have to stop doing

MOTION FOR PRELIMINARY INJUNCTIVE RELIEF
123002-0005.0012/LEGAL144431665.4

things they are not entitled to do: infringing Niantic's copyrights, accessing Niantic's computers without authorization, and violating their enforceable agreements with Niantic.

**Fourth,** and finally, the public interest favors an injunction. An injunction would serve the public's interest in enforcing the laws protecting intellectual property and would deter circumvention of the intellectual property protections that have enabled the multibillion-dollar mobile game industry to flourish. It would also protect the millions of honest players of Niantic's games who wish to play the games as they were meant to be played.

In short, every factor favors the issuance of a preliminary injunction. This Court should therefore grant Niantic's motion, enjoin defendants' ongoing violations of Niantic's rights, and protect Niantic and the public from defendants' blatantly illegal conduct.[3]

## II.    ISSUE TO BE DECIDED

Whether Niantic is entitled to a preliminary injunction enjoining and restraining the unlawful activities of defendants, as well as defendants' officers, agents, servants, and employees, and all persons in active concert or participation with defendants.

## III.    STATEMENT OF FACTS

### A.    Niantic's Mobile Games and Applications

Niantic is a pioneer and leader in the field of location-based augmented reality mobile games. In Niantic's games, the world is the game board. Players interact with augmented reality characters and features that appear on the screens of their mobile devices when they visit real-world locations. *See* Complaint ("Compl.") ¶ 2, 29-32; Decl. of Scot Frank in Supp. of Niantic's Mot. for Preliminary Injunctive Relief ("Frank Decl.") ¶¶ 3-6; Lanz Decl. ¶¶ 3-4. For example, in Niantic's *Pokémon GO* game, players collect imaginary creatures called "Pokémon" by searching for and finding them in real-world locations (e.g., parks) and then capturing them using

---

[3] Niantic strongly believes that the record supports the issuance of a preliminary injunction, even before any discovery has taken place. If, however, the Court concludes that additional factual development is necessary, then Niantic respectfully requests the opportunity to seek expedited discovery.

- 4 -

"Pokéballs." Players can obtain Pokéballs by visiting "Pokéstops," which are also found at real-world locations (e.g., fountains and murals). *See* Compl. ¶ 31; Frank Decl. ¶ 5; Lanz Decl. ¶ 5.[4]

Niantic's games are based on three core principles: exploration and discovery of new places, exercise, and real-world social interaction with other people. Through these principles, and by leveraging sophisticated mapping and augmented reality technologies, Niantic encourages players to head outside, visit new places, and play together with friends and family in games that span and unite the entire planet. *See* Compl. ¶ 33; Frank Decl. ¶ 7.

Niantic currently publishes three popular games: *Harry Potter*, *Pokémon GO*, and *Ingress*. *See* Compl. ¶ 29; Frank Decl. ¶ 3; Decl. of Phil Keslin in Supp. of Niantic's Mot. for Preliminary Injunctive Relief ("Keslin Decl.") ¶ 4; Lanz Decl. ¶ 3. To play Niantic's games, players download and install Niantic's mobile apps on their mobile devices. Those apps connect to the Internet and, through the Internet, obtain game-related information from Niantic's servers (e.g., names and locations of nearby characters or features), which is then rendered on the screens of players' mobile devices. *See* Compl. ¶ 2; Frank Decl. ¶ 8; Lanz Decl. ¶ 7. Niantic's apps are the only authorized means for players to access Niantic's servers in order to play Niantic's games. All other means are prohibited. *See* Compl. ¶ 101; Frank Decl. ¶ 9; Lanz Decl. ¶ 8.

Niantic's apps include Niantic's Client Code—innovative and proprietary code that enables users to access Niantic's servers and play Niantic's games. *See* Compl. ¶ 8; Lanz Decl. ¶¶ 13-15, 17.[5] Several versions of Niantic's Client Code have been registered with the U.S. Copyright Office, including the Client Code for Version 0.133.0 of the *Pokémon GO* app ("*Pokémon GO*, Version 0.133.0," released January 28, 2019) and the Client Code for Version 2.11.2 of the *Ingress* app ("*Ingress*, Version 2.11.2," released November 5, 2018). *See* Compl.

---

[4] For the Court's convenience, Niantic has provided short video clips illustrating how Niantic's games work. *See* Lanz Decl., Exs. A-1 (*Harry Potter*), A-2 (*Pokémon GO*), A-3 (*Ingress*). These video clips will be submitted on electronic media.

[5] Generally speaking, Niantic's Client Code includes two distinct types or bodies of code: "game-specific client code" and "platform client code." Game-specific client code is code that is unique to a particular game (e.g., *Pokémon GO*). Platform client code is the body of client code that is common or very similar across all of Niantic's game titles that are released around the same time. Some version of the platform client code appears in all relevant versions of all Niantic's apps. *See* Lanz Decl. ¶ 15.

