FABIO E. MARINO (SBN 183825)
fmarino@polsinelli.com
POLSINELLI LLP
1661 Page Mill Road, Suite A
Palo Alto, CA 94304
T:  650-461-7700
F:  650-461-7701

Phillip Zeeck (*Admitted PHV*)
pzeeck@polsinelli.com
POLSINELLI PC
900 West 48th Place, Ste. 900
Kansas City, MO 64112
T:  816-753-1000
F:  816-753-1536

Attorneys for Defendants
Ryan Hunt and Alen Hundur

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NIANTIC, INC., <br><br> Plaintiff, <br><br> v. <br><br> GLOBAL++, et al., <br><br> Defendants. | Case No. 3:19-cv-03425 JST <br><br> **DEFENDANTS RYAN HUNT AND ALEN HUNDUR'S OPPOSITION TO PLAINTIFF NIANTIC, INC.'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF** <br><br> Date:    September 4, 2019 <br> Time:    2:00 p.m. <br> Ctrm:    9, 19th Floor <br> Judge:   Honorable Jon S. Tigar <br><br> Date Action Filed: June 14, 2019 |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...........................................................................................................1

II. BACKGROUND .............................................................................................................1

III. LEGAL STANDARD......................................................................................................3

IV. ARGUMENT...................................................................................................................4

    A. Niantic has little chance of success on the merits because Global++ software does not create any derivative work. ................................4

    B. Niantic faces no immediate threat of irreparable harm....................................6

        1. Global++ games are not operating, so they pose no threat of harm to Niantic. ....................................................................7

        2. Ordering the relief Niantic requests will not prevent the harm it alleges. .....................................................................8

    C. The balance of equities also weighs strongly against granting Niantic's motion. .................................................................................................9

    D. An injunction serves no public interest............................................................10

    E. Even if this Court were to enter a preliminary injunction, it should require a substantial bond. ..........................................................................11

V. CONCLUSION................................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Beverage Ass'n v. City and Cnty. of San Francisco*,
   916 F.3d 749 (9th Cir. 2019) ..................................................................................................3

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
   877 F. Supp. 2d 838 (N.D. Cal. 2012) (*rev'd on other grounds*, 695 F.3d 1370
   (9th Cir. 2012)) .......................................................................................................................8

*Benisek v. Lamone*,
   138 S. Ct. 1942 (2018) ............................................................................................................8

*BOKF, NA v. Estes*,
   923 F.3d 558 (9th Cir. 2019) ...............................................................................................4, 7

*Bowen v. Consol. Elec. Distribs., Inc. Emp. Welfare Benefit Plan*,
   461 F. Supp. 2d 1179 (C.D. Cal. 2006) ................................................................................11

*CITA – The Wireless Ass'n v. City of Berkeley*,
   928 F.3d 832 (9th Cir. 2019) ................................................................................................10

*Cnty. of Santa Clara v. Trump*,
   250 F. Supp. 3d 497 (N.D. Cal. 2017) ..................................................................................10

*Disney Enters., Inc. v. VidAngel, Inc.*,
   224 F. Supp. 3d 957 (C.D. Cal. 2016) ....................................................................................9

*in Illumina, Inc. v. Qiagen, N.V.*,
   207 F. Supp. 3d 1081 (N.D. Cal. 2016) ..................................................................................4

*Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*,
   964 F.2d 965 (9th Cir. 1992) ......................................................................................... passim

*Nat'l Ass'n of Wheat Growers v. Zeise*,
   309 F. Supp. 3d 842 (E.D. Cal. 2018) ....................................................................................9

*Rubin ex rel. Nat'l Labor Relations Bd. v. Vista Del Sol Health Servs., Inc.*,
   80 F. Supp. 3d 1058 (C.D. Cal. 2015) ....................................................................................7

*Nat'l Steel Car, Ltd. v. Canadian P. Ry., Ltd.*,
   357 F.3d 1319 (Fed. Cir. 2004)...............................................................................................3

*Negrete v. Allianz Life Ins. Co. of N.A.*,
   523 F.3d 1091 (9th Cir. 2008) ................................................................................................4

