Julie E. Schwartz, Bar No. 260624
JSchwartz@perkinscoie.com
Perkins Coie LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300
Facsimile: 650.838.4350

Todd M. Hinnen (admitted *pro hac vice*)
THinnen@perkinscoie.com
Ryan Spear (admitted *pro hac vice*)
RSpear@perkinscoie.com
Perkins Coie LLP
1201 Third Ave., Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for Plaintiff Niantic, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NIANTIC, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>GLOBAL++, an unincorporated association; RYAN HUNT, a.k.a. "ELLIOTROBOT," an individual; ALEN HUNDUR, a.k.a. "IOS N00B," an individual; and DOES 1-20,<br><br>Defendants. | Case No. 19-cv-03425-JST<br><br>**NIANTIC, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**<br><br>**Date:** September 11, 2019<br>**Hearing Time:** 2:00 p.m.<br>**Courtroom:** 6, 2nd Floor (Oakland)<br>**Judge:** Hon. Jon S. Tigar |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ............................................................................................................. 1

III. ARGUMENT .................................................................................................................. 2

    A. Defendants Concede that Niantic Is Entitled to a Preliminary Injunction Based on Its Non-Copyright Claims ................................................................. 2

    B. Niantic Is Entitled to a Preliminary Injunction Based on Its Copyright Claim ................................................................................................................ 3

        1. Niantic is likely to succeed on the merits of its copyright claim ............... 3

            a. *Galoob* does not foreclose Niantic's copyright claim .................... 3

            b. Defendants cannot raise a fair use defense .................................... 5

            c. Defendants' "implicit permission" theory is also meritless ........... 6

        2. Absent a preliminary injunction, defendants' infringement will continue to cause irreparable harm to Niantic ........................................... 7

            a. A preliminary injunction would be appropriate and necessary even if defendants had stopped their unlawful conduct ......................................................................................... 7

            b. A preliminary injunction is appropriate and necessary even if others are also violating Niantic's copyrights ............................. 9

            c. Niantic did not unreasonably delay bringing its claims ................ 10

        3. The balance of hardships tips sharply in Niantic's favor .......................... 11

        4. The public interest favors preliminary injunctive relief ............................ 11

    C. No Bond Should Be Required ........................................................................... 11

IV. CONCLUSION ............................................................................................................ 12

# TABLE OF AUTHORITIES

Page

**CASES**

*Angeles v. U.S. Airways, Inc.*,
   No. C 12-05860 CRB, 2013 WL 622032 (N.D. Cal. Feb. 19, 2013)..........................................2

*Apple, Inc. v. Psystar Corp.*,
   673 F. Supp. 2d 931 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011)............................4

*Arc of Cal. v. Douglas*,
   757 F.3d 975 (9th Cir. 2014)....................................................................................................11

*Comet Techs. U.S. of Am. Inc. v. Beuerman*,
   No. 18-CV-01441-LHK, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ................................12

*Domain Name Comm'n Ltd. v. DomainTools, LLC*,
   No. C18-0874RSL, 2018 WL 4353266 (W.D. Wash. Sept. 12, 2018)......................................9

*F.T.C. v. Affordable Media, LLC*,
   179 F.3d 1228 (9th Cir. 1999)....................................................................................................9

*Facebook, Inc. v. Wallace*,
   No. C-09-00798-JF, 2009 WL 840391 (N.D. Cal. Mar. 24, 2009) ...........................................3

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009)..................................................................................................11

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*,
   964 F.2d 965 (9th Cir. 1992)........................................................................................3, 4, 5, 6

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   886 F.3d 803 (9th Cir. 2018)....................................................................................................10

*Nexon Am. Inc. v. S.H.*,
   No. CV 10-9689 PA, 2011 WL 13217951 (C.D. Cal. Dec. 13, 2011) ......................................4

*Perfect 10, Inc. v. Google, Inc.*,
   653 F.3d 976 (9th Cir. 2011)....................................................................................................10

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*,
   793 F.2d 1132 (9th Cir. 1986)....................................................................................................9

*Polymer Techs., Inc. v. Bridwell*,
   103 F.3d 970 (Fed. Cir. 1996)..................................................................................................10

