Julie E. Schwartz, Bar No. 260624
JSchwartz@perkinscoie.com
Perkins Coie LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300
Facsimile: 650.838.4350

Todd M. Hinnen (admitted *pro hac vice*)
THinnen@perkinscoie.com
Ryan Spear (admitted *pro hac vice*)
RSpear@perkinscoie.com
1201 Third Ave., Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for Plaintiff Niantic, Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| NIANTIC, INC., a Delaware corporation,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>GLOBAL++, an unincorporated association; RYAN HUNT, a.k.a. "ELLIOTROBOT," an individual; ALEN HUNDUR, a.k.a. "IOS N00B," an individual; and DOES 1-20,<br><br>　　　　Defendants. | Case No. 19-cv-03425-JST<br><br>**SECOND DECLARATION OF ERIC LANZ IN SUPPORT OF NIANTIC, INC.'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF** |

I, Eric Lanz, declare and state as follows:

1. I am a Senior Software Engineer at Niantic, Inc., a position I have held since February 2018. My responsibilities in this role include writing code for Niantic, analyzing malicious and suspicious applications ("apps"), and designing and implementing code security features to defeat hackers and malicious actors.

2. This second declaration is based on my personal knowledge, investigation, and review of Niantic's business records and is made to the best of my knowledge, information, and belief. If called to testify regarding the facts set forth in this declaration, I could and would testify competently.

3. This second declaration incorporates and relies upon my first declaration, which I understand was submitted simultaneously with Niantic's motion for preliminary injunctive relief.

4. I understand that the defendants in this case have filed an opposition to Niantic's motion for preliminary injunctive relief, titled "Defendants Ryan Hunt and Alen Hundur's Opposition to Plaintiff Niantic, Inc.'s Motion for Preliminary Injunctive Relief" (the "Opposition"). I also understand that the defendants in this case have filed a declaration from defendant Ryan Hunt, titled "Declaration of Ryan Hunt in Support of Defendants Opposition to Plaintiff's Motion for Preliminary Injunction" (the "Hunt Declaration"). I have reviewed both documents.

5. Niantic has consistently and on an ongoing basis invested considerable time and resources trying to implement additional technical measures designed to prevent defendants and the Cheating Programs from copying and modifying Niantic's Client Code, accessing Niantic's computers, and undermining the integrity of Niantic's games. These have included adding security measures to Niantic's Client Code when Niantic has released new versions of its legitimate apps, which generally occurs every two to three weeks. Those additional security measures are intended to prevent modified versions of Niantic's legitimate apps (including the Cheating Programs) from connecting to Niantic's servers.

6. However, when Niantic has released new versions of its legitimate apps that contain updated security features, defendants have acted to evade and thwart these measures by identifying the pieces of Client Code that are intended to prevent modified versions of Niantic's Client Code from connecting to Niantic's servers, and either disabling those pieces of Client Code or implementing alternative mechanisms to evade that security measure. Since August 2018, defendants have used different methods to accomplish this evasion, including by injecting code to skip the portions of code that impose the security measure, or by modifying inputs to the code and thereby causing the downstream execution of the code to skip security measures.

7. What this means, as a practical matter, is that Niantic has been engaged in an ongoing technological "arms race" with the defendants. Each time Niantic has released a new version of its legitimate apps that contain modifications intended to prevent defendants from accessing, copying, and modifying Niantic's Client Code and using it to create corresponding new versions of their Cheating Programs, those security measures have ultimately proved ineffective. Sometimes it took defendants a few days to defeat the new security measures, sometimes they were able to defeat the protections almost immediately. Until Niantic filed its lawsuit, defendants defeated Niantic's technical measures in each instance in order to create new versions of their Cheating Programs.

8. The Opposition states that "[a]t least eight other spoofers of Niantic's games operate similar software to Global++." Opposition at 2. Similarly, the Hunt Declaration states that "[a]t least eight other spoofing vendors targeting Niantic's games operate similar software." Hunt Declaration ¶ 9. Niantic was aware of some of these spoofing vendors, and only became aware of others upon receiving the Hunt Declaration. I have now reviewed and am at least marginally familiar with all of the other supposed spoofing programs identified in the Opposition and the Hunt Declaration. They are not all comparable to the Cheating Programs for several reasons, including:

    a.    To Niantic's knowledge, none of the creators and distributors of the other supposed spoofing programs provided unauthorized derivative versions of all three of Niantic's games (*Harry Potter: Wizards Unite*, *Pokémon GO*, and *Ingress*). Defendants, in contrast, have provided and may still provide unauthorized derivative versions of all three of Niantic's games (*Potter++*, *PokeGo++*, and *Ingress++* (sometimes called "*Ingress Prime++*")).

    b.    To Niantic's knowledge, only a few of the other supposed spoofing programs incorporate copies of Niantic's Client Code as the Cheating Programs do.

    c.    To Niantic's knowledge, only a few of the other supposed spoofing programs scrape (i.e., access and collect) valuable game-related data from Niantic's servers, including point-of-interest data ("POI Data") and ephemeral game information, as the Cheating Programs do.

9.    Additionally, to Niantic's knowledge, at the time that Niantic filed this lawsuit, the Cheating Programs provided by defendants were far and away the most popular vehicles for cheating in Niantic's games, and caused the most harm to Niantic. Based on my investigation, I estimate that there were hundreds of thousands of accounts that used the Cheating Programs, and that at least tens of thousands of users made Patreon donations to Global++ in order to unlock cheating features before Niantic filed this lawsuit.

