Julie E. Schwartz, Bar No. 260624
JSchwartz@perkinscoie.com
Perkins Coie LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300
Facsimile: 650.838.4350

Todd M. Hinnen (admitted *pro hac vice*)
THinnen@perkinscoie.com
Ryan Spear (admitted *pro hac vice*)
RSpear@perkinscoie.com
1201 Third Ave., Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for Plaintiff Niantic, Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NIANTIC, INC., a Delaware corporation,<br><br>              Plaintiff,<br><br>    v.<br><br>GLOBAL++, an unincorporated association; RYAN HUNT, a.k.a. "ELLIOTROBOT," an individual; ALEN HUNDUR, a.k.a. "IOS N00B," an individual; and DOES 1-20,<br><br>              Defendants. | Case No. 19-cv-03425-JST<br><br>**SECOND DECLARATION OF SCOT FRANK IN SUPPORT OF NIANTIC, INC.'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF** |

I, Scot Frank, declare and state as follows:

1. I am a Senior Product Manager at Niantic, Inc., a position I have held since August 24, 2017. In this role, working with cross-functional teams, I define, launch, analyze, and maintain Niantic's anticheat detection and defense systems and processes, among other responsibilities. That includes not only identifying cheating and other impermissible activity on Niantic's platform, but also identifying the specific accounts associated with such misconduct, and the individuals using those accounts, so that Niantic can, where appropriate, take action to protect its rights and its users. I also coordinate with cross-functional teams to develop and implement policies related to anticheat, including warning, suspending, and banning accounts determined to be engaged in conduct that violates Niantic's Terms of Service.

2. This second declaration is based on my personal knowledge, investigation, and review of Niantic's business records and is made to the best of my knowledge, information, and belief. If called to testify regarding the facts set forth in this declaration, I could and would testify competently.

3. This second declaration incorporates and relies upon my first declaration, which I understand was submitted simultaneously with Niantic's motion for preliminary injunctive relief.

4. I understand that the defendants in this case have filed an opposition to Niantic's motion for preliminary injunctive relief, titled "Defendants Ryan Hunt and Alen Hundur's Opposition to Plaintiff Niantic, Inc.'s Motion for Preliminary Injunctive Relief" (the "Opposition"). I also understand that the defendants in this case have filed a declaration from defendant Ryan Hunt, titled "Declaration of Ryan Hunt in Support of Defendants Opposition to Plaintiff's Motion for Preliminary Injunction" (the "Hunt Declaration"). I have reviewed both documents.

5. The Opposition and the Hunt Declaration refer to action taken by Niantic to "suspend" certain unidentified Niantic user accounts in 2018 (the "2018 Suspensions"). Specifically, the Opposition states that, at some point in 2018, Niantic "identified user accounts associated with Global++ creators and suspended those accounts to immediately halt Global++

software from operating." Opposition at 3. Similarly, the Hunt Declaration states that "Niantic identified user accounts associated with Global++ creators and suspended those accounts to immediately halt Global++ software from operating." Hunt Declaration ¶ 10.

6. Defendants do not state when the 2018 Suspensions happened, nor which accounts were affected, making it difficult to respond to their assertions about the 2018 Suspensions.

7. It is true, however, that Niantic is engaged, and has been engaged since before 2018, in ongoing efforts to enforce Niantic's Terms of Service, protect Niantic's rights, and protect Niantic's players against cheating and other impermissible activity. That may include, for example, suspending or terminating user accounts associated with unauthorized or unlawful activity, including the use of unauthorized third-party applications ("apps") that enable cheating in Niantic's games.

8. Suspending or terminating user accounts can, in some cases, be an effective way to protect Niantic and its users. Unfortunately, however, that method has not been effective in protecting Niantic and its users from the harms caused by defendants' misconduct and the unauthorized apps created and distributed by the defendants—*Potter++*, *PokeGo++*, *and Ingress++* (sometimes called *Ingress Prime++*) (the "Cheating Programs")—and it will not be effective in the future, either.

9. It has been and will continue to be technologically difficult, time-consuming, and costly to identify all accounts associated with individuals using the Cheating Programs, especially because the Cheating Programs are so widespread and because, over time, defendants have implemented technical measures that make it difficult to identify accounts associated with individuals using the Cheating Programs.

10. It also has been and will continue to be technologically difficult, time-consuming, and costly to isolate, from among the accounts associated with individuals using the Cheating Programs, the accounts associated with the defendants in this case (and others who are responsible for creating and distributing the Cheating Programs).