¶¶ 59, 66, Exs. D-E; Decl. of Julie E. Schwartz in Supp. of Niantic's Mot. for Preliminary Injunctive Relief ("Schwartz Decl.") ¶¶ 2-3, Exs. A-B.

Niantic's apps are free to download and use, and it is possible to play Niantic's games for free indefinitely. *See* Compl. ¶ 34; Frank Decl. ¶ 10. However, to obtain in-game items that can be beneficial during game play, players can make in-game purchases. *See* Compl. ¶ 34; Frank Decl. ¶ 10. For example, in *Pokémon GO*, players can purchase in-game currency ("Pokécoins") to redeem for additional Pokéballs, which are used to capture Pokémon. Players may do this, for example, if they run out of Pokéballs when they are not near a Pokéstop, at which they could otherwise obtain Pokéballs for free by interacting with the location. In-game purchases are a fundamental aspect of Niantic's business model and represent one of Niantic's primary sources of revenue. *See* Compl. ¶ 34; Frank Decl. ¶ 11.

Niantic's games are the product of Niantic's skills, resources, and creative energies, and they have great value to Niantic. Niantic has invested significant resources, including time, effort, talent, creativity, and money, to develop and produce its games, including the mobile apps through which they are played. *See* Compl. ¶ 36; Frank Decl. ¶ 12.

Equally important, Niantic has invested substantial resources in protecting the integrity of its games, including their reputation for fair play and adherence to Niantic's core principles. *See* Compl. ¶ 11; Frank Decl. ¶ 13. For example, Niantic requires all users to agree to its Terms of Service, which prohibit cheating. *See* Compl. ¶ 37; Frank Decl. ¶ 13; Decl. of Steven VanDeBogart in Supp. of Niantic's Mot. for Preliminary Injunctive Relief ("VanDeBogart Decl.") ¶ 5, Ex. A. Niantic also invests substantial resources, in excess of $2 million annually, to monitor for and eliminate cheating and other unauthorized activity. *See* Keslin Decl. ¶ 5. Maintaining the integrity of Niantic's games is essential to Niantic's business model because Niantic's games are multiplayer games—that is, all players share the same online environment. *See* Compl. ¶ 6; Frank Decl. ¶ 13. Thus, when one player gains an unfair advantage by cheating, it affects all other players and threatens the integrity of Niantic's games. *See* Compl. ¶ 6; Frank Decl. ¶ 13.

**B.      Defendants' Unlawful Conduct**

Defendant Global++ provides what it calls "tweaks"—that is, unauthorized derivative versions of other companies' mobile game apps. *See* Compl. ¶ 52, Ex. B (Global++ website advertising the Cheating Programs and other unauthorized apps and referring to Global++'s products as "Spoofing Tweaks & Apps"). Defendant Ryan Hunt is the leader of Global++ and its primary developer and spokesperson. *See* Compl. ¶ 7; Lanz Decl. ¶¶ 20-21. He is assisted and supported by defendant Alen Hundur, who helps develop, market, and distribute Global++'s products and maintains a YouTube channel devoted to Global++. *See* Compl. ¶ 7; Lanz Decl. ¶¶ 20-21. In this motion, Niantic refers to Global++, Hunt, and Hundur, along with the Doe Defendants, collectively as the "defendants."

Defendants create, distribute, and profit from unauthorized derivative versions of Niantic's mobile apps, namely, *Potter++* (sometimes called *Unite++*), which is an unauthorized derivative version of the *Harry Potter* app; *PokeGo++*, which is an unauthorized derivative version of the *Pokémon GO* app; and *Ingress++*, which is an unauthorized derivative version of the *Ingress* app. *See* Compl. ¶ 4; Frank Decl. ¶ 17; Lanz Decl. ¶ 19. In this motion, Niantic refers to *Potter++*, *PokeGo++*, and *Ingress++* collectively as the "Cheating Programs."

Defendants' customers download the Cheating Programs directly from defendants' website and install the programs on their mobile devices. The Cheating Programs allow those customers to access Niantic's computer servers, play Niantic's games, and perform unauthorized actions while playing Niantic's games. *See* Compl. ¶¶ 5, 45; Lanz Decl. ¶ 35. For example, the Cheating Programs allow defendants' customers to "spoof" their locations (i.e., visit geographical locations in the games without visiting those locations in the real world by communicating to Niantic's servers GPS coordinates that do not match the GPS coordinates generated by the customers' mobile devices); obtain items and achievements that they have not legitimately earned; automate certain in-game tasks so that they are always successful; and obtain valuable information that is not available to other users. *See* Compl. ¶ 46; Lanz Decl. ¶ 35. The Cheating Programs also allow defendants' customers to use their mobile devices as bots, that is, automated computer programs that interact with Niantic's servers to make it appear as if defendants'

- 7 -

customers are playing Niantic's games 24 hours a day, 7 days a week. This gives defendants' customers an unfair advantage over honest players because the legitimate apps do not allow players to automate game play in the same way. *See* Compl. ¶ 47; Lanz Decl. ¶ 36.