**TABLE OF AUTHORITIES
CONTINUED**

**Page(s)**

**Cases**

*Perfect 10, Inc. v. Google, Inc.*,
   653 F.3d 976 (9th Cir. 2011) .................................................................................................. passim

*Sierra Club v. Trump*,
   379 F. Supp. 3d 883 (N.D. Cal. 2019) .................................................................................7, 8

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
   507 F. Supp. 2d 1096 (C.D. Cal. 2007) ...................................................................................11

*Trump v. Int'l Refugee Assistance Project*,
   137 S. Ct. 2080 (2017).............................................................................................................9

*Washington Capitols Basketball Club, Inc. v. Barry*,
   304 F. Supp. 1193 (N.D. Cal. 1969) .......................................................................................11

*Winter v. Nat'l Resources Defense Council, Inc.*,
   555 U.S. 7 (2008).................................................................................................................4, 7

**Other Authorities**

Fed. R. Civ. P. 65(c) ........................................................................................................................11

I.      INTRODUCTION

Niantic, Inc. ("Niantic") claims that Defendants are liable for allegedly spoofing video games that Niantic creates and sells. Niantic has asked this Court to take the drastic and extraordinary step of entering a preliminary injunction before adjudicating these claims' merits.

Niantic's Motion for Preliminary Injunctive Relief should be denied.  Niantic bears the burden of persuading this Court that it is likely to succeed on the merits of its claim. But Global++ software does not create any derivative works from Niantic's copyrightable material. It creates nothing with any physical form that can be sold and does not alter Niantic's games' source code. Global++ users were required to pay Niantic for their use of Niantic's products just like all other users. Indeed, Niantic's past conduct suggests that Niantic profits handsomely from the additional users accessing Niantic's games through spoofing software like Global++: in 2018, Niantic temporarily suspended Defendants' user accounts on Niantic's servers, but quickly reactivated them once revenue from its own games dropped. As a result, Niantic cannot show that it will succeed at trial.

In addition, Niantic has not shown (and cannot show) that it faces likely irreparable harm if an injunction does not issue. Global++ games have been taken offline, and if they were to restart, Niantic has the power to immediately and unilaterally shut them down again by terminating certain user accounts, just like it did in 2018. Moreover, many other spoofer games are still on the market, yet Niantic has taken no action against them, such that, as a result, even if this Court enters the injunction Niantic requests, no alleged harm to Niantic would be prevented. Thus, under Ninth Circuit law, Niantic cannot meet its burden to prove irreparable harm, and its motion should be denied. *See Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011).

II.     BACKGROUND

Niantic asserts six claims against Defendants. All of these claims are based on Niantic's allegation that Global++ distributes "unauthorized derivative versions" of video games that Niantic creates and sells. ECF No. 1 ¶ 3. As Defendants Ryan Hunt and Alen Hundur have explained in their motion to dismiss, most of Niantic's allegations concern Defendant Global++, but Global++ is a nonentity that cannot sue or be sued. *See* ECF No. 26 pp. 4-5. Niantic makes

1  only vague and conclusory allegations against Mr. Hunt and Mr. Hundur individually. *Id.* at 6.

2  More problematically, however, Niantic misrepresents the basic nature of Global++
3  software. Global++ software "creates nothing with any physical form that can be sold." Hunt
4  Decl. ¶ 5.[1] It does not alter the the software of Niantic's game nor the data that Niantic's game
5  creates. *Id.* at ¶ 6. Instead, it merely supplements the Niantic game's visual display by
6  manipulating the GPS information that a user's mobile device supplies to the game. *Id*. It does so
7  without supplanting demand for the game itself. *Id.* at ¶ 7. While Global++ users were invited to
8  support its creators, they were required to pay for Niantic's products just like all other users of
9  those products. *Id.* at ¶ 8.