*RoDa Drilling Co. v. Siegal*,
   552 F.3d 1203 (10th Cir. 2009)................................................................................................11

# TABLE OF AUTHORITIES
(continued)

**Page**

*S.E.C. v. Koracorp Indus., Inc.*,
  575 F.2d 692 (9th Cir. 1978) ......................................................................................................9

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
  802 F. Supp. 2d 1125 (C.D. Cal. 2011) ......................................................................................2

*Take-Two Interactive Software, Inc. v. Zipperer*,
  No. 18 Civ. 2608 (LLS), 2018 WL 4347796 (S.D.N.Y. Aug. 16, 2018) ....................................9

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
  507 F. Supp. 2d 1096 (C.D. Cal. 2007) ..............................................................................3, 6, 8

*Wall Data Inc. v. L.A. Cty. Sheriff's Dep't*,
  447 F.3d 769 (9th Cir. 2006) ......................................................................................................6

*Wash. Capitols Basketball Club, Inc. v. Barry*,
  304 F. Supp. 1193 (N.D. Cal. 1969) ........................................................................................11

**STATUTES**

17 U.S.C. § 107 ..................................................................................................................................6

Computer Fraud and Abuse Act .............................................................................................1, 2, 3

Copyright Act ..........................................................................................................................1, 2, 5

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65(c) ........................................................................................................................11

## I. INTRODUCTION

Niantic's motion for preliminary injunctive relief ("PI Motion") asks this Court to enjoin defendants from violating Niantic's rights under the Copyright Act, the Computer Fraud and Abuse Act, and Niantic's Terms of Service. In their opposition ("PI Opposition"), defendants address only the first claim. Defendants therefore concede that Niantic is entitled to relief based on its non-copyright claims, and the Court should grant Niantic's motion on that ground alone.

With respect to Niantic's copyright claim, defendants do not deny that they copied, modified, and distributed copyrighted code from Niantic's mobile applications ("apps"). Instead, hoping to muddy the waters, they mischaracterize Niantic's claims and rely heavily on cases that do not apply or do not support their arguments. Defendants also argue that the Court should deny Niantic's PI Motion because they are not currently infringing Niantic's rights—even though it appears that defendants continue to distribute at least one (and perhaps all three) of their infringing programs through a new outlet, and even though defendants offer no assurances that they will obey the law in the future. Those arguments fail, and defendants' remaining arguments are equally irrelevant, incorrect, or both. Niantic's PI Motion should be granted in its entirety.

## II. BACKGROUND

As explained in Niantic's PI Motion, Niantic's mobile apps contain copyrighted code that Niantic refers to as its "Client Code." Defendants steal the Client Code and use it to create, distribute, and profit from "hacked" versions of Niantic's apps that enable cheating in Niantic's games (the "Cheating Programs"). To do so, defendants download legitimate copies of Niantic's apps, "circumvent technical security measures designed to protect" the Client Code, and copy the Client Code "without Niantic's permission." Decl. of Eric Lanz ("Lanz Decl.") ¶¶ 24-25 (Dkt. 7-2). Defendants then "disabl[e] specific pieces of code" in Niantic's Client Code and "add[] their own code" to the Client Code, thereby creating the Cheating Programs. *Id.* ¶ 25. Defendants do not dispute those key facts. They also do not dispute that the Cheating Programs undermine the integrity of Niantic's games, drive honest players away from Niantic's games, and enable defendants to obtain unauthorized access to Niantic's computers and steal valuable data. *See* Decl. of Scot Frank ("Frank Decl.") ¶¶ 19-21 (Dkt. 7-4); Lanz Decl. ¶ 51. Defendants do argue

that Niantic will not suffer further harm from their misconduct because the Cheating Programs were "taken offline" after Niantic sent defendants a cease-and-desist letter. PI Opp. at 1. But in fact, it appears that defendants continue to distribute at least one of the Cheating Programs (and perhaps all three of the Cheating Programs) through a new online platform—the AppHaven app. *See* Second Decl. of Eric Lanz ("Second Lanz Decl.") ¶¶ 14-20.

Defendants nevertheless argue that Niantic's PI Motion should be denied. Their arguments are meritless for the reasons below.