10.    The Opposition states that Niantic has not been diligent in pursuing its claims against defendants. Opposition at 7-8, n.2. In fact, Niantic sought relief against defendants as soon as it reasonably could, after undertaking the significant and costly investigation necessary to identify defendants and fully understand the technical details of the Cheating Programs.

11.    The Opposition states that Niantic has "tak[en] no action against . . . numerous other spoofing companies." Opposition at 10. Defendants do not cite any basis for that claim about Niantic's enforcement efforts and I am unaware of any public sources from which defendants could obtain such information. In fact, Niantic is constantly engaged in significant and costly investigations and enforcement activities involving numerous entities that threaten the integrity of Niantic's gaming platform, including some of the entities identified in defendants' Opposition. As explained in the Declaration of Phil Keslin (Dkt. 7-6), Niantic spends upwards of $2 million annually to monitor for, design to defend against, and eliminate cheating and other unauthorized activity.

12. The Opposition states that the Cheating Programs do not "supplant[]" Niantic's legitimate apps in the marketplace. Opposition at 6. Similarly, the Hunt Declaration states that the Cheating Programs do not "supplant[]" Niantic's legitimate apps. Hunt Declaration ¶ 7. In fact, in order to install and use the Cheating Programs, users must *uninstall* Niantic's legitimate apps from their devices. Attached as Exhibit A is a true and correct March 19, 2019 screenshot from defendants' now-defunct website (www.globalplusplus.com) instructing defendants' customers to remove Niantic's legitimate apps from their devices in order to use the Cheating Programs, as follows: "2. If you have the original app on your iOS device, remove it from your device." Attached as Exhibit B is a true and correct August 9, 2019 screenshot from the stand-alone AppHaven app including similar instructions. As explained below, I believe that defendants are currently using the AppHaven app to distribute the Cheating Programs.

13. The Opposition states that "Global++ software was shut down immediately after Defendants received" Niantic's cease-and-desist letter, which I understand was sent on June 7, 2019. Opposition at 3. Similarly, the Hunt Declaration states that "Global++ software was shut down immediately after Defendants received that letter, and it has not been restarted." Hunt Declaration ¶ 13. As explained in my first declaration, I saw no evidence that defendants removed or limited the availability of the Cheating Programs until after Niantic filed this lawsuit on June 14, 2019. In fact, after Niantic sent the cease-and-desist letter on June 7, 2019, but before Niantic filed this lawsuit on June 14, 2019, defendants released a new version (version R119) of their Pokémon GO Cheating Program, *PokeGo++*.

14. The Opposition states that the Cheating Programs "have been taken offline" and that the Cheating Programs "are no longer operating." Opposition at 1, 7. It is true that the original website used to distribute the Cheating Programs (www.globalplusplus.com) appears to have been disabled. However, it appears that defendants continue to distribute at least one of the Cheating Programs through the AppHaven app, a stand-alone app that is currently available.

15. The owners and operators of AppHaven have used their Twitter account (@apphaven1) to advertise all three of the Cheating Programs, as shown in Exhibit C (tweet

4

from AppHaven Twitter account advertising all three Cheating Programs). In addition, at least one of the Cheating Programs (*Ingress Prime++*), and potentially all three, are currently available for download through the stand-alone AppHaven app, as shown in Exhibits D-1, D-2, and D-3 (August 9, 2019 screenshots from AppHaven app showing availability of *Ingress Prime++*, *Takumi Pokego++*, and *iPotter for wizards*, the latter two of which may be renamed versions of the *PokeGo++* and *Potter++* Cheating Programs). I therefore conclude that the AppHaven app is the current distribution platform for the Cheating Programs.

16.     Based on my investigation, and for the reasons explained below, I further conclude that the AppHaven app is operated and controlled by defendants or their agents.

17.     Publicly available WHOIS information attached as Exhibit E shows that the domain name globalplusplus.com was registered to a certain individual who purportedly resides in Missouri. As noted above, defendants used the globalplusplus.com domain name for their original website, through which defendants distributed the Cheating Programs before that original website was disabled.

18.     Information from service provider Domains By Proxy, which is attached as Exhibit F, shows that the domain name apphaven.org was also registered to the same individual who purportedly resides in Missouri. The domain name apphaven.org was used for a website that recently offered the Cheating Programs for download, as shown in Exhibits G-1 and G-2 (June 25, 2019 screenshots of apphaven.org website showing distribution of Cheating Programs).

19.     The apphaven.org website, which is no longer accessible, appears to have been a precursor to the stand-alone AppHaven app. The apphaven.org website and the stand-alone AppHaven app have offered the same programs for download and have used the same branding, including the same blue-and-white logo. *Compare* Exhibit G-1 (June 25, 2019 screenshot of apphaven.org website, showing use of blue-and-white logo) with Exhibit H (August 9, 2019 screenshot of AppHaven's Patreon site explaining how to obtain the AppHaven app, showing use of same logo).

20. Based on this evidence and my investigation, I conclude that the stand-alone AppHaven app is the latest iteration of the distribution platform for the Cheating Programs, which emerged after the original Global++ website and the apphaven.org website were disabled. I also conclude that the name of the individual who purportedly resides in Missouri, which is associated with both the globalplusplus.com domain name and the apphaven.org domain name, is either a pseudonym used by the individual named defendants or is the actual name of defendants' agent.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on _____August 14th_____, 2019 in the City of Los Angeles, State of California.

_____Eric Lanz_____
ERIC LANZ