11. One reason it is difficult to isolate the accounts associated with the defendants is that defendants have created multiple Niantic accounts (in violation of Niantic's Terms of Service), likely to evade Niantic's enforcement efforts. In addition, defendants have taken steps to obscure their true identities when creating their multiple accounts.

12. Individuals who profit from abusing Niantic's platform, like defendants, often employ these and other tactics to make it difficult for Niantic to pinpoint which accounts and which users are responsible for cheating and other impermissible activity. Thus, it often takes considerable amounts of time, skill, and resources to identify which accounts and which users are responsible for such activity. It also takes considerable time, skill, and resources to identify, and physically locate, the individuals associated with those accounts.

13. As a result, it is simply not feasible for Niantic to identify and take action against all accounts associated with Global++ users, defendants, and the Cheating Programs. Moreover, defendants (and their customers) can easily evade such actions, at least for some period of time, simply by creating new accounts after their "old" accounts are banned or suspended.

14. For the foregoing reasons, Niantic has never been able to halt the operation of the Cheating Programs exclusively through account suspensions or terminations (or any other form of technological "self help"). Nor could Niantic do so in the future.

15. Even if Niantic could identify and ban all accounts associated with defendants' Cheating Programs, that would not address all harm from the Cheating Programs. For example, defendants would still be able to distribute and profit from unauthorized copies of Niantic's Client Code, which are contained in the Cheating Programs. Moreover, merely "blocking" the Cheating Programs would not prevent defendants from trafficking in the valuable and proprietary game-related information that they have already collected through the Cheating Programs.

16. Both the Opposition and the Hunt Declaration suggest that Niantic reversed or curtailed the 2018 Suspensions, including with respect to defendants' Niantic accounts, in order to increase Niantic's revenues. For example, the Opposition states that "Niantic's past conduct suggests that Niantic profits handsomely from the additional users accessing Niantic's games

through spoofing software like Global++: in 2018 Niantic temporarily suspended Defendants' user accounts on Niantic's servers, but quickly reactivated them once revenue from its own games dropped." Opposition at 1. Similarly, the Hunt Declaration states that "Niantic's revenues dropped after suspending Defendants' user accounts" but, after Niantic "quickly lifted those suspensions," then "Niantic's revenues increased as a result." Hunt Declaration ¶ 11.

17.  Defendants do not cite any basis for these claims about Niantic's user base and Niantic's revenues and I am unaware of any public sources from which defendants could obtain such information about Niantic's user base and Niantic's revenues.

18.  In any case, Niantic did not reverse or curtail account suspensions or terminations related to Global++ users, defendants, and the Cheating Programs during the 2018 Suspensions or at any other time, in order to increase its revenues. Moreover, I am not aware of any instance in which Niantic has reversed or curtailed its anticheat efforts, including account suspensions or terminations, in order to increase revenues. And it would not be logical to reverse or curtail account suspensions or terminations for that reason. The type of misconduct targeted by account suspensions and terminations, like defendants' misconduct, tends to drive legitimate users away from Niantic's platform and tends to directly undermine Niantic's business model. Thus, minimizing that conduct through account suspensions and terminations tends to *increase* Niantic's revenues, not *decrease* it.

19.  The Opposition states that, by permitting unidentified Niantic accounts to "resume operating" after the 2018 Suspensions, Niantic thereby "implicitly permitt[ed] Global++ to continue operating for over a year." Opposition at 3. Similarly, the Hunt Declaration states that Niantic "implicitly permitt[ed] Global++ to continue operating for over a year." Hunt Declaration ¶ 12.

20.  Again, because defendants do not explain when the 2018 Suspensions happened, nor which accounts were affected, it is difficult to respond to their assertions about the 2018 Suspensions. However, it is true that Niantic often suspends accounts caught cheating for a limited period of time, such as 7, 30, or 90 days, and after that time, allows the account to play

on Niantic's platform again. By allowing such suspensions to run their course, Niantic does not approve of the misconduct that led to the suspension.

21. In any case, Niantic has never authorized Global++ or the Cheating Programs to operate, implicitly or explicitly.

22. To the contrary, as explained in the Second Declaration of Eric Lanz, which I have reviewed, Niantic has been engaged in an ongoing technological "arms race" with the defendants in which Niantic has repeatedly modified new versions of its legitimate apps in ways intended to prevent defendants from accessing, copying, and modifying Niantic's Client Code to create corresponding new versions of the Cheating Programs, and defendants, in response, have repeatedly defeated those new technical measures.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on August 14, 2019 in the City of San Francisco, State of California.

_____
SCOT FRANK