In addition, it appears that the Cheating Programs access and obtain valuable and proprietary data about points of interest within Niantic's games (including names, descriptions, photographs, game states, and precise coordinates for those points of interest), then automatically upload this data to servers controlled by defendants. *See* Compl. ¶ 48, 50; Lanz Decl. ¶ 51. Niantic's point-of-interest data ("POI Data") is an extremely important component of Niantic's location-based games, and Niantic has invested substantial amounts of time, effort, and money to develop, curate, and protect this unique asset. *See* Compl. ¶ 48; Frank Decl. ¶¶ 14-16.[6]

To create the Cheating Programs, defendants necessarily and deliberately infringe Niantic's rights and misappropriate Niantic's most valuable intellectual property.

**First,** defendants download legitimate copies of Niantic's mobile apps, which include Niantic's Client Code. *See* Compl. ¶ 8, 41; Lanz Decl. ¶ 23.

**Second,** defendants circumvent the technical security measures designed to protect Niantic's Client Code. That allows defendants to access and copy Niantic's Client Code, in its entirety, without Niantic's permission. *See* Compl. ¶ 8, 42; Lanz Decl. ¶ 24.

**Third,** defendants modify and adulterate Niantic's Client Code by, among other things, disabling security measures and adding Global++ code that enables the cheating features described above. *See* Compl. ¶ 9, 42; Lanz Decl. ¶ 25.

**Fourth,** defendants publish the modified Niantic code as part of their Cheating Programs and market the Cheating Programs under the titles *Potter++*, *PokeGo++*, and *Ingress++*. *See* Compl. ¶ 3-4, 9, 40; Lanz Decl. ¶¶ 26, 31.

There is no genuine dispute that defendants copy Niantic's code and create unauthorized derivative works based largely on that code. Indeed, according to Niantic's analysis, certain

---

[6] The Cheating Programs also appear to access and obtain valuable ephemeral game information, such as the type and value of particular Pokémon appearing in precise locations. *See* Compl. ¶¶ 49-50; Lanz Decl. ¶ 51. Niantic refers to this data as "Spawn Data."

1   versions of defendants' Cheating Programs contain up to 99% of Niantic's copyrighted Client

2   Code. *See* Compl. ¶ 43; Lanz Decl. ¶¶ 37-48.

3        Notably, defendants are serial infringers. Each time Niantic releases new versions of its

4   mobile apps, defendants repeat the process described above (or a substantially similar process)

5   and publish new, corresponding versions of their Cheating Programs—often within days or even

6   hours of Niantic releasing its new apps. *See* Compl. ¶ 54; Lanz Decl. ¶¶ 27-29. For example,

7   when Niantic released a new version of *Pokémon GO* on June 10, 2019, defendants released a

8   new version of *PokeGo++* that same day. And defendants released the first version of *Potter++*

9   less than one month after Niantic debuted the beta version of *Harry Potter* in New Zealand. *See*

10  Lanz Decl. ¶¶ 28-29. Adding more urgency to this matter, Niantic anticipates that defendants will

11  release an updated version of *Potter++* very quickly after Niantic launches *Harry Potter* in the

12  United States. *See id.* ¶ 30; Frank Decl. ¶ 24. That would have very serious ramifications for

13  Niantic's business because *Harry Potter* is a significant new game release, because the United

14  States is Niantic's largest market, and because a new product launch presents a unique and

15  valuable opportunity to establish customer loyalty and goodwill. *See* Frank Decl. ¶ 24.

16       In addition to being serial infringers, defendants are also highly organized and deliberate.

17  They advertise and distribute their Cheating Programs through numerous online channels,

18  including the official Global++ website (www.globalplusplus.com) and a popular YouTube

19  channel maintained by Hundur. *See* Compl. ¶ 52, Exs. B-C; Lanz Decl. ¶ 31. They also generate

20  substantial profits from their illegal activities by using online payment platforms, including

21  Patreon and Stripe, to sell multi-level "subscriptions" that allow their customers to access and use

22  the Cheating Programs' unauthorized features. *See* Compl. ¶¶ 53, 55; Lanz Decl. ¶¶ 32-34 Exs.