10  At least eight other spoofers of Niantic's games operate similar software to Global++. *Id.*
11  at ¶ 9.

- iSpoofer, which is the largest Pokemon Go spoofing hack, has developers in the United Kingdom and Australia, and Niantic's code and iSpoofer's hack are available directly on iSpoofer's website. iSpoofer offers subscriptions for paid services, and it offers a nonpublic edition of Niantic's Harry Potter game. *Id.* at ¶ 9(a).
- iTools is a desktop application that allows users to modify their GPS position in Pokemon Go. It also sends users notifications about nearby Pokemon. iTools is a direct competitor to iSpoofer. *Id.* at ¶ 9(b).
- iPotter, which is a GPS spoofing application for Niantic's Harry Potter game. It includes an in-game map which shows landmarks that are important for gameplay and allows users to spoof anywhere in the world. iPotter maintains a Discord dedicated to support and helping users download their IPA. *Id.* at ¶ 9(c).
- Webspoof, which is an open-sourced software available on GitHub for users around the world. It also allows users to spoof their locations on Pokemon Go from Apple computers. It has been "starred" more than 2,100 times and "forked"

---

[1] The Declaration of Ryan Hunt is attached hereto as Exhibit A.

more than 250 times. *Id.* at ¶ 9(d).

- FlyGPS is an Android equivalent to iSpoofer. It allows spoofing for Android devices and includes features that allow users to run automatically and engage in joystick abilities. *Id.* at ¶ 9(e).
- Other spoofers include iPogo, LazyGo, and an unknown build for a Pokemon Go spoof available at buildstore.io. *Id.* at ¶ 9(f).

These spoofers previously competed with Global++ software, but since Global++ was shut down in June, they have seen increases and both users and revenue. Niantic has taken no action against any of these companies.

As Niantic admits in its opening brief, it has known about Global++ software since at least 2018. *Id.* at ¶ 10. In that year, Niantic identified user accounts associated with Global++ creators and suspended those accounts to immediately halt Global++ software from operating. *Id*. It then permitted those accounts to resume operating, and Global++ software began operating again. *Id.* at ¶ 11. Niantic's revenue from its games decreased during the time those accounts were suspended, but quickly rebounded once access was restored. *Id*.

After implicitly permitting Global++ to continue operating for over a year, Niantic sent Defendants a cease-and-desist letter earlier this year. *Id.* at ¶ 12. Global++ software was shut down immediately after Defendants received that letter, and it has not been restarted. *Id.* at ¶ 13. Other spoofers of Niantic's games continue to operate, however, and, upon information and belief, those spoofers have seen increased traffic since Global++ has been shut down because Global++ users are migrating to them. *Id.* at ¶¶ 7, 14.

### III.   LEGAL STANDARD

"A preliminary injunction is a drastic and extraordinary remedy . . . ." *Nat'l Steel Car, Ltd. v. Canadian P. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004) (*quoted in Illumina, Inc. v. Qiagen, N.V.*, 207 F. Supp. 3d 1081, 1087 (N.D. Cal. 2016)). It "may be awarded only if the plaintiff clearly shows entitlement to [its requested] relief." *Am. Beverage Ass'n v. City and Cnty. of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019).

> A plaintiff seeking preliminary injunctive relief must establish that he is likely to succeed on the merits that he is likely to suffer irreparable harm in the absence of a preliminary injunction, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Winter v. Nat'l Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (internal quotation marks omitted). These "factors are, at least in part, fact-dependent . . . ." *BOKF, NA v. Estes*, 923 F.3d 558, 565 (9th Cir. 2019). But "[a] district court abuses its discretion in issuing a preliminary injunction if its decision is based on . . . clearly erroneous factual findings." *Negrete v. Allianz Life Ins. Co. of N.A.*, 523 F.3d 1091, 1096 (9th Cir. 2008).

## IV. ARGUMENT

Niantic is not likely to prevail on the merits of its claims because Global++ has not created any derivative work of Niantic's games. In addition, Niantic faces no immediate threat of irreparable harm. Global++'s software has been shut down; if it restarts, Niantic can shut it down again without this Court's assistance by terminating the user accounts associated with Global++, just like Niantic did last year. Niantic's proposed injunction also fails to prevent the harm it identifies because other spoofers are still spoofing Niantic's games just like Global++'s software did previously. The balance of equities and the public interest also weigh against a preliminary injunction. This Court should therefore deny Niantic's motion because Niantic has failed to carry its burden of persuasion. If the Court were going to grant Niantic's motion, it should impose a significant bond requirement.