### III.   ARGUMENT

#### A.   Defendants Concede that Niantic Is Entitled to a Preliminary Injunction Based on Its Non-Copyright Claims

Defendants argue at length that Niantic is not entitled to a preliminary injunction based on its claim under the Copyright Act. *See, e.g.*, PI Opp. at 4-10; *see also id.* at 11 (wrongly arguing that "Niantic's claims all depend on its ability to prove that Global++ software creates a derivative work"). But Niantic's PI Motion also seeks relief under the Computer Fraud and Abuse Act ("CFAA") and Niantic's Terms of Service—neither of which depends on proof of infringement. Defendants simply ignore those distinct and independent claims. Defendants therefore concede that Niantic's non-copyright claims, and the undisputed evidence that Niantic has submitted in support of them, justify a preliminary injunction. *See Angeles v. U.S. Airways, Inc.*, No. C 12-05860 CRB, 2013 WL 622032, at *4 (N.D. Cal. Feb. 19, 2013) ("The failure to respond amounts to a concession.") (collecting cases); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) (same) (collecting cases).

Nor could defendants credibly argue otherwise. The undisputed evidence shows that defendants violated the CFAA by using the Cheating Programs to access Niantic's servers without authorization and thereby obtaining valuable game-related data. *See* Frank Decl. ¶ 25; Lanz Decl. ¶¶ 49-53; PI Mot. at 11-13. It also shows that defendants violated Niantic's Terms of Service by, among other things, exploiting Niantic's games for commercial purposes. *See* Decl. of Steven VanDeBogart ¶¶ 14-17 (Dkt. 7-7); PI Mot. at 15-16. In addition, the undisputed evidence shows that defendants' violations of the CFAA and Niantic's Terms of Service will continue

1  harming Niantic in distinct and irreparable ways, including by burdening Niantic's servers and
2  enabling theft of Niantic's data. *See* Frank Decl. ¶ 25; Lanz Decl. ¶ 51. And, finally, because
3  defendants' misconduct harms Niantic and its users, the balance of hardships and the public
4  interest favor preliminary relief. *See Facebook, Inc. v. Wallace*, No. C-09-00798-JF, 2009 WL
5  840391, at *2 (N.D. Cal. Mar. 24, 2009) (preliminary injunction based on CFAA claim);
6  *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1110 (C.D. Cal. 2007) (same,
7  based on breach of terms of service).

8      In short, Niantic's non-copyright claims justify preliminary relief, and defendants do not
9  argue otherwise. The Court could and should grant Niantic's PI Motion for that reason alone.

10     **B.**    **Niantic Is Entitled to a Preliminary Injunction Based on Its Copyright Claim**
11         **1.**    **Niantic is likely to succeed on the merits of its copyright claim**

12     The bulk of defendants' brief argues that Niantic's copyright claim fails for a number of
13 reasons. None of those arguments is persuasive.

14         **a.**    ***Galoob*** **does not foreclose Niantic's copyright claim**

15     Defendants' main argument is that Niantic cannot succeed on the merits of its copyright
16 claim under *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.* ("*Galoob*"), 964 F.2d 965 (9th
17 Cir. 1992). *See* PI Opp. at 4-6. Defendants misunderstand Niantic's claim and misread *Galoob*.

18     In *Galoob*, Nintendo sued Galoob Toys, maker of the "Game Genie." The Game Genie
19 was a hardware device that sat between Nintendo's game cartridges (which contained the
20 software code for Nintendo's copyrighted games) and Nintendo's game console (which enabled
21 users to play Nintendo's games). *Galoob*, 964 F.2d at 967. It enabled users to alter the game-
22 playing experience, including the speed at which Nintendo's games were played. *See id*. The
23 Game Genie did not contain any of Nintendo's copyrighted code. Instead, the Game Genie
24 worked "by blocking the value for a single data byte sent by the game cartridge to the central
25 processing unit in the Nintendo [game console] and replacing it with a new value." *Id*. That, in
26 turn, altered the audiovisual display of the game as experienced by the player. *See id*. at 968.