23  B-C. Based on public information from Graphtreon, a website that tracks activity on the Patreon

24  platform, as well as Niantic's records, Niantic believes that defendants have sold hundreds of

25  thousands of subscriptions for their Cheating Programs and obtained millions of dollars in illicit

26  profits. *See* Compl. ¶ 55; Lanz Decl. ¶¶ 33-34, Exs. B-C.

27

28

**C.      Harm to Niantic**

Defendants' misconduct has caused or will cause several harms, many of which would be difficult to quantify in monetary terms. For example:

1. The Cheating Programs give defendants' customers unfair advantages, frustrating some honest players and leading others to quit Niantic's games altogether. That erodes Niantic's hard-won reputation and goodwill, and with it Niantic's value and stature as a company. It also deprives Niantic of profits it would otherwise have obtained from in-game purchases, thereby undermining a core part of Niantic's business. *See* Compl. ¶¶ 6, 11; Frank Decl. ¶¶ 19-21, Exs. A-H.

2. The Cheating Programs also threaten to disrupt the upcoming domestic launch of Niantic's new game, *Harry Potter*. Defendants will almost certainly release a new version of *Potter++* within days (or possibly even hours) of that launch. That would drastically undercut Niantic's ability to capitalize on the launch and could impact Niantic's business for years to come. *See* Compl. ¶ 12; Frank Decl. ¶¶ 22-24.

3. The Cheating Programs appear to scrape valuable and proprietary game-related information from Niantic's servers, including POI Data. Niantic has invested countless hours and significant resources to enhance, curate, and protect that unique resource, which is essential to Niantic's success. *See* Compl. ¶ 13; Frank Decl. ¶ 25.

Defendants know that their conduct is illegal and that it harms Niantic and Niantic's customers. Niantic has tried to stop defendants' infringement by adding new security measures to its code, but defendants have intentionally thwarted those measures. *See* Compl. ¶¶ 8, 42, 54; Lanz Decl. ¶¶ 25, 55-56, 57(c)-(f). Further, before filing this lawsuit, Niantic contacted defendants in writing and explained that their schemes are unlawful and unauthorized. Niantic also demanded that defendants cease creating, selling, and distributing the Cheating Programs, and expressly revoked defendants' limited license to access Niantic's computers and servers. Defendants ignored that letter. *See* Compl. ¶¶ 57, 78; Schwartz Decl. ¶ 4, Ex. C. This lawsuit followed.

# IV.      ARGUMENT

To obtain a preliminary injunction, a party "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of

- 10 -

success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 375 (9th Cir. 2016) (internal quotation marks, emphasis, and citation omitted).

Here, Niantic is entitled to a preliminary injunction because it is likely to prevail on the merits of its claims under the Copyright Act, the Computer Fraud and Abuse Act, and Niantic's Terms of Service. At the very least, there are "serious questions going to the merits" of those claims. In addition, Niantic has suffered and will continue to suffer irreparable injury if defendants' misconduct is not enjoined; the balance of hardships favors Niantic; and it is in the public interest to enjoin defendants' misconduct.

**A.      Niantic Is Likely to Succeed on the Merits of Its Claims**

Based on the governing law and evidence submitted with this motion, Niantic is very likely to prevail on the merits of its claims.

**1.      Niantic is likely to succeed on its claim under the Copyright Act**

To establish a violation of the Copyright Act, a plaintiff "must (1) show ownership of the allegedly infringed material and (2) demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal quotation marks and citation omitted). Niantic can prove both elements.

**First,** the allegedly infringed material—Niantic's Client Code—is protected under the Copyright Act. *See* Compl. ¶¶ 59-62, 66-69; Schwartz Decl. ¶¶ 2-3, Exs. A-B; *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1519 (9th Cir. 1992) ("[T]he 1980 amendments to the Copyright Act unambiguously extended copyright protection to computer programs."). In addition, as noted above, several versions of the Client Code have been deposited with the U.S. Copyright Office and Niantic has obtained a certificate of registration for those versions. *See* Compl. ¶¶ 59-62, 66-69, Exs. D-E; Schwartz Decl. ¶¶ 2-3, Exs. A-B; 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first

publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.").