### A. Niantic has little chance of success on the merits because Global++ software does not create any derivative work.

A party seeking a preliminary injunction must show "a probability of fifty-one percent or more" that it will ultimately prevail at trial. *Illumina*, 207 F. Supp. 3d at 1087. Here, Niantic cannot make this showing. All of Niantic's claims are based on its allegations that Global++'s software creates derivative works of Niantic games, and in order to be a derivative work, the allegedly infringing material "must incorporate a protected work in some concrete or permanent form." *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 964 F.2d 965, 967 (9th Cir. 1992).

-4-

1  Niantic cannot prevail because Global++'s software does not create any derivative work of
2  Niantic's copyrighted software.

3       In *Galoob*, a toymaker produced a device called a "Game Genie" that allowed video
4  game users "to alter up to three features of a Nintendo game." *Id*. It functioned "by blocking the
5  value for a single data byte sent by the game cartridge to the central processing unit in the
6  Nintendo Entertainment System and replacing it with a new value." *Id*. "If that value controls the
7  [game] character's strength, for example, then the character can be made invincible by increasing
8  the value sufficiently." *Id*.

9       Nintendo sued the Game Genie's creator for copyright infringement and sought a
10 preliminary injunction. *Id*. The district court denied the injunction request, and Nintendo
11 appealed. *Id*.

12      The Ninth Circuit affirmed the district court's ruling because the Game Genie created no
13 derivative work. Critically, the Game Genie "does not alter the data that is stored in the game
14 cartridge." *Id*. Instead, it "merely enhances the audiovisual displays (or underlying data bytes)
15 that originate in Nintendo game cartridges. The altered displays do not incorporate a portion of a
16 copyrighted work in some concrete or permanent *form*." *Id.* at 968. The Court contrasted those
17 facts to a case in which "ceramic tiles *physically* incorporated the copyrighted works in a form
18 that could be sold." *Id*. But altering a user's experience of playing a video game created no such
19 commercial product. *Id.* at 969.

20      The Court also ruled that the Game Genie did not "supplant demand for Nintendo game
21 cartridges." *Id*. Even if the Game Genie's maker profited from the device's sales, "a family's use
22 of a Game Genie for private home enjoyment must be characterized as a non-commercial,
23 nonprofit activity." *Id.* at 970 (internal quotation marks omitted).

24           Consumers are not invited to witness Nintendo's audiovisual displays free
25           of charge, but, once they have paid to do so, the fact that the derivative
26           works created by the Game Genie are comprised almost entirely of
27           Nintendo's copyrighted displays does not militate against a finding of fair
28           use.