27     Nintendo argued that the altered audiovisual displays were unauthorized derivative works
28 based on its copyrighted games. *See id*. The Ninth Circuit disagreed for two reasons. First, a

1  derivative work "must incorporate a protected work in some concrete or permanent 'form,'" *id*. at

2  967, and the "Game Genie merely enhance[d] the audiovisual displays . . . that originate[d] in

3  Nintendo game cartridges"; it did not "incorporate a portion of [Nintendo's] copyrighted work in

4  some concrete or permanent *form*." *Id*. at 968. Second, the Ninth Circuit found that the Game

5  Genie did not "supplant demand for Nintendo's game cartridges." *Id*. at 969.

6  According to defendants, *Galoob*'s reasoning applies equally to Niantic's copyright claim

7  and therefore bars Niantic's claim in its entirety. Defendants are incorrect for three reasons.

8  First, unlike in *Galoob*, in this case Niantic has established that defendants create

9  concrete, permanent works that incorporate a portion of a copyrighted work. Undisputed evidence

10 shows that defendants modify Niantic's Client Code and then combine the Client Code with

11 defendants' code to create the Cheating Programs. *See* Lanz Decl. ¶¶ 24-25, 37-48; PI Mot. at 8,

12 12-13. By modifying Niantic's copyrighted code, and by incorporating it into their programs,

13 defendants create derivative works. *See Nexon Am. Inc. v. S.H.*, No. CV 10-9689 PA (JCx), 2011

14 WL 13217951, *4 (C.D. Cal. Dec. 13, 2011) (defendant created a derivative work by modifying

15 plaintiff's code, including by removing security measures, to enable cheating in plaintiff's

16 computer game); *Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 931, 938 (N.D. Cal. 2009) ("The

17 inclusion of [plaintiff's] copyrighted [software] with [defendant's] additions and modifications

18 makes [defendant's] product an infringing, derivative work."), *aff'd*, 658 F.3d 1150 (9th Cir.

19 2011). Far from altering that conclusion, *Galoob* confirms it. Unlike the audiovisual displays at

20 issue in *Galoob*, defendants' derivative works indisputably "incorporate a portion of a

21 copyrighted work" (Niantic's Client Code) "in some concrete or permanent form" (the Cheating

22 Programs). *Galoob*, 964 F.2d at 968 (emphasis omitted). In other words, defendants' claim that

23 they do not "create . . . derivative works from Niantic's copyrightable material" is demonstrably

24 untrue. PI Opp. at 1. *Galoob* therefore does not help them.[1]

---

[1] Defendants repeatedly insist that the altered audiovisual displays created by the Cheating Programs are "not a basis for copyright infringement" under *Galoob*. PI Opp. at 6. That is beside the point because Niantic's PI Motion does not seek relief based on the altered displays; it seeks relief based on defendants' modification and misuse of Niantic's Client Code. To be clear, however, Niantic reserves the right to argue that the altered displays are unlawful derivative works of Niantic's copyrighted audiovisual works if further discovery supports that argument.

Second, unlike in *Galoob*, in this case Niantic has established that defendants' derivative works supplant demand for Niantic's copyrighted works—specifically, Niantic's legitimate apps. For example, as shown by instructions posted to defendants' (now-defunct) website, users of the Cheating Programs must uninstall Niantic's legitimate apps in order to install and use the Cheating Programs. *See* Second Lanz Decl., Ex. A. Similar instructions appear when users download the Cheating Programs through defendants' new platform, the AppHaven app. *See id.*, Ex. B. Thus, the Cheating Programs literally "supplant" Niantic's apps on users' devices. More broadly, the Cheating Programs supplant Niantic's apps by enabling defendants' customers to play Niantic's games through defendants' "tweaked" versions of the apps rather than through Niantic's authentic versions of those apps. *See* Lanz Decl. ¶ 35. In addition, by replacing Niantic's apps with their own "tweaked" versions, defendants deprive Niantic of profits it would otherwise obtain from in-game purchases made through its legitimate apps, "which are a critical component of Niantic's business model and income stream." Frank Decl. ¶ 21. Thus, defendants' claim that the Cheating Programs do not "supplant[] demand" for Niantic's games is also untrue, and defendants' attempt to analogize to *Galoob* fails on that ground as well. PI Opp. at 2.[2]

Third, *Galoob* addressed only § 106(2) of the Copyright Act, which governs derivative works. *See Galoob*, 964 F.2d at 969. Here, in contrast, Niantic contends not only that defendants violated § 106(2), but also that defendants violated § 106(1) (prohibiting unauthorized copying) and § 106(3) (prohibiting unauthorized distribution). *See* PI Mot. at 12-13; *see generally* Lanz Decl. Thus, even if *Galoob* is relevant to this case (it is not), it is relevant to only one of defendants' acts of infringement.