**Second,** even at this early stage of the case, it is clear that defendants have violated Niantic's rights under the Copyright Act. Section 106 of the Act provides that the owner of a copyright (in this case, Niantic) has "the exclusive rights to do and to authorize any of the following": "to reproduce the copyrighted work in copies," 17 U.S.C. § 106(1); "to prepare derivative works based upon the copyrighted work," *id.* § 106(2); and "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending," *id.* § 106(3). Defendants have violated and, unless enjoined, will continue violating each of those rights. Specifically, defendants have:

1. Copied Niantic's copyrighted Client Code without Niantic's permission, in violation of 17 U.S.C. § 106(1), *see* Compl. ¶ 9, 42-43, 64-65, 70; Lanz Decl. ¶¶ 9-16, 25, 37-48;

2. Created unauthorized derivative versions of Niantic's copyrighted Client Code, which they then incorporated into the Cheating Programs, in violation of 17 U.S.C. § 106(2), *see* Compl. ¶ 9, 42-43, 64-65, 71; Lanz Decl. ¶¶ 9-16, 25, 37-48; and

3. Distributed unauthorized copies and derivative versions of Niantic's copyrighted Client Code by distributing the Cheating Programs to their customers, in violation of 17 U.S.C. § 106(3), *see* Compl. ¶¶ 7, 9, 15, 18, 20, 40, 52, 57, 64, 71, Exs. B-C; Lanz Decl. ¶ 19, 26, 31.

Each of those acts, standing alone, is unlawful and justifies a preliminary injunction.

The *Zipperer* case is instructive. *See Take-Two Interactive Software, Inc. v. Zipperer*, No. 18 CIV. 2608 (LLS), 2018 WL 4347796 (S.D.N.Y. Aug. 16, 2018). There, as here, the defendant "creat[ed] and distribut[ed] software programs for cheating in and manipulating" a well-known online game. *Id.* at *1. And there, as here, the publisher of the game sued and sought a preliminary injunction, arguing that the unauthorized programs violated the Copyright Act. The *Zipperer* court agreed. Based on evidence that the defendant's programs "created an alternative version of [plaintiff's game] which is based on [plaintiff's game] but with added elements that allow its users to use features not available in the original version"—evidence analogous to the evidence submitted here—the court held that the defendant's programs "likely constitute[d] a derivative work which [the plaintiff] has the exclusive right to create under 17 U.S.C. § 106." *Id.*

- 12 -

at *8. The court therefore issued a preliminary injunction prohibiting the defendant from creating and distributing his programs. *See id.* at *11.

Other courts have reached similar conclusions. *See Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1112 (9th Cir. 1998) (reversing partial denial of motion for preliminary injunction because plaintiff was likely to succeed on its infringement claim based on defendant's creation of unauthorized derivative works, namely, user-created video game levels); *Nexon Am., Inc. v. S.H.*, No. CV 10-9689 PA (JCX), 2011 WL 13217951, at *4 (C.D. Cal. Dec. 13, 2011) (defendant infringed plaintiff's rights by copying code in plaintiff's online game, altering code to remove security measures, and distributing the modified code); *Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 931, 935-38 (N.D. Cal. 2009) (defendant infringed plaintiff's rights by modifying and distributing code), *aff'd*, 658 F.3d 1150 (9th Cir. 2011). This Court should do the same.

### 2. Niantic is likely to succeed on its claim under the Computer Fraud and Abuse Act

The Computer Fraud and Abuse Act, or CFAA, "prohibits a number of different computer crimes, the majority of which involve accessing computers without authorization or in excess of authorization, and then taking specified forbidden actions, ranging from obtaining information to damaging a computer or computer data." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1131 (9th Cir. 2009). Although the CFAA is primarily a criminal statute, private parties may sue for violations of the CFAA under 18 U.S.C. § 1030(g).

Here, Niantic seeks relief under Section 1030(a)(2) of the CFAA—the "unauthorized access" provision of the statute. *See* 18 U.S.C. § 1030(a)(2). To prevail on an unauthorized access claim, Niantic must show that the defendants "(1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that [they] (3) thereby obtained information (4) from any protected computer (if the conduct involved an interstate or foreign communication), and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value." *Brekka*, 581 F.3d at 1132. Again, Niantic can prove all those elements.

**First,** when defendants and defendants' customers use the Cheating Programs to play Niantic's games, they access the Niantic computers, servers, and networks that enable users to

- 13 -

play Niantic's games ("Niantic Computers"). *See* Compl. ¶ 13, 45, 77; Lanz Decl. ¶ 49. Indeed, the Cheating Programs could not work without accessing Niantic's Computers. *See* Lanz Decl. ¶ 49.

**Second,** defendants have accessed Niantic's Computers without authorization. Niantic's legitimate apps are the only authorized means for players to access Niantic's servers for purposes of playing Niantic's games; Niantic does not allow players to access Niantic's Computers for that purpose via any other means. But, as explained above, that is *not* how defendants access Niantic's Computers. Instead, they access Niantic's Computers through the Cheating Programs, which is not authorized. Nor can defendants plead ignorance on that front. On June 7, 2019, Niantic expressly revoked defendants' limited license to access Niantic's Computers for any reason and by any method, including through the Cheating Programs. *See* Compl. ¶ 57; Schwartz Decl. ¶ 4, Ex. C; *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) (cease-and-desist letter from Facebook was sufficient to put defendants on notice that their access was unauthorized). Nevertheless, defendants have continued to access Niantic's Computers (and enabled others to access Niantic's Computers) through the Cheating Programs. *See* Compl. ¶ 57; Lanz Decl. ¶ 60-61.