-5-

1  *Id.* at 971. The Game Genie therefore did not cause "any harm to the present market for
2  [Nintendo's] video games and [Nintendo] has failed to establish the reasonable likelihood of a
3  potential market for slightly altered versions of the games at suit." *Id.* (internal quotation marks
4  omitted).
5        The Ninth Circuit's reasoning in *Galoob* is precisely on point here. The Global++
6  software "creates nothing with any physical form that can be sold." Hunt Decl. ¶ 5. Like the
7  Game Genie, Global++ software does not alter the data that Niantic's game creates. *Id.* at ¶ 6.
8  Instead, it merely enhances a Niantic game's display by manipulating the GPS information that a
9  user's mobile device supplies to the game. *Id*. Altering a user's experience without altering the
10 game itself is not a basis for copyright infringement. *See Galoob*, 964 F.2d at 968.
11       It is also important under the Ninth Circuit's reasoning in *Galoob* that Global++ software
12 alters a game user's experience without supplanting demand for the game itself. Hunt Decl. at ¶
13 7. While Global++ users were invited to support its developers, they were required to pay for
14 Niantic's products just as all other users of those products. Hunt Decl. at ¶ 8. In fact, Global++
15 software directs additional users to Niantic's games, and Niantic profits substantially from each
16 such user. *Id.* at ¶ 7. Many users who have limited mobility, live in rural areas, or suffer from a
17 physical disability that prohibits them from being able to walk, and, as a result, can only play
18 Niantic's games through spoofing software. *Id*. For example, when a Niantic-focused account
19 posted about this lawsuit on social media under the headline "The Global downfall of ++
20 Tweaked apps!," users commented to complain that their usage would be curtailed and that
21 Niantic "may actually lose money in the long run since people who do use tweaked versions still
22 pay for everything." *Id*.
23       Global++ software therefore does not cause any harm to the present market for Niantic's
24 games, and Niantic has failed to establish the reasonable likelihood of a potential market for
25 tweaked versions of its games. Niantic is thus unlikely to succeed on the merits, and this Court
26 should deny its preliminary injunction request. *See Galoob*, 964 F.2d at 971.
27       **B.**    **Niantic faces no immediate threat of irreparable harm.**
28       In this case, Niantic cannot show that Global++ games pose any threat of irreparable

1  harm to Niantic. Global++ games are no longer operating; if they restart, Niantic has the ability
2  to immediately shut them down by suspending certain user accounts, just as Niantic did in 2018.
3  In addition, issuing the injunction Niantic requests would not prevent the harm Niantic alleges
4  because several other products spoofing Niantic's games remain on the market. *See Perfect 10,*
5  *Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011). As a result, Niantic has failed to meet its
6  burden to show irreparable harm, and this Court should deny its request for a preliminary
7  injunction.

        **1.     Global++ games are not operating, so they pose no threat of harm to Niantic.**

10  "A likelihood of success on the merits is not, on its own, sufficient basis for the grant of a
11  preliminary injunction." *BOKF*, 923 F.3d at 558. A plaintiff also bears the burden of showing
12  "that he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555
13  U.S. at 20. In particular, the threatened injury must be "*likely* in the absence of an injunction."
14  *Trump*, 379 F. Supp. 3d at 959 (*citing Winter*, 55 U.S. at 22). "Speculative or possible injury is
15  not enough." *Id.* (internal quotation marks omitted). The threatened harm must also be
16  irreparable; if the harm perceived can be compensated by damages, no injunction can issue. *See*
17  *Rubin ex rel. Nat'l Labor Relations Bd. v. Vista Del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058,
18  1074 (C.D. Cal. 2015).

19  Niantic cannot make either of these showings. Global++'s developers shut down all of its
20  programs as soon as Defendants received a cease-and-desist letter from Niantic. Hunt Decl. at ¶¶
21  12-13. They have not been restarted. *Id.* at ¶ 13. Global++ software thus poses no threat of injury
22  to Niantic.

23  Even if Global++ were restarted, however, Niantic can immediately shut it down by
24  simply suspending Global++'s creators' user accounts. *Id.* at ¶ 10. Niantic has identified which
25  user accounts are associated with Global++ users. *Id*. It has demonstrated its ability to
26  immediately halt Global++ software from operating by suspending certain user accounts—
27  Niantic did so in 2018. *Id.*[2] Thus, even if Global++ software were to resume operations, Niantic

---

[2] Niantic knew about Defendants' allegedly-infringing activities since at least 2018, when it

-7-

1  could shut it down at any time, as it has in the past. *Id*. That is, Niantic does not need this

2  Court's intervention to prevent any injury from Global++ software. It exercises total control over

3  whether and to what degree Global++ harms it. Niantic therefore cannot meet its burden to show

4  that irreparable harm is likely absent an injunction, and this Court should deny Niantic's motion.

           **2.      Ordering the relief Niantic requests will not prevent the harm it
                     alleges.**

7          A plaintiff seeking an injunction must also "present some persuasive counterfactual

8  analysis showing a likelihood that irreparable harm would occur absent an injunction, but would

9  not occur if an injunction is granted." *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 925 (N.D. Cal.