### b. Defendants cannot raise a fair use defense

In a related vein, defendants suggest that the Cheating Programs pose no harm to the market for Niantic's games, citing portions of *Galoob*'s fair use analysis. *See* PI Opp. at 6. But defendants have not properly asserted a fair use defense, so their throw-away reference to

---

[2] Defendants seem to argue that the Cheating Programs do not supplant demand for Niantic's copyrighted works in part because the Cheating Programs "direct[] additional users to Niantic's games." PI Opp. at 6. But even if the Cheating Programs do lure "additional users" (a claim for which defendants have provided no support), those additional users would be users of the Cheating Programs—not users of Niantic's legitimate apps.

1  *Galoob*'s analysis is irrelevant. *See Ticketmaster*, 507 F. Supp. 2d at 1109 (rejecting fair use
2  defense because the defendant did not provide any "evidence of fair use" or "attempt to explain
3  how its use satisfies any of the four fair use factors") (internal quotation marks omitted).

4        Even if defendants were to assert a fair use defense, it would fail because all the relevant
5  factors favor Niantic. *See* 17 U.S.C. § 107 (fair use factors are: "(1) the purpose and character of
6  the use, including whether such use is of a commercial nature or is for nonprofit educational
7  purposes; . . . (2) the nature of the copyrighted work; . . . (3) the amount and substantiality of the
8  portion used in relation to the copyrighted work as a whole; and . . . (4) the effect of the use upon
9  the potential market for or value of the copyrighted work"). First, "the purpose and character of
10 the use" favors Niantic because defendants did not use Niantic's Client Code "in a different
11 context such that the [Client Code was] transformed into a new creation." *Wall Data Inc. v. L.A.*
12 *Cty. Sheriff's Dep't*, 447 F.3d 769, 778 (9th Cir. 2006). Instead, defendants used the Client Code
13 for "the identical purpose as the original software"—to provide mobile apps—and they did so for
14 their own commercial gain. *Id*. Second, the "nature of the copyrighted work" favors Niantic
15 because Niantic's Client Code is a highly creative work and Niantic invested substantial time,
16 effort, and resources to develop it. *See, e.g.*, Frank Decl. ¶ 12; Lanz Decl. ¶¶ 9-12. Third, "the
17 amount and substantiality of the portion used" favors Niantic because defendants copied and
18 redistributed virtually all of Niantic's Client Code. *See* Lanz Decl. ¶¶ 37-48. Fourth, and finally,
19 "the effect of the use upon the potential market for or value of the copyrighted work" favors
20 Niantic because the Cheating Programs literally replace Niantic's legitimate apps. *See* Second
21 Lanz Decl. ¶ 12, Exs. A, B. The Cheating Programs also directly undermine the market for
22 Niantic's games because, unlike the games at issue in *Galoob*, "Niantic's games are multiplayer
23 games," so enabling cheating in the games "affects all other players and threatens the integrity
24 and commercial viability of Niantic's games." Frank Decl. ¶ 13. In sum, any attempt to invoke
25 the fair use defense in this case would be futile.

26       **c.**    **Defendants' "implicit permission" theory is also meritless**
27       Apart from their arguments based on *Galoob*, defendants also suggest that Niantic cannot
28 succeed on its copyright claim because, at some point in 2018, Niantic suspended Niantic

- 6 -

1  accounts associated with the Cheating Programs (including defendants' accounts) but then
2  reversed those suspensions because they reduced Niantic's revenues. Thus, defendants reason,
3  Niantic "implicitly permitt[ed] Global++ to continue operating for over a year" to make more
4  money. PI Opp. at 3. Defendants do not explain how this argument undermines Niantic's
5  copyright claim. Nor do they offer any support for the notion that the Cheating Programs benefit
6  Niantic financially. They do not. *See, e.g.*, Frank Decl. ¶ 19 (Cheating Programs drive users away
7  from Niantic's games); *id.*, Exs. A-H (customer complaints about the Cheating Programs).