**Third,** when the Cheating Programs access Niantic's Computers, they obtain information from Niantic's Computers, including (but not limited to) valuable and proprietary POI Data and Spawn Data. *See supra* at 8, 10. And, based on its investigation to date, Niantic believes that defendants have designed the Cheating Programs so that they not only obtain Niantic's POI Data and Spawn Data, but also upload that POI Data and Spawn Data from defendants' customers' devices to servers controlled by defendants—presumably so defendants can further exploit it for their own commercial purposes. *See* Compl. ¶ 50; Lanz Decl. ¶ 51. The Cheating Programs therefore "obtain[] . . . information" from Niantic's Computers. 18 U.S.C. § 1030(a)(2), (a)(2)(C).

**Fourth,** Niantic's Computers are "protected computers" within the meaning of the CFAA. The CFAA defines "protected computer" to mean a computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2). As the Ninth Circuit has explained, "effectively all computers with Internet access" meet that requirement. *United*

- 14 -

*States v. Nosal*, 676 F.3d 854, 859 (9th Cir. 2012). Here, Niantic's Computers are connected to the Internet and enable Niantic's customers to play Niantic's games throughout the United States and all over the world. *See* Compl. ¶ 77; Lanz Decl. ¶ 50. Niantic's Computers therefore qualify as "protected computers" within the meaning of the statute.

**Fifth,** Niantic has suffered losses far exceeding the $5,000 threshold as a direct and proximate result of defendants' CFAA violations. *See* 18 U.S.C. § 1030(g); *see also* 18 U.S.C. § 1030(e)(11) (defining "loss" to mean "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service"). In the last 12 months, Niantic estimates that its employees have spent more than 2,000 hours, at a combined estimated cost of approximately $1 million, to investigate and respond to defendants' misconduct. Niantic has also had to expend significant effort to respond to user complaints about the Cheating Programs. *See* Compl. ¶ 83; Frank Decl.¶ 20; Keslin Decl. ¶¶ 7-9; Lanz Decl. ¶¶ 57-58.

In short, there is more than enough evidence to conclude that Niantic is likely to prevail on its CFAA claim.

### 3. Niantic is likely to succeed on its claim under Niantic's Terms of Service

"To state a claim for breach of contract under California law, plaintiff must plead facts establishing the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *Twitter, Inc. v. Skootle Corp.*, No. C 12-1721 SI, 2012 WL 2375486, at *7 (N.D. Cal. June 22, 2012) (holding that Twitter adequately alleged breach-of-contract claim based on violation of Twitter's Terms of Service). Niantic can prove all those elements.

**First,** there is a contract between Niantic and defendants: Niantic's Terms of Service. *See, e.g.*, *Caraccioli v. Facebook, Inc.*, 700 F. App'x 588, 590 (9th Cir. 2017) (Facebook terms of service created a binding agreement between Facebook and Facebook user), *cert. denied*, 138 S. Ct. 1027 (2018). In order to play Niantic's games, all users must agree to Niantic's Terms of Service and any subsequent modifications to the Terms of Service. *See* Compl. ¶ 37; Frank Decl.

¶ 13; VanDeBogart Decl. ¶ 5. Here, Niantic's internal records show that both Hunt and Hundur agreed to be bound by Niantic's Terms of Service and any subsequent modifications. *See* Compl. ¶ 98; VanDeBogart Decl. ¶¶ 14-17. And because Hunt is the leader and principal developer of Global++, his agreement to the Terms of Service binds Global++ as well. *See* Compl. ¶¶ 7, 98; Lanz Decl. ¶¶ 20-21; *Red.com, Inc. v. Jinni Tech Ltd.*, No. SA-CV-17-00382-CJC (KESx), 2017 WL 8223610, at *2, *8 (C.D. Cal. Nov. 29, 2017) (enforcing Firmware License Agreement against limited liability company where plaintiff alleged the company's founder "downloaded and consented to" the agreement both "individually and for the benefit of" the LLC); *see also BladeRoom Grp. Ltd. v. Facebook, Inc.*, 219 F. Supp. 3d 984, 996 (N.D. Cal. 2017) (a contract made by an agent for an undisclosed principal is, for most purposes, the contract of the principal).

**Second,** Niantic has fully performed under its Terms of Service. *See* Compl. ¶ 100.

**Third,** defendants have repeatedly breached Niantic's Terms of Service in multiple ways, including by copying, modifying, and creating derivative works based on Niantic's code, *see supra* at 7, 9, and by using Niantic's code and Niantic's games for their own commercial purposes, *see supra* at 9.