10 2019). This requires proof of a causal connection between any alleged harm and the activities

11 targeted by the proposed injunction. *See Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th

12 Cir. 2011).

13         In *Perfect 10*, a pornography website, which "generated virtually all of its revenue" from

14 copyrighted images, sued Google for permitting its search engine users to find those images

15 without charge. *Id.* at 978. The website sought to enjoin Google from directing users to the

16 website's images. *Id*. The district court denied the website's request, and the website appealed.

17 *Id.* at 979.

18         The Ninth Circuit affirmed the district court's ruling in large part because, even if the

19 website could show that it was failing financially due to Google's activities, the website "has not

20 established that the requested injunction would forestall that fate." *Id.* at 982. "[S]earch engines

21 other than Google contribute to making [the website's] images freely available." *Id*. Even if the

22 Court entered an order exactly as the website requested, other search engines would provide

23 users the same access to the website's images. *Id*. The website could not meet its burden to show

---

25 suspended their user accounts. Hunt Decl. ¶ 10. Its failure to pursue the claims it asserts in this
   action is, in itself, a reason to deny Niantic's motion. *Benisek v. Lamone*, 138 S. Ct. 1942, 1944
26 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable
   diligence."); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 877 F. Supp. 2d 838, 913 (N.D. Cal. 2012)
27 (*rev'd on other grounds*, 695 F.3d 1370 (9th Cir. 2012)) ("[A] prolonged or undue delay in
   bringing suit or seeking a preliminary injunction is an important factor bearing on the need for a
28 preliminary injunction.").

irreparable harm because it could not show that the injury would not occur absent its proposed injunction. *Id*. Without a "sufficient causal connection between irreparable harm to [the website's] business and Google's operation of its search engine," no injunction could issue. *Id*.

The same is true here. Global++ games were just one of numerous spoofs available to Niantic's users. Hunt Decl. at ¶ 9. Global++ has shut its software down, but at least eight other spoofers are still operating. *Id*. Many of these spoofers provide users with services nearly identical to the location-spoofing features in Global++ software. *See id.* at ¶¶ 9(a)-(e). Indeed, those other sites have seen increased traffic and revenue since Global++ shut down, suggesting that Global++ users are merely switching from Global++ software to others'. *Id.* at ¶ 7. Even if this Court were to order all the relief Niantic requests, other spoofers will continue to provide users the same access to Niantic's games as Global++ provided before its servers were shut down in June. There is therefore no sufficient causal connection between the alleged irreparable harm and Global++'s now-ceased operation of its software. *See Perfect 10*, 653 F.3d at 982. Niantic cannot meet its burden of persuasion, and this Court should deny its motion for a preliminary injunction.

**C.     The balance of equities also weighs strongly against granting Niantic's motion.**

Because "[c]rafting a preliminary injunction is an exercise of discretion and judgment, [it is] often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). "To determine the balance of equities, the court must 'balance the interests of all parties and weigh the damage to each.'" *Nat'l Ass'n of Wheat Growers v. Zeise*, 309 F. Supp. 3d 842, 853 (E.D. Cal. 2018) (*quoting Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009)). A preliminary injunction "*may not issue* unless the balance of hardships tips sharply in favor of the moving party." *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 977 (C.D. Cal. 2016) (emphasis added).

Here, the balance of equities weighs strongly against a preliminary injunction. As explained above, Global++ software creates no derivative work and thus does not infringe on any

-9-

1  Niantic copyright. *See* Hunt Decl. at ¶ 5. It does not alter Niantic's source code or supplant

2  demand for Niantic's games. *See id.* at ¶¶ 6-7. Moreover, Global++ software was shut down

3  immediately after Defendants received Niantic's cease-and-desist letter and has not been

4  restarted. *Id.* at ¶ 13. Niantic therefore will receive no benefit from an injunction.