Further, defendants' own evidence contradicts their fanciful theory. According to defendants, the message that they received from Niantic upon suspension of their accounts informed them that, "[o]nce your account has been reinstated, *our expectation is that you will continue to play with the official version of Pokémon GO available only on Google Play and the App Store*." Decl. of Ryan Hunt, Ex. A-7 (Dkt. 32-1) (emphasis added). That message suggests that if defendants' accounts were reinstated, they were reinstated only because the suspensions were temporary and expired as a matter of course—not because reinstatement benefited Niantic. That message also makes clear that Niantic did not "permit" defendants' misconduct; to the contrary, the message clearly warns defendants to cease their misconduct. None of this is surprising because, in fact, Niantic has "never authorized Global++ or the Cheating Programs to operate, implicitly or explicitly," and "Niantic did not reverse or curtail account suspensions or terminations related to Global++ users, defendants, and the Cheating Programs . . . to increase its revenues." Second Decl. of Scot Frank ¶¶ 18, 21 ("Second Frank Decl.").

      **2.**      **Absent a preliminary injunction, defendants' infringement will continue to cause irreparable harm to Niantic**

Defendants also argue that Niantic cannot establish the irreparable harm necessary to justify a preliminary injunction. Those arguments fare no better.

      **a.**      **A preliminary injunction would be appropriate and necessary even if defendants had stopped their unlawful conduct**

As a threshold matter, defendants insist that Niantic will not suffer irreparable harm absent an injunction because they immediately stopped trafficking in the Cheating Programs upon receipt of Niantic's cease-and-desist letter; because they have not "restarted" their infringing

- 7 -

1  activity; and because even "if they restart, Niantic has the ability to immediately shut them down
2  by suspending certain user accounts, just as Niantic [purportedly] did in 2018." PI Opp. at 1, 7.
3  That argument fails for multiple reasons.[3]

4        First, defendants' claims about their conduct are untrue. Defendants did not "shut down"
5  the Cheating Programs "as soon as [they] received a cease-and-desist letter from Niantic." *Id*. at
6  7. To the contrary, defendants released a new version of at least one of the Cheating Programs
7  under the Global++ brand *after* receiving Niantic's letter. *See* Second Lanz Decl. ¶ 13. It is also
8  not true that the Cheating Programs "have been taken offline" and are "no longer operating." PI
9  Opp. at 1. Although defendants are no longer distributing the Cheating Programs through the
10 original Global++ website, it appears that defendants *are* distributing at least one (and perhaps all
11 three) of the Cheating Programs through a new outlet—the AppHaven app. *See* Second Lanz
12 Decl. ¶¶ 14-20.

13       Second, contrary to defendants' argument, Niantic cannot unilaterally "block" the
14 Cheating Programs. "Niantic has been engaged in an ongoing technological 'arms race' with the
15 defendants," and defendants have consistently frustrated Niantic's efforts to prevent the Cheating
16 Programs from undermining Niantic's games. Second Lanz Decl. ¶ 7. For various reasons—
17 including defendants' efforts to obscure their true identities when creating Niantic accounts—
18 "Niantic has never been able to halt the operation of the Cheating Programs exclusively through
19 account suspensions or terminations (or any other form of technological 'self help'). Nor could
20 Niantic do so in the future." Second Frank Decl. ¶ 14; *see also Ticketmaster*, 507 F. Supp. 2d at
21 1115 (rejecting "self-help" argument).