**Fourth,** Niantic has suffered damages as a result of defendants' breaches. Defendants' schemes have harmed Niantic's reputation and goodwill and interfered with Niantic's ability to make money through in-game purchases. *See infra* at 17-19. Niantic has also been forced to incur significant costs for investigating and responding to defendants' misconduct. *See supra* at 15.

For all these reasons, defendants' multiple and ongoing violations warrant preliminary injunctive relief. *See, e.g.*, *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1110 (C.D. Cal. 2007) (granting motion for preliminary injunction where defendant violated plaintiff's terms of service by "using automated devices, making excessive requests, and interfering with the proper working of" plaintiff's services).

**B.      Niantic Will Suffer Irreparable Harm Absent a Preliminary Injunction**

In addition to likelihood of success on the merits, a party seeking a preliminary injunction must also "demonstrate immediate threatened injury as a prerequisite to preliminary injunctive

relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Niantic is currently suffering and will continue to suffer irreparable harm absent a preliminary injunction.

**First,** because the Cheating Programs give defendants' customers unfair advantages, they frustrate some honest players and lead others to simply quit Niantic's games. Indeed, Niantic has received numerous complaints about the Cheating Programs. *See* Compl. ¶ 11; Frank Decl. ¶ 20, Exs. A-H. By diminishing Niantic's user base and user enthusiasm, the Cheating Programs deprive Niantic of profits it would otherwise obtain from in-game purchases, which is one of the fundamental building blocks of Niantic's business model. *See* Compl. ¶¶ 11, 35; Frank Decl. ¶ 11, 21; *VidAngel*, 869 F.3d at 866 (defendant's infringement caused irreparable harm because it "undermine[d] the value of . . . [plaintiffs'] 'windowing' business model").

Even more importantly, the Cheating Programs erode Niantic's hard-won reputation and goodwill in the marketplace, including its reputation for providing fair games that adhere to Niantic's core principle. *See* Compl. ¶ 11; Frank Decl. ¶ 13, 19. Many courts, including the Ninth Circuit Court of Appeals and other courts in this district, have held that "loss of control over business reputation and damage to goodwill can constitute irreparable harm" because such harms are hard to quantify in monetary terms. *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018) (alterations omitted) (quoting *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013)); *see also Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1018 (C.D. Cal. 2013) (finding irreparable injury and granting permanent injunction based on complaints lodged by World of Warcraft game players regarding the use of bots because such complaints "reflect customer dissatisfaction and resulting loss of goodwill and harm to [the game creator's] reputation"); *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012) (potential loss of goodwill or loss of ability to control reputation are irreparable harms that may justify preliminary injunctive relief); *MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007) (defendant's infringement caused irreparable harm to online service provider because it "degraded the user experience"); *Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004)

- 17 -

("Damage to a business' goodwill is typically irreparable injury because it is difficult to calculate."). This Court should reach the same conclusion.

**Second,** defendants' misconduct threatens to interfere with the upcoming domestic launch of Niantic's highly-anticipated new game, *Harry Potter*. The United States is Niantic's largest and most important market. *See* Compl. ¶¶ 12, 30; Frank Decl. ¶ 23. And in the mobile gaming world, a product launch is a uniquely important event for establishing the reputation of a game and building loyalty among customers. *See* Frank Decl. ¶ 23. Niantic's ability to capitalize on that opportunity will be severely impacted if defendants' misconduct is allowed to continue. Niantic anticipates that defendants will infringe the upcoming new version of *Harry Potter* that will be released in connection with the United States launch in order to publish a new version of *Potter++* immediately thereafter—just as they did within a month of the overseas beta launch of the game. *See* Frank Decl. ¶ 24; Lanz Decl. ¶¶ 28-29. That, in turn, would deprive Niantic of its ability to control how United States consumers first encounter and experience the game. *See* Frank Decl. ¶ 24; *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) (infringement threatened irreparable harm because it "dilute[d] plaintiffs' . . . control over their product"); *Fox Broad. Co. v. Dish Network, L.C.C.*, No. CV 12-04529 DMG (SHx), 2013 WL 11238486, at *4 (C.D. Cal. Sept. 23, 2013) ("[L]oss of control over the dissemination of copyrighted works can, under certain circumstances, constitute irreparable harm."). Just as worrisome, honest players trying the game for the first time would immediately discover that the game is "rigged" in favor of defendants' customers, who would have access to the cheating features created by defendants. That would undermine the gaming experience for honest players, discourage them from playing *Harry Potter*, and interfere with Niantic's efforts to attract new users for a game that it has invested many years and millions of dollars to develop. *See* Frank Decl. ¶ 24.