5       By contrast, an injunction will impose severe reputational harm on Defendants.

6  Defendants are individuals and entrepreneurs, and they depend on their reputation for their

7  livelihood. Being named as defendants in a federal lawsuit—and the related negative publicity

8  Niantic's online supporters have generated—has already injured their reputation unfairly.

9  Granting Niantic's motion would only exacerbate that injury. The equities thus weigh against

10 granting Niantic's motion.

11      **D.**    **An injunction serves no public interest.**

12      "The public interest inquiry primarily addresses impact on non-parties rather than

13 parties." *CITA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019)

14 (internal quotation marks omitted). "It embodies the Supreme Court's direction that, in

15 exercising their sound discretion, courts of equity should pay particular regard for the public

16 consequences in employing the extraordinary remedy of injunction." *Id.* (internal quotation

17 marks omitted). The party seeking the injunction bears the burden of proving that an injunction

18 would serve some public interest. *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539 (N.D.

19 Cal. 2017).

20      In this case, no public purpose would be served by entering a preliminary injunction. As

21 set forth above, Global++ software has been shut down. Hunt Decl. at ¶ 13. Niantic argues that

22 an injunction would serve the public interest by "discourag[ing] defendants and copycat

23 violators." ECF No. 7 at 20. Yet, this stated purpose is negated by Niantic's own actions in

24 selectively bringing suit against Defendants, while taking no action against the numerous other

25 spoofing companies, as detailed above. Niantic has therefore failed to meet its burden to show

26 that a preliminary injunction is in the public interest, and this Court should deny its motion.

27

28

### E. Even if this Court were to enter a preliminary injunction, it should require a substantial bond.

Under Fed. R. Civ. P. 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "The main purpose of the injunction bond is to safeguard defendants from costs and damages incurred as the result of a preliminary injunction improvidently granted." *Washington Capitols Basketball Club, Inc. v. Barry*, 304 F. Supp. 1193, 1203 (N.D. Cal. 1969). Although "[d]istrict courts have properly disposed of the bond requirement under limited circumstances," *Bowen v. Consol. Elec. Distribs., Inc. Emp. Welfare Benefit Plan*, 461 F. Supp. 2d 1179, 1186 (C.D. Cal. 2006), "the Court retains discretion to require a bond when the party seeking the injunction has not offered evidence of its own harm in posting a bond." *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1116 (C.D. Cal. 2007).

If this Court were to enter a preliminary injunction in this case, it should require Niantic to post a substantial bond of at least a million dollars. As explained above, Niantic's claims all depend on its ability to prove that Global++ software creates a derivative work. Under binding Ninth Circuit precedent, a derivative work "must incorporate a protected work in some concrete or permanent form." *Galoob*, 964 F.2d at 967. But Global++ software "creates nothing with any physical for that can be sold." Hunt Decl. at ¶ 5. It merely enhances a Niantic game's visual display without supplanting demand for the game itself. *Id.* at ¶¶ 6-7. Niantic has profited handsomely from expanded user access to Niantic games that Global++ software creates. *Id.* at ¶ 7. Niantic therefore has little chance of success, and Defendants are entitled to a safeguard against their losses. *See Washington Capitols*, 304 F. Supp. at 1203.

Niantic has also failed to assert—let alone prove—that it cannot post a substantial bond. Niantic is a large corporation "founded . . . as a startup within Google" and eventually spun off. *See Niantic*, The Niantic Story, https://nianticlabs.com/about/ (last visited July 31, 2019).[3] It

---

[3] The Niantic Story is attached hereto as Exhibit B.

began with $35 million in Series-A funding and partnerships with The Pokemon Company Group, Google, and Nintendo. *Id*. Its current games include "the most popular augmented reality app of all time, and the most profitable," generating over $1 billion in revenue. *Id*. There is no reason Niantic cannot provide the security that Rule 65 requires.

## V. CONCLUSION

Accordingly, Defendants respectfully request the Court deny Plaintiff's Motion for Preliminary Injunctive Relief.

Dated:  July 31, 2019

Respectfully Submitted,

POLSINELLI LLP

By:  */s/ Fabio E. Marino*
     Fabio E. Marino

Attorneys for Defendants
RYAN HUNT AND ALEN HUNDUR