22       Third, even if defendants had suspended their unlawful activity, that would not undermine
23 Niantic's PI Motion. "An inference arises from illegal past conduct that future violations may
24 occur," and the "fact that illegal conduct has ceased does not foreclose injunctive relief." *S.E.C. v.*

---

[3] In making this argument, defendants inadvertently undercut their claim that Global++ is a "nonentity that cannot sue or be sued," PI Opp. at 1, by repeatedly referring to Global++ as a cohesive entity with resources, agents, and a clear purpose. *See, e.g., id.* at 7-8 (referring to "Global++ software," "Global++'s developers," and "Global++'s creators," and arguing, wrongly, that Niantic can control "to what degree Global++ harms" Niantic). Defendants' own descriptions of Global++ therefore make clear that Global++ is an unincorporated association that can be sued, as explained in Niantic's opposition to defendants' motion to dismiss (Dkt. 33).

1   *Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978) (internal citations omitted). Moreover, while "[p]romises of reformation and acts of contrition are relevant in deciding whether an injunction shall issue, . . . courts must be particularly skeptical about attaching any significance to contrition under protest." *Id*. Accordingly, an injunction is appropriate "if there is a possibility of recurrence." *F.T.C. v. Affordable Media, LLC*, 179 F.3d 1228, 1237 (9th Cir. 1999).

Here, defendants have not offered the sort of "promises of reformation" or "contrition" that might be relevant. To the contrary, despite multiple opportunities to reassure the Court that they will not infringe Niantic's rights in the future, defendants have studiously avoided making any such promises. Equally important, defendants' conduct strongly suggests "a possibility of recurrence"—indeed, it appears that they never stopped trafficking in the Cheating Programs. A preliminary injunction is therefore appropriate and necessary. *See, e.g.*, *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135-36 (9th Cir. 1986) (district court abused its discretion by denying request for preliminary injunctive relief where, as here, defendants refused to stop violating plaintiff's rights until plaintiff sued); *Domain Name Comm'n Ltd. v. DomainTools, LLC*, No. C18-0874RSL, 2018 WL 4353266, at *1 n.1 (W.D. Wash. Sept. 12, 2018) ("Defendant's voluntary cessation of the challenged conduct does not make plaintiff's request for an order precluding access moot.") (internal quotation marks and citation omitted); *Take-Two Interactive Software, Inc. v. Zipperer*, No. 18 Civ. 2608 (LLS), 2018 WL 4347796, at *10 (S.D.N.Y. Aug. 16, 2018) (similar).

          **b.**    **A preliminary injunction is appropriate and necessary even if others are also violating Niantic's copyrights**

Defendants also argue that Niantic cannot establish irreparable harm from defendants' infringement because "other spoofers" are engaged in similar infringement. PI Opp. at 8-9. Again, defendants' argument fails.

First, to Niantic's knowledge, at least some of the "other spoofers" identified in the PI Opposition do not provide products similar to the Cheating Programs, do not copy Niantic's code, and/or do not threaten the same kind of harms to Niantic. *See* Second Lanz Decl. ¶¶ 8-9.

1  Defendants offer no evidence to the contrary. Thus, the premise of defendants' argument—that
2  the harm they inflict is the same as the harm inflicted by the "other spoofers"—is incorrect.
3        Second, defendants' argument is legally unsound. Defendants rely exclusively on the
4  Ninth Circuit's decision in *Perfect 10, Inc. v. Google, Inc.* ("*Perfect 10*"), 653 F.3d 976 (9th Cir.
5  2011), to argue that Niantic cannot obtain an injunction unless it would remedy *all* harm caused
6  by *all* infringers. *See* PI Opp. at 9. But *Perfect 10* held only that "[t]here must be a 'sufficient
7  causal connection' between the alleged irreparable harm and the activity to be enjoined." *Nat'l*
8  *Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018). Thus, "a
9  plaintiff need not further show that the action sought to be enjoined is the exclusive cause of the
10 injury," and "[i]t is not an abuse of discretion for a court to issue an injunction that does not
11 completely prevent the irreparable harm that it identifies." *Id.* (internal quotation marks omitted).
12       Here, Niantic's declarations and exhibits document the irreparable harms that defendants
13 have caused and will cause in the future. If the Court preliminarily enjoins defendants, that will
14 remedy at least some (if not all) of those harms. Niantic has therefore established a "'sufficient
15 causal connection' between the alleged irreparable harm and the activity to be enjoined," and a
16 preliminary injunction is appropriate. *Id.* at 823; *cf. Polymer Techs., Inc. v. Bridwell*, 103 F.3d
17 970, 975 (Fed. Cir. 1996) ("The fact that other infringers may be in the marketplace does not
18 negate irreparable harm. A patentee does not have to sue all infringers at once. Picking off one
19 infringer at a time is not inconsistent with being irreparably harmed.").
20       **c.**    **Niantic did not unreasonably delay bringing its claims**
21       Finally, defendants argue that Niantic was not diligent in filing this action. *See* PI Opp. at
22 7-8 & n.2. Defendants are wrong. Upon discovery of the Cheating Programs, Niantic moved to
23 investigate them and to identify and locate defendants and other members of Global++ in order to
24 file this lawsuit. *See* Second Lanz Decl. ¶ 10. That required a significant investment of time and
25 resources, in part because of defendants' efforts to obscure their identities. *See id.*; *see also*
26 Second Frank Decl. ¶¶ 10-12. Where, as here, the movant suffers worsening injuries (more users
27 being driven from the platform) or new injuries (a threat to the launch and early adoption of a
28 new game), "the magnitude of the potential harm becomes apparent gradually" and "waiting to