**Third,** Niantic's investigation indicates that the Cheating Programs scrape valuable and proprietary game-related information from Niantic's servers, including POI Data. Niantic has invested many hours, at great cost, to develop, curate, and protect its POI Data—which, among other things, enriches Niantic's games and helps Niantic design its games to be safe for players.

MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

*See* Compl. ¶¶ 48-50; Frank Decl. ¶¶ 14-16. It would be difficult, if not impossible, to calculate the harm from defendants' conversion of that unique resource. *See* Frank Decl. ¶¶ 25-26.

**C.    The Balance of Hardships Tips Sharply in Niantic's Favor**

The third factor of the preliminary injunction standard requires the Court to "balance the interests of all parties and weigh the damage to each." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). Generally, the party seeking an injunction must show the injunction would "do more good than harm." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133 (9th Cir. 2011) (citation omitted). But if that party has shown only serious questions concerning the merits of a claim (not a likelihood of success), then it must show the "balance of hardships tips sharply in [its] favor." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211,  1217 (9th Cir. 2017) (emphasis and citation omitted).

Niantic meets both standards. Absent an injunction, Niantic will continue to be irreparably harmed, as described above. Conversely, defendants would suffer no cognizable harm from a preliminary injunction. It is true that defendants would be prohibited, at least temporarily, from making money by infringing Niantic's copyrights, accessing Niantic's Computers without authorization, and breaching Niantic's Terms of Service. But defendants were never entitled to engage in those activities, so being ordered to stop is not a cognizable hardship. *See Blackberry Ltd. v. Typo Prods. LLC*, No. 14-cv-00023-WHO, 2014 WL 1318689, at *12 (N.D. Cal. Mar. 28, 2014) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.") (citation and alteration omitted). And even if it was, it certainly would not outweigh the real and palpable harms that defendants' schemes inflict on Niantic. *See, e.g.*, *VidAngel*, 869 F.3d at 867 (affirming district court's conclusion "that the only harm [defendant] asserted—financial hardship from ceasing cheating activities—did not outweigh the irreparable harm likely to befall the [plaintiffs] without an injunction"); *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) ("[L]ost profits from an activity which has been shown likely to be infringing . . . merit[] little equitable consideration.") (internal quotation marks and citation omitted).

**D.     The Public Interest Favors Preliminary Injunctive Relief**

Finally, if the requested relief "reaches beyond the parties, carrying with it a potential for public consequences," then the Court must consider whether it is in the public interest. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023-24 (9th Cir. 2016) (citation omitted).

The public interest plainly favors a preliminary injunction in this case. "[T]he public has an interest in vindicating intellectual property rights, and in prohibiting unfair competition." *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017). As the Second Circuit has explained, "[i]nadequate protections for copyright owners can threaten the very store of knowledge to be accessed; encouraging the production of creative work thus ultimately serves the public's interest in promoting the accessibility of such works." *WPIX*, 691 F.3d at 287. Plus, issuing a preliminary injunction here would not just protect Niantic. It would also discourage defendants and copycat violators from circumventing the intellectual property protections that have enabled the multibillion-dollar mobile game industry to flourish. And, no less important, it would protect millions of consumers by eliminating the cheating enabled by defendants' schemes.

**E.     No Bond Should Be Required**

Niantic respectfully submits that it should not be required to post a bond in this case. The Ninth Circuit has recognized a district court's discretion under Federal Rule of Civil Procedure 65(c) to "dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009); *see also Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985). Here, the preliminary injunction sought by Niantic would "simply enjoin Defendant[s] from doing something Defendant[s] never had a right to do in the first place." *Comet Techs. U.S. of Am. Inc. v. Beuerman*, No. 18-CV-01441-LHK, 2018 WL 1990226, at *6 (N.D. Cal. Mar. 15, 2018). Because granting such relief presents no realistic likelihood of harm to defendants, the Court should order no bond or, at most, a nominal bond. *See, e.g.*, *Domain Name Comm'n Ltd. v. DomainTools, LLC*, No. C18-0874RSL, 2018 WL

- 20 -

4353266, at *7 (W.D. Wash. Sept. 12, 2018) (requiring a nominal bond of $1,000), *appeal filed*, No. 18-35850 (9th Cir. Oct. 12, 2018).

## V.      CONCLUSION

For the foregoing reasons, Niantic respectfully requests that its motion for a preliminary injunction be granted in substantially the form of the Proposed Order filed with this motion.


DATED:  June 14, 2019                                **PERKINS COIE LLP**


By:     */s/ Julie E. Schwartz*
                                                     Julie E. Schwartz, Bar No. 260624
                                                     JSchwartz@perkinscoie.com

                                                     Attorneys for Plaintiff Niantic, Inc.

MOTION FOR PRELIMINARY INJUNCTIVE RELIEF