file for preliminary relief until a credible case for irreparable harm can be made is prudent, rather than dilatory." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990-91 (9th Cir. 2014); *see also e.g.*, *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) (two-year investigation was not dilatory).

### 3. The balance of hardships tips sharply in Niantic's favor

In arguing that the balance of hardships favors them, defendants recycle their arguments related to Niantic's copyright claim. *See* PI Opp. at 9-10. Those arguments fail for the reasons above. Defendants also argue that an injunction will "exacerbate" the reputational harm they have allegedly suffered as a result of this case. *See id*. at 10. But that argument is entirely speculative and unsupported by any evidence. Plus, as a matter of logic, defendants' reputations would not be harmed by an injunction prohibiting the very conduct that they claim to have stopped.

### 4. The public interest favors preliminary injunctive relief

Defendants argue that an injunction would not serve the public interest in this case mainly because "the Global++ software has been shut down." PI Opp. at 10. As explained above, that appears to be untrue and, even if it was true, defendants will likely re-offend in the future. Defendants also seem to argue that the public interests identified by Niantic are pretextual because Niantic has "selectively" sued defendants "while taking no action against . . . numerous other spoofing companies." *Id*. That is wrong. *See* Second Lanz Decl. ¶ 11 (explaining that Niantic is constantly engaged in enforcement efforts, of which this case is just one example).

## C. No Bond Should Be Required

In its PI Motion, Niantic argued that the Court should exercise its discretion under Federal Rule of Civil Procedure 65(c) to "dispense with the filing of a bond" because "there is no realistic likelihood of harm to the defendant[s] from enjoining [their] conduct." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). In response, defendants argue that Niantic should be required to post a bond of "at least a million dollars." PI Opp. at 11.

Defendants acknowledge that the "main purpose of the injunction bond is to safeguard defendants from costs and damages incurred as the result of a preliminary injunction improvidently issued." *Wash. Capitols Basketball Club, Inc. v. Barry*, 304 F. Supp. 1193, 1203 (N.D. Cal. 1969). But defendants do not even try to show that they might suffer losses of "at least

a million dollars" from an improvidently granted injunction. Nor could they, because (according to defendants) they have *voluntarily* ceased the conduct that would be enjoined. And even if they have not ceased that conduct, an injunction would "simply enjoin Defendant[s] from doing something Defendant[s] never had a right to do in the first place." *Comet Techs. U.S. of Am. Inc. v. Beuerman*, No. 18-CV-01441-LHK, 2018 WL 1990226, at *6 (N.D. Cal. Mar. 15, 2018).

## IV.   CONCLUSION

For the foregoing reasons, Niantic respectfully requests that the Court grant Niantic's motion for preliminary injunctive relief (Dkt. 7).

DATED: August 14, 2019

**PERKINS COIE** LLP

By:  */s/ Julie E. Schwartz*
Julie E. Schwartz, Bar No. 260624
JSchwartz@perkinscoie.com

Attorneys for plaintiff Niantic, Inc.