1  FABIO E. MARINO (SBN 183825)
   fmarino@polsinelli.com
2  REBECCA B. HORTON (SBN 308052)
   rhorton@polsinelli.com
3  POLSINELLI LLP
   1661 Page Mill Road, Suite A
4  Palo Alto, CA 94304
   T:  650-461-7700
5  F:  650-461-7701

6  Phillip Zeeck (*Admitted PHV*)
   pzeeck@polsinelli.com
7  POLSINELLI PC
   900 West 48th Place, Ste. 900
8  Kansas City, MO 64112
   T:  816-753-1000
9  F:  816-753-1536

10 Attorneys for Defendants
   Ryan Hunt and Alen Hundur
11

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14                   OAKLAND DIVISION

15

16 NIANTIC, INC.,                    Case No. 4:19-cv-03425 JST

17              Plaintiff,           **DEFENDANTS RYAN HUNT'S AND**
                                     **ALEN HUNDUR'S MOTION TO LIFT**
18      v.                           **THE PRELIMINARY INJUNCTION**

19 GLOBAL++, et al.,
                                     Date:   December 4, 2019
20              Defendants.          Time:   2:00 P.M.
                                     Ctrm:   6, 2nd Floor
21                                   Judge:  Honorable Jon S. Tigar

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................1

II.  BACKGROUND ....................................................................................................2

III.  LEGAL STANDARD..............................................................................................3

IV.  ARGUMENT ..........................................................................................................4

    A.  Scraping Publicly-Available Data Is Not A Violation Of The CFAA....................4

        1.  Preliminary Injunction Enjoins Scraping
            Points-of-Interest Data ...................................................................................4

        2.  Ninth Circuit's Decision In *HiQ Labs v. LinkedIn* .......................................5

        3.  Niantic Does Not Own Nor Demarcate As Private
            The POI It Alleges Global++ Scrapes .........................................................6

            a.  Niantic Disclaims Rights To The User-Generated POI...................7

            b.  Users Choose To Publicly-Post POI ................................................8

            c.  User-Posted POI Within Niantic App...............................................9

        4.  Niantic's Cease-And-Desist Letter And Its Terms
            Of Service Do Not Render Scraping Of User-generated
            POI "Without Authorization" Under the CFAA........................................10

    B.  Niantic Failed To Show That Defendants Are In "Active Concert Or
        Participation" With Signing Services .....................................................................11

        1.  Niantic Did Not Argue That Defendants Are Responsible For Actions of
            Third Party Until Its Reply ..........................................................................12

        2.  Global++ Solely Develops Software Code And Does
            Not Create Nor Distribute Tweaked Apps ..................................................13

        3.  Preliminary Injunction Enjoins Global++ For Actions Of Independent
            Third Parties................................................................................................14

        4.  Material Issues With Evidence That Niantic Presented
            Undercut  Niantic's Likelihood Of Success On The Merits .......................14

            a.  Matthew Johnson Appears To Be An Individual
            Who Is In The Business Of Registering Domains .........................15

            b.  *iPotter For Wizards, Takumi PokeGo*++ And *IngressPrime*++
            Are Not Created, Controlled Or Distributed By Global++............16

        5.  A Complete Evidentiary Record Demonstrates That Signing
            Services Is An Independent Third Party .....................................................17

**TABLE OF CONTENTS CONTINUED**

Page

6.    Additional Evidence Shows That Allegations Of Security Breaches To Access Niantic's Code Are Not Required Nor Technically Feasible ..............................................................18

a.    Not Required To Circumvent Niantic's "Technical Measures" To View Niantic's App Code ......................................18

b.    Global++ Software Does Not Circumvent Niantic's Security Encryption..........................................................21

7.    The Material Factual Distinctions Undercut Niantic's Claim To Likelihood Of Success On The Merits ....................................22

8.    Enjoining Defendants For Actions Of Independent Third Parties Has Unfairly Foreclosed Defendants Ability To Make Any Profit ........................................................................23

V.    CONCLUSION................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Herron,*
   634 F.3d 1101 (9th Cir. 2011) ................................................................3

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
   239 F.3d 1343 (Fed.Cir.2001)..............................................................14

*Canal Auth. of State of Fla. v. Callaway,*
   489 F.2d 567 (5th Cir. 1974) ..................................................................3

*Centennial Broadcasting, LLC v. Burns,*
   433 F. Supp. 2d 730(W.D. Va. 2006) .....................................................3

*Delta Ltd. v. U.S. Customs and Border Protection Bureau,*
   393 F. Supp. 2d 15 (D.D.C. 2005) ........................................................22

*Gregg v. American Quasar Petroleum Co.,*
   840 F. Supp. 1394 (D. Colo. 1991).........................................................3

*hiQ Labs, Inc. v. LinkedIn Corp.,*
   No. 17-16783, 2019 WL 4251889 (9th Cir. Sept. 9, 2019) ........................... *passim*

*Love v. Pence,*
   47 F. Supp. 3d 805 (S.D. Ind. 2014) .......................................................4

*McGhee v. N. Am. Bancard, LLC,*
   No. 17-CV-0586-AJB-KSC, 2017 WL 3118799 (S.D. Cal. July 21, 2017),
   *aff'd,* 755 F. App'x 718 (9th Cir. 2019)...............................................20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. New York State Dept. of Environmental
   Conservation,*
   831 F. Supp. 57 (N.D. N.Y. 1993), *judgment aff'd in part, rev'd in part on
   other grounds,* 17 F.3d 521 (2d Cir. 1994) ...............................................4

*Provenz v. Miller,*
   102 F.3d 1478 (9th Cir. 1996) ...............................................................12

*Specht v. Netscape Communications Corp.,*
   306 F.3d 17 (2nd Cir. 2002)...................................................................21

**Statutes**

Fed. R. Civ. P. 59(e) ....................................................................................1, 3

-iv-

## I.      INTRODUCTION

Pursuant to Fed. R. Civ. P. 59(e), Defendants respectfully bring this motion requesting the Court to lift the preliminary injunction which was ordered on September 26, 2019. Dkt. 55 ("Injunction Order").

First, the Injunction Order enjoins Defendants for scraping user data which the Ninth Circuit has recently held in *hiQ Labs, Inc. v. LinkedIn Corp.,* No. 17-16783, 2019 WL 4251889 (9th Cir. Sept. 9, 2019) is permitted.  *Id.* at * 14 (scraping of user data on a website is not a violation of the Computer Fraud and Abuse Act ('CFFA'), particularly where that website disclaims ownership over the data.)  *See* Dkt. 55 (Injunction Order) at 16.

Second, the Injunction Order enjoins Defendants for the actions of independent third parties, which is based upon arguments and evidence which Niantic failed to offer until its Reply briefing, thus unfairly foreclosing Defendants from having the opportunity to correct and respond to the factual inaccuracies.  Declaration of Rebecca B. Horton ISO Motion to Lift the Preliminary Injunction ("Horton Decl."), Ex. P (Sep. 11, 2019 Tr.) at 57:1-4 (denying request to rebut Niantic's Reply evidence with either testimony or supplemental briefing at hearing). Niantic's untimely and misleading evidence falls far short of the "highly fact-specific" standard of the in "active concert or participation" requirement that is required in order to enjoin a party for the actions of independent third parties.  *Asetek Danmark A/S*, 852 F.3d 1352, 1369 (Fed. Cir. Apr. 3, 2017) ("deferring conclusions until the facts about the relationship of Cooler Master and CMI, both in their businesses and in this litigation, are more fully developed and their legal significance more fully explored," thereby partially vacating the injunction and remanding to the district court).  In light of the evidence set forth below which Defendants were not previously permitted to submit, it is clear that the Injunction Order is premised upon an incorrect factual basis and the more complete evidentiary record readily undercuts Niantic's likelihood of success on the merits.

Under the current Injunction Order and incorrect factual record, Defendants are being unfairly enjoined for the actions of independent third parties and robbed of any ability to use its proprietary software, substantially impairing Defendants' business.  With the benefit of a

1    corrected factual and legal record, it becomes clear that the Injunction Order results in a manifest

2    injustice to Defendants.

3    **II.      BACKGROUND**

4            On or about June 14, 2019, Niantic filed a motion for preliminary injunction.  Dkt. 1

5    (Compl.) and Dkt. 7 (Mot. for Preliminary Injunction).  Defendants Ryan Hunt and Alen Hundur

6    filed a timely opposition, to which Niantic filed its Reply.  Dkt. 32 (Def. Opp. to Mot. for PI) and

7    Dkt. 39 (Niantic Reply).   In Niantic's Reply, it raised for the first time the argument that

8    Global++ was affiliated with, and responsible for, the actions of the third party Signing Service,

9    AppHaven.  Dkt. 39 (Niantic Reply) at 1 ("it appears that defendants continue to distribute at

10   least one (and perhaps all three) of their infringing programs through a new outlet").

11           After the parties completed briefing but prior to the Court's Order, the Ninth Circuit

12   issued its opinion in *hiQ Labs, Inc. v. LinkedIn Corp.,* 2019 WL 4251889 (9th Cir. Sept. 9,

13   2019).  Further, at the September 11, 2019 hearing on the motions to dismiss and preliminary

14   injunction, Defendants sought to address the new evidence and arguments Plaintiff included in

15   its Reply by introducing testimony of Defendant Ryan Hundur who was present at the hearing, or

16   via supplemental briefing.  The Court denied Defendants' request and thereafter issued the

17   Injunction Order relying in part on the new evidence and arguments that Niantic did not offer

18   until its Reply.  Dkt. 55 (Injunction Order).

19           On September 26, 2019, this Court issued its ruling granting Niantic's Motion for

20   Preliminary Injunction and enjoining Defendant on the following bases:

> (1) Acquiring or copying without authorization any portion of the mobile apps developed
>     and published by Niantic and used to play Niantic's location-based augmented reality
>     games, including Niantic's Client Code;
> (2) Reverse engineering, decompiling, or disassembling Niantic's mobile apps;
> (3) Creating derivative works based on any portion of Niantic's games, mobile apps, and
>     Client Code, including without limitation the Accused Programs titled *Potter++* (or
>     *Unite++*), *PokeGo++,* and *Ingress++*;
> (4) Distributing, selling, renting, leasing, or otherwise trafficking in copies of Niantic's
>     Client Code or any apps or computer programs that include any portion of Niantic's
>     Client Code, including without limitation the Accused Programs;
> (5) Cheating or enabling cheating within Niantic's mobile games, including through the
>     Accused Programs;

> (6) Accessing Niantic's network, computers, and servers, including the computers and
>     servers that enable users to play Niantic's games via Niantic's mobile apps, by any
>     direct or indirect means or method;
>
> (7) Extracting, scraping, or indexing data about points of interest or spawning locations
>     within Niantic's games, including names, descriptions, photographs, game states, and
>     precise coordinates for those points of interest;
>
> (8) Using Niantic's Client Code or any other aspect of Niantic's mobile apps, mobile
>     games, or other services or content, for any commercial purpose;
>
> (9) Violating Niantic's Terms of Service; and
>
> (10)   Participating or assisting in any such activity.

Dkt. 55 (Order) at 16-17.

## III.   LEGAL STANDARD

Pursuant to Rule 59(e), a party may move to alter or amend a judgment within 28 days. "In general, there are four basic grounds upon which a Rule 59(e) motion may be granted: (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011).  But a Court's discretion to grant a Rule 59(e) motion is not limited to those situations.  *Id*; *see e.g., Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 578 (5th Cir. 1974) ("[t]he court is authorized to make any changes in the injunction that are equitable in light of subsequent changes in the facts or the law, **or for any other good reason**") (emphasis added); *Centennial Broadcasting, LLC v. Burns*, 433 F. Supp. 2d 730, 733(W.D. Va. 2006) ("the Court has continuing plenary power to modify or dissolve a preliminary injunction applying general equitable principles.").

Here, Defendants are seeking that the Court lift the Injunction Order on the following bases: (1) to correct errors of law and fact; (2) in light of evidence which was previously unavailable; and (3) manifest injustice.  *Gregg v. American Quasar Petroleum Co.*, 840 F. Supp. 1394 (D. Colo. 1991) (A motion for reconsideration is proper when … there has been a significant change or development in the law or facts since submission of the issues to the

-3-

court"); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. New York State Dept. of Environmental Conservation*, 831 F. Supp. 57 (N.D. N.Y. 1993), *judgment aff'd in part, rev'd in part on other grounds*, 17 F.3d 521 (2d Cir. 1994) (Motion for reconsideration will be granted when the court has overlooked matters that might have materially influenced the earlier decision) ("[a]ffidavits submitted by Defendants' experts disputed the conclusions reached by Plaintiffs' experts as to the degree and nature of the effects which higher levels of sulfur would have on the emission control systems. Although the Court has earlier ruled that the degree of such effect is irrelevant, on reconsideration the Court finds that the nature and degree of this effect are significant to, and indeed controlling factors in, a determination on count two of the complaint"); *Love v. Pence*, 47 F. Supp. 3d 805, 807 (S.D. Ind. 2014) ("[t]he memoranda show that the court's conclusion was based on an inaccurate premise—that the Governor played no role in enforcing the statute. Thus, the court must revisit its prior decision and the motion for reconsideration should be considered on its merits.").

The evidentiary and legal grounds for reconsideration in large part arise from Niantic waiting until its Reply to offer new arguments and evidence—which Defendants were foreclosed from responding to and upon which this Court relied upon—in addition to the controlling decision which came down in *hiQ Labs, Inc. v. LinkedIn Corp.* after the parties completed briefing.

## IV.    ARGUMENT

### A.    Scraping Publicly-Available Data Is Not A Violation Of The CFAA

On September 9, 2019, the Ninth Circuit held that it is not a violation of the CFAA to scrape user data that is publicly-available data.  *hiQ Labs, Inc.*, 2019 WL 4251889 at *14. Defendants respectfully request that by considering this ruling in conjunction with the necessary corrections to Niantic's factual misrepresentations, Injunction Order No. 7 which enjoins the scraping of points-of-interest (POI) data should be lifted.

#### 1.    Preliminary Injunction Enjoins Scraping Points-of-Interest Data

The Court's Order enjoined Defendants from "[e]xtracting, scraping or indexing data about points of interest or spawning locations within Niantic's games, including names,

-4-

1   descriptions, photographs, game states, and precise coordinates for these points of interest." Dkt.

2   55 at 16.

3          In an effort to obtain this Order, Niantic made the following factual representations which

4   suggested ownership of the POI for which it alleged the Defendants were improperly scraping:

5          •   "In addition, it appears that the Cheating Programs access and obtain valuable
6              and **proprietary data about points of interest within Niantic's games**
               (including names, descriptions, photographs, game states, and precise coordinates
7              for those points of interest), then automatically upload this data to servers
               controlled by defendants. Niantic's point-of-interest data ("POI Data") is an
8              extremely important component of Niantic's location-based games, and **Niantic
               has invested substantial amounts of time, effort, and money to develop,**
9              **curate, and protect this unique asset**."
           •   "The Cheating Programs appear to scrape **valuable and proprietary game-**
10             **related information from Niantic's servers**, including POI Data. Niantic **has**
               **invested countless hours and significant resources to enhance, curate, and**
11             **protect that unique resource, which is essential to Niantic's success**."

12   Dkt. 7 at 8, 10 (internal citations omitted) (emphasis added).

13          As set forth below, Niantic disclaims rights to the POI data generated by users, and states

14   that this data belongs to the user.  Further, users are able to, and do, chose to make their POI data

15   available to third parties.  In light of the Ninth Circuit's decision in *HiQ Labs v. LinkedIn*,

16   Niantic cannot show a likelihood of success on the merits on its CFAA claim.

17          **2.     Ninth Circuit's Decision In *HiQ Labs v. LinkedIn***

18          On September 9, 2019, the Ninth Circuit returned its decision in *hiQ Labs, Inc. v.*

19   *LinkedIn Corp*. which examined the meaning of "without authorization" in the context of website

20   scraping.

21          HiQ, a data analytics company, used automated bots which scraped information that

22   LinkedIn users, the professional networking website, would post on their LinkedIn profiles, and

23   would use this information "along with a proprietary predictive algorithm, to yield 'people

24   analytics,' which it sells to business clients." *Id.* at 3.  LinkedIn sent hiQ a cease-and-desist

25   letter which asserted that "hiQ was in violation of LinkedIn's User Agreement and demanding

26   that hiQ stop accessing and copying data from LinkedIn's server.  The letter stated that if hiQ

27   accessed LinkedIn's data in the future, it would be violating state and federal law, including the

28   Computer Fraud and Abuse Act ("CFAA")...," among other federal and state laws.  *Id.* at 3.

1   Unable to resolve the dispute, hiQ filed suit and sought injunctive relief that LinkedIn could not

2   lawfully invoked CFAA, among other laws, and prohibit hiQ's access to LinkedIn's public

3   pages.  *Id.* at 4. The District Court granted hiQ's motion and "ordered LinkedIn to withdraw its

4   cease-and-desist letter, to remove any existing technical barriers to hiQ's access to public

5   profiles, and to refrain from putting in place any legal or technical measures with the effect of

6   blocking hiQ's access to public profiles. LinkedIn timely appealed."  LinkedIn then appealed to

7   the Ninth Circuit.  *Id*. at 4.

8        In considering the issue of whether hiQ's scraping of LinkedIn's data was a violation of

9   the CFAA, the Ninth Circuit held that "[i]t is likely that when a computer network generally

10  permits public access to its data, a user's accessing that publicly available data will not constitute

11  access without authorization under the CFAA."  *hiQ Labs, Inc.,* 2019 WL 4251889, at *14.

12  Thus, because the "data hiQ seeks to access is not owned by LinkedIn and has not been

13  demarcated by LinkedIn as private using such an authorization system," hiQ's scraping of that

14  data is not a violation of CFAA. *Id*.

15        **3.    Niantic Does Not Own Nor Demarcate As Private The POI It Alleges**
16              **Global++ Scrapes**

17        As an initial matter, there are two types of POI data at issue by nature of Niantic's

18  allegations—(1) POI data that is generated by a user by, for example, encountering a Pokemon at

19  a particular GPS location ("User-generated POI"), and (2) POI data which is stored on Niantic's

20  server ("Server POI").  Niantic's allegations and preliminary injunction motion accuse

21  Defendants of improperly scraping or obtaining both kinds of POI data.  Dkt. 1 (Complaint) at ¶¶

22  48 ("while they are running on the mobile devices of defendants' customers, the Cheating

23  Programs access and obtain valuable and proprietary game-related data, including data about

24  points of interest); ¶ 50; Dkt. 7 (Motion for Preliminary Injunction) at 5 ("[t]hose apps connect to

25  the internet and, through the Internet, obtain game-related information from Niantic's servers).

26  The Court then relied upon Niantic allegations that this User-generated and Server POI is

27  proprietary and Defendants' access to it is unauthorized in issuing its Injunction Order enjoining

28  Defendants from scraping POI data.  Dkt. 55 at 10-11 (citing to Niantic's allegations in its

-6-

Complaint and preliminary injunction briefing); *id.* at 16 (enjoining "extracting, scraping, or indexing data about points of interest or spawning locations within Niantic's games.").

Because Niantic does not have rights over certain POI data for which it alleges Global++ improperly scrapes, it does not have a claim under CFAA.

### a.     Niantic Disclaims Rights To The User-Generated POI

Niantic voluntarily relinquishes its right to User-generated POI data and thus cannot claim that access and use of User-generated POI is "unauthorized" under the CFAA.[1]

Expressly set out in its Terms of Service, Niantic states that it does "not claim ownership rights in User Content" and that "nothing in these terms restricts any rights that you may have to use and exploit your User Content":

> 5.1   Content Ownership
> Niantic does not claim ownership rights in User Content and nothing in these Terms restricts any rights that you may have to use and exploit your User Content. Subject to the foregoing, Niantic and its licensors exclusively own all right, title, and interest in and to the Services and Content, including all associated intellectual property rights. You acknowledge that the Services and Content are protected by copyright, trademark, and other laws of the United States and foreign countries. You agree not to remove, alter, or obscure any copyright, trademark, service mark, or other proprietary rights notices incorporated in or accompanying the Services or Content.

Dkt. 7-8 at 6.

"User Content" is broadly defined as "any Content a user of a Service provides to be made available through Services."  *Id.*  This extends to "user-submitted content," which includes information regarding the PokéStops and other POI:

> Note about user-submitted content and ownership
>
> When you submit a PokéStop nomination to Niantic, we don't claim ownership of that content. You still retain your rights to the content as the creator. But you do grant Niantic a license to use the content in any way we see fit. This means, for example, that we have your permission to use the PokéStop images and descriptions to create new in-game locations in Pokémon GO, but we also have your permission to use them to create locations across different games. This is just a brief summary of how we use user-submitted content. For the full details, please review the Pokémon GO Terms of Service.

*Available at* https://niantic.helpshift.com/a/pokemon-go/?p=web&l=en&s=pokestops&f=submitting-a-pokestop-nomination.

---

[1] Further, as set forth below, Niantic's claim that Defendants improperly scrape Server POI is neither what actually occurs with Defendants' software (*i.e.*, Defendants' software does not communicate with Niantic's servers) and is technically not feasible (*i.e.*, in light of the extensive security measures that Niantic utilizes to prevent unauthorized access to its server). *See* Zeidman Decl. at ¶¶ 39-40.

1   Consequently, like LinkedIn, Niantic disclaims its right to user content – "LinkedIn

2   specifically disclaims ownership of the information users post to their personal profiles:

3   according to LinkedIn's User Agreement, members own the content and information they submit

4   or post to LinkedIn and grant LinkedIn only a non-exclusive license to 'use, copy, modify,

5   distribute, publish, and process' that information." *hiQ Labs, Inc.,* 2019 WL 4251889 at *2.

6   **b.   Users Choose To Publicly-Post POI**

7   Niantic also cannot claim that scraping of publicly-posted POI is "without access" as

8   defined by the CFAA. First, Users are allowed, and do choose, to make POI public, which is

9   accessible on other social media Apps that do not require a Niantic log-in:

 

19   Horton Decl. at ¶ 3.   Further, set forth below shows a publicly accessible Twitter post indicating

20   that there is a Grimer Pokémon with an IV of 100, Combat Power of 1237, Level 37 located at

21   GPS coordinate 40.631567, -122.29213:

**Pokemon Go Coordinates** @PoGoCoordinates · Sep 11
Grimer IV**100** CP1237 L33 ♂
40.631567,-112.29213

#PokemonGo | #PoGoCoordinates

25   Horton Decl. at ¶ 4 (setting forth other examples of publicly posted POI data conveying GPS

26   locations of certain Pokémon).

27   There are also publicly-available maps which aggregate the user-inputted data regarding

28   POI:

MTN TO LIFT PRELIMINARY INJUNCTION
CASE NO. 4:19-cv-03425-JST



Horton Decl. at ¶ 5.  Therefore, under *hiQ Labs, Inc. v. LinkedIn Corp.,* the scraping of any of this publicly available POI is permitted.

### c.    User-Posted POI Within Niantic App

At best, Niantic may claim that excluded from the *hiQ Labs, Inc. v. LinkedIn Corp.* decision is POI information that is posted within Niantic's Apps. An example is where a user has posted a POI, then Niantic takes that information and re-posts it in its *Ingress* App.  Yet, when Niantic posts this POI, it denotes the "Owner" of that information as individual users.

For example, the below image reflects a POI at "Alcatraz Lighthouse" and that the owner of this POI is user "oracleruiz":



Horton Decl. at ¶ 6.

Consistent with its disclaimer of User Content, Niantic only maintains a non-exclusive license to the above POI information.  Thus, even when posted within its App., Niantic has

-9-

1    disclaimed ownership to this POI and lacks an individual right to assert that use of this

2    information was "without [Niantic's] authorization."

3           Any attempt by Niantic to contend that it is asserting its claim in order to protect member

4    data and Niantic's investment made in developing its platform is unavailing—these same

5    arguments were made and rejected by the Ninth Circuit:

6           "LinkedIn has only a non-exclusive license to the data shared on its platform, not
            an ownership interest. Its core business model—providing a platform to share
7           professional information—does not require prohibiting hiQ's use of that
            information, as evidenced by the fact that hiQ used LinkedIn data for some time
8           before LinkedIn sent its cease-and-desist letter. As to its members' interests in
            their data, for the reasons already explained, *see supra* pp. —— – ——, we agree
9           with the district court that members' privacy expectations regarding information
            they have shared in their public profiles are "uncertain at best."
10

11   *hiQ Labs, Inc.*, 2019 WL 4251889, at *9.

12                  **4.    Niantic's Cease-And-Desist Letter And Its Terms Of Service Do Not
                           Render Scraping Of User-generated POI "Without Authorization"
13                         Under the CFAA**

14

15          The applicability of *hiQ Labs, Inc. v. LinkedIn Corp*. does not change in light of Niantic's

16   cease-and-desist letter.

17          The Ninth Circuit addressed "whether once hiQ received LinkedIn's cease-and-desist

18   letter, any further scraping and use of LinkedIn's data was 'without authorization' within the

19   meaning of the CFAA and thus a violation of the statute." *hiQ Labs, Inc.,* 2019 WL 4251889, at

20   *10.  The Ninth Circuit ultimately held that this was not sufficient to render the scraping of

21   public-information "without authorization" – the CFAA is not a "contract-based" statute, but

22   rather an "anti-intrusion statute," thus the litmus test is the following:

23          [I]t appears that the CFAA's prohibition on accessing a computer "without
            authorization" is violated **when a person circumvents a computer's generally**
24          **applicable rules regarding access permissions, such as username and**
            **password requirements**, to gain access to a computer. It is likely that **when a**
25          **computer network generally permits public access to its data, a user's**
            **accessing that publicly available data will not constitute access without**
26          **authorization** under the CFAA. The data hiQ seeks to access is not owned by
            LinkedIn and has not been demarcated by LinkedIn as private using such an
27          authorization system.

28

                                                  -10-
                                                              MTN TO LIFT PRELIMINARY INJUNCTION
                                                              CASE NO. 4:19-cv-03425-JST

1   *hiQ Labs, Inc.,* 2019 WL 4251889 at *14 (emphasis added).

2           Thus, Niantic's claim that its June 7, 2019 cease-and-desist letter rendered any further

3   scraping of the POI "without authorization" under the CFAA is incorrect.  Dkt. 7 at 14.  Because

4   users own POI they generate and POI is also made available publicly, scraping of said data is not

5   rendered "unauthorized" by nature of Niantic's cease-and-desist letter.

6           Even the express terms of Niantic's Terms of Service, which could only govern POI

7   posted within Niantic's App, acknowledge that any activities which it prohibits are limited by

8   any "applicable law [which] mandates that you be given the right to do so":



13  Dkt. 7-8 (Ex. A, Terms of Service) at 8.  This includes limitations imposed by exceptions to

14  CFAA and related case law.

15          **B.    Niantic Failed To Show That Defendants Are In "Active Concert Or
                    Participation" With Signing Services**

17          Pursuant to Rule 65(d), although an injunction may bind more than just the parties,

18  evidence must be presented to show that the third parties "are in active concert or participation"

19  with the name parties.  *Asetek Danmark A/S*, 852 F.3d at 1365–66.  In order to be "in active

20  concert," the enjoining party must show that the parties are in privity, abetting behavior, or be

21  legally identified with the enjoined party.  *Id.* at 1366.  This inquiry is "highly fact-specific" and

22  intensive, where courts are advised to approach cautiously, less a non-party is enjoined who is

23  deprived of their day in court.  *Id.*  An "injunction may not 'make punishable the conduct of

24  persons who act independently and whose rights have not been adjudged according to

25  law.'"  *Asetek Danmark A/S,* 852 F.3d at 1365 (citing *Regal Knitwear Co. v. NLRB*, 324 U.S. 9,

26  13 (1945) (citing *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 436–37, 54 S.Ct. 475

27  (1934), and other decisions)).

28

1    Here, Niantic first alleged and presented evidence that Global++ was affiliated with a

2    third party, AppHaven, in its Reply briefing, to which Defendants were foreclosed from

3    responding to and correcting.  As set forth below, Niantic's evidence falls far short of the fact-

4    intensive and narrow standard which permits the enjoinder of a party for the actions of third

5    parties.  Defendants therefore respectfully request that the Court lift the PI and not enjoin

6    Defendants for the actions of independent third parties.

7                    1.      **Niantic Did Not Argue That Defendants Are Responsible For Actions
                             of Third Party Until Its Reply**

8

9    Plaintiff admits that it did not argue that Global++ was responsible for third-party

10   AppHaven's actions until its Reply.  Horton Decl., Ex. P (Sept. 11, 2019 Tr.) at 19:22- 21:16

11   ("[a]s explained in the [] Second Declaration of Mr. Lanz.").  Only then did Niantic first allege

12   an affiliation between Global++ and AppHaven—"it appears that defendants continue to

13   distribute at least one of the Cheating Programs (and perhaps all three of the Cheating Programs)

14   through a new online platform— the AppHaven app." Dkt. 39 (Niantic Reply) at 2.

15   The sum of the evidence that Niantic offers in its Reply to show an affiliation between

16   Global++ and AppHaven is the following: (1) both domains were registered by an individual

17   named "Matthew Johnson," and; (2) AppHaven advertises and offers games that were allegedly

18   created by Global++.  Dkt. 39-1 (Second Lanz Decl.) at ¶¶ 14-19.  The Injunction Order in turns

19   cites to, and relies on, this evidence (that Niantic failed to disclose until its Reply) in its holding–

20   "Defendants are still distributing at least one of their Cheating Programs and that Niantic cannot

21   unilaterally block the Cheating Programs due to Defendants' efforts to obscure their true

22   entities."  Dkt. 55 at 13 (citing to the second declarations of Mr. Lanz and Mr. Frank which were

23   attached to Niantic's Reply).

24    "Where new evidence is presented in a reply," such evidence "should not [be] considered

25   without giving the [non-]movant an opportunity to respond."  *Provenz v. Miller*, 102 F.3d 1478,

26   1483 (9th Cir. 1996) (citing *Black v. TIC Inv. Corp.,* 900 F.2d 112, 116 (7th Cir.1990)).

27   Defendants respectfully submit that the Court's Order was based upon an incomplete and

28   incorrect factual record arising from Niantic's failure to raise certain arguments until its Reply—

1   and this incorrect factual record has resulted in a manifest injustice, improperly holding

2   Defendants liable and enjoined for the actions of independent third parties.

### 2.    Global++ Solely Develops Software Code And Does Not Create Nor Distribute Tweaked Apps

5       Defendants create Object Code and then makes this code available online in the form of a

6   Dynamic Library.  Second Decl. of Ryan Hunt at ¶¶ 7-14.  Defendants do not link these

7   Dynamic Libraries to Apps, nor distribute the linked Apps.  *Id.* at ¶¶ 14-15.  Thus, the only

8   allegations that could plausibly relate to Defendants are allegations regarding the creation of the

9   Global++ Object Code.[2]

10       It is Signing Services, such as AppHaven, who link Dynamic Libraries to various Apps

11  and then distribute to subscribers.  Zeidman Decl. at ¶ 22; Second Hunt Decl. at ¶¶ 14-19.

12  Signing Services does this by taking a Dynamic Library, linking it to a copy of an App, which

13  creates an IPA File.  Second Hunt Decl. at ¶¶ 22, 31.  Signing Services then distribute this IPA

14  File.  *Id.*  Within an IPA File, the Dynamic Library is only one small component of the Dynamic

15  Library. *See e.g., id.* at ¶ 22 (the Dynamic Library is only a 12 MB of the nearly 60 files images,

16  folders, code and other items that make up an IPA File); Second Hunt Decl. at ¶ 15.  When the

17  IPA File is launched, Global++'s Object Code does not become part of, modify or otherwise

18  copy the App to which its linked, but rather co-exists with the App.  *Id.* at ¶ 31.  At most, the

19  Global++ software once linked to an App works as an overlay to the App.  Second Hunt Decl. at

20  ¶ 28.[3]

21       Therefore, here, it is the Signing Service, App Haven, which has taken Global++'s

22  Dynamic Library, linked it to Niantic's App, thereby creating an IPA File, and then is allegedly

---

24  [2] Niantic has not made any claim that Global++ software itself copies or modifies Niantic's Object Code – the allegations are against the "Cheating Programs," which are the IPA File

25  resulting from when a Signing Service has linked Global++'s software to Niantic's App.  *See e.g.*, Dkt. 39 at 1 ("Defendants steal the Client Code and use it create, distribute and profit from

26  'hacked' versions of Niantic's apps that enable cheating in Niantic's games (the "Cheating Programs')").

27  [3] If this overlay was considered copyright infringement, then any App would have a claim against the phone's operating system, e.g., Apple, whose date, timestamp and battery icon also

28  constitute an overlay of any App running on the phone.  *See* Second Hunt Decl. at ¶ 28.

-13-

distributing the IPA File.  Zeidman Decl. at ¶ 22; Second Hunt Decl. at ¶¶ 14-19.

### 3. Preliminary Injunction Enjoins Global++ For Actions Of Independent Third Parties

As evidenced by the above facts, the following enjoined actions relate to the alleged actions of the independent party, AppHaven:

> (1) Acquiring or copying without authorization any portion of the mobile apps developed and published by Niantic and used to play Niantic's location-based augmented reality games, including Niantic's Client Code;
> (2) Reverse engineering, decompiling, or disassembling Niantic's mobile apps;
> (3) Creating derivative works based on any portion of Niantic's games, mobile apps, and Client Code, including without limitation the Accused Programs titled *Potter++* (or *Unite++*), *PokeGo++*, and *Ingress++*;
> (4) Distributing, selling, renting, leasing, or otherwise trafficking in copies of Niantic's Client Code or any apps or computer programs that include any portion of Niantic's Client Code, including without limitation the Accused Programs;
>
> (6) Accessing Niantic's network, computers, and servers, including the computers and servers that enable users to play Niantic's games via Niantic's mobile apps, by any direct or indirect means or method;
> (8) Using Niantic's Client Code or any other aspect of Niantic's mobile apps, mobile games, or other services or content, for any commercial purpose;

Dkt. 55 at 16-17.

But the evidentiary basis set forth by Niantic in its Reply, upon which the Court relied, is far from sufficient to demonstrate that Global++ and AppHaven are "in active concert or participation" in the alleged wrongdoing such that Global++ should be held liable and enjoined for the alleged acts of AppHaven.

### 4. Material Issues With Evidence That Niantic Presented Undercut Niantic's Likelihood Of Success On The Merits

Had Defendants had the opportunity to respond to the new arguments and evidence set forth in Niantic's Reply, the following material deficiencies would have been identified and following evidence would have been provided to the Court to demonstrate that at the very least, there is a serious question as to Niantic's likelihood of success on the merits of this claim such that an injunction is not proper. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350–51 (Fed.Cir.2001) (because defendants raised ""substantial question[s] concerning []

-14-

1  infringement," the preliminary injunction should not have issued.)

2              a.      **Matthew Johnson Appears To Be An Individual Who Is In The**
3                      **Business Of Registering Domains**

4          Niantic claims that Global++ and AppHaven are affiliated because both entities have the

5  same domain registrant, Mr. Matthew Johnson.  Dkt 39-1 (Second Decl. of Lanz) at ¶ 18.  What

6  Niantic does not acknowledge, but publicly-available information shows, is that Mr. Johnson is

7  also the domain registrant of at least over 1,000 other websites:



18  Horton Decl. at ¶ 10, Ex. Q.  Consistent with the Court's observation during the hearing, it

19  appears that Mr. Johnson is an individual whose profession it is to create domains for other

20  companies.  *See* Horton Decl., Ex. P at (Sep. 11, 2019 Tr.) at 21:12-13 ("it's also true that

21  sometimes people allow third parties to take care of details for them.").

22          Niantic points to its customer inquiry to Domains by Proxy, which it submitted to obtain

23  the contact information for Mr. Johnson, as proof that AppHaven and Global++ are affiliated.

24  Dkt. 39-2 (Ex. F); Dkt. 39-1 at ¶ 18.  In response to Niantic's inquiry, Domains by Proxy

25  provided an address, email and a telephone number associated with Mr. Johnson "[t]o allow

26  [Niantic] to contact the registrant directly."  Dkt. 39-1 at 21.  Absent from Mr. Lanz Second

27  Declaration and Niantic's briefing is any indication that Niantic did in fact reach out to Mr.

28  Johnson.  Because Niantic bears the burden of production to satisfy the "highly fact-specific"

1   nature of whether a nonparty acted in concert or participation with Defendants, Niantic is not

2   entitled to any inference or speculation of an association between the two entities, much less to

3   the extent of establishing Niantic's likelihood of success. *Asetek Danmark A/S*, 852 F.3d at 1366.

4

            **b.**     ***iPotter For Wizards, Takumi PokeGo++* And *IngressPrime++***
                        **Are Not Created, Controlled Or Distributed By Global++**

5

6        Niantic acknowledges that it cannot affirmatively claim that two of the apps offered on

7   AppHaven's site, *Takumi Pokego++* and *iPotter for Wizards*, are affiliated with Global++. Dkt.

8   39-1 (Second Lanz Decl.) at ¶ 15 ("the latter two **may** be renamed versions of the PokeGo++ and

9   Potter++ Cheating Programs") (emphasis added).  Indeed, Niantic would be unable to do so.

10       This is because *iPotter* was not created, and is not owned, operated or controlled by

11   Global++.  Second Decl. of Ryan Hunt at ¶ 24(c).  *iPotter* uses the Dynamic Library of a

12   unaffiliated third-party, which a Signing Service has then linked to Niantic's code.  *Id*.  As it

13   relates to *Takumi PokeGo++*, it is an App created by Takumi, a Signing Service. Second Decl.

14   of Ryan Hunt at ¶ 24(a).  Takumi linked an outdated version of Global++'s Object Code (stolen

15   in the course of a breach in 2017), to the latest versions of *PokémonGo*. *Id*.

16       Similarly, *IngressPrime ++* is an App that was created by a Signing Service that linked a

17   version of Global++'s software which was available **prior** to June 2019 (when Defendants

18   shutdown the website server in light of Niantic's Cease and Desist Letter) to Niantic's App.  *Id.*

19   at ¶ 24(b).[4] Thus, Niantic has failed to show how the existence of these Apps on a third party

20   Signing Service site satisfies its evidentiary burden of showing that Defendants and AppHaven

21   are in active concert or participation.

22

23

24

25

---

26   [4] Defendants note that Niantic contended in its Reply that "defendants released a new version
(version R119) of their Pokemon GO Cheating Program, *PokeGo++*" after Niantic's June 7,
27   2019 Cease-and-Desist Letter and before Niantic filed suit seven days later (Dkt. 39-1 (Second
Lanz Decl.) at ¶ 13) – the lack of any evidentiary support offered in support undercuts any
28   weight that could be afforded to such an allegation.

1

**5.     A Complete Evidentiary Record Demonstrates That Signing Services Is An Independent Third Party**

2

3      Defendants do not, nor have ever, controlled the AppHaven app.  First, AppHaven has

4  expressly disclaimed any affiliation, connection or overlapping ownership between itself and

5  Global++:

6

7

8

9

10

11

12

13

14

15

16



17  Horton Decl. at ¶ 8.

18      The separation between the two entities is further evidenced by the third-person language

19  utilized in the post, stating that AppHaven reached out to Global++ regarding the availability of

20  PokemonGo++ and Potter++ "but never received any response, so its (sic) safe to assume they

21  wont (sic) be coming back and its (sic) time to move on."  *Id.*

22      Contrary to Niantic's speculation that Defendants are subversively continuing to

23  distribute its software via AppHaven, it is clear that as of August 16, 2019 AppHaven users were

24  seeking to use *PokemonGo++* and *Potter++,* yet, consistent with Defendants' representation,

25  Global++ no longer offers the software that is linked via the IPA File.  *See* Dkt. 39 (Reply) at 2.

26  The lack of affiliation is furthered by the fact that AppHaven currently hosts approximately 100

27  games available for download, only three of which does Niantic allege even relate to Global++.

28  *See* Second Hunt Decl. at ¶¶ 21-22.

-17-

1    Additionally, the "++" included in the name of the tweaked Apps that AppHaven (and

2    other Signing Services) offer on its site do not denote an affiliation with Global++.  Signing

3    Services use "++" to indicate that an App has been linked to a Dynamic Library.  *See* Second

4    Hunt Decl. at ¶¶ 16-17 .  Thus, users searching Signing Services can enter "++" to find linked

5    Apps.  *Id*.

  

11    Dkt. 39-2 (Ex. G-1 and G-2) at 23-26.  For example, a user of Signing Services would search a

12    Signing Services platform for "Spotify++" to locate Spotify Apps that are linked to Dynamic

13    Libraries.  Reflected in Niantic's own exhibits, the '++' addendum is associated with Apps

14    attributed to individuals other than Global++, such as "iJulioVerne" and "SarahH12099."  *Id.*

15    As a practical matter, if Global++ was in fact a Signing Service that would mean that

16    Global++ is distributing competing tweaked Apps.  For example, *iSpoofer* is an IPA File which

17    incorporates software that allows a user to alter its GPS data.  Second Hunt Decl. at ¶ 18;

18    Zeidman Decl. at ¶ 26.[5]   If Global++ was a signing service, then that would mean it was

19    distributing the IPA File which links its software to Niantic's App, and then also distributing a

20    directly competing IPA File which links the *iSpoofer* software to Niantic's App.

21    This evidence further underscores the lack of any affiliation, much less rising to the level

22    of "in active concert or participation," between Defendants and Signing Services.

23    **6.    Additional Evidence Shows That Allegations Of Security Breaches To Access Niantic's Code Are Not Required Nor Technically Feasible**

24    **a.    Not Required To Circumvent Niantic's "Technical Measures" To View Niantic's App Code**

---

[5] Evidenced by the IPA File, *iSpoofer* links a software distinct and separate from that of Global++'s with Niantic's Object Code.  Zeidman Decl. at ¶ 26.

1    Niantic claims in its briefing that it "protects its Client Code via technical measures

2 designed to prevent users from viewing the code."  Dkt. 7 at 1.  Further, Niantic seems to

3 contend that the only method to access Niantic's code is after agreement to its Terms of Service.

4 *Id.* at 3 (Terms of Service "provide that users may not, among other things, copy Niantic's code

5 or misappropriate Niantic's code for any commercial purpose.")  Implicit in these representations

6 is that the only method to access said code is by circumventing Niantic's "technical measures"

7 and after agreement to its Terms of Service—in reality, neither of these steps are required.

8    To download Niantic's App, for example PokémonGo, an individual only needs an Apple

9 or Google account to access the App Store.  No information set forth in the App's description

10 alerts the downloader to the Terms of Service, much less prompts the downloader to look at or

11 agree to its terms.



19 Horton Decl., at ¶¶ 1.  Unlike Niantic's Privacy Policy which was listed in the window at the

20 download stage of the App, Niantic did not set out its Terms of Service:



MTN TO LIFT PRELIMINARY INJUNCTION
CASE NO. 4:19-cv-03425-JST

1    Upon downloading the App, an individual or entity can access Niantic's Object Code if it

2    so chooses.  Zeidman Decl. at ¶¶ 27-28.  For example, Signing Services could obtain Niantic's

3    code at this point without having encountered Niantic's Terms of Service. *Id.*

4    Agreement to Niantic's Terms of Service is not prompted or required until an individual

5    seeks to play Niantic's game:

6
7
8      
9
10
11
12
13
14

15    Zeidman Decl. at ¶ 27 (citing Compl. ¶ 37; Frank Decl. ¶ 13; VanDeBogart Decl. ¶ 5) ("**In order**

16    **to play Niantic's games,** all users must agree to Niantic's Terms of Service and any subsequent

17    modifications to the Terms of Service"); Horton Decl. at ¶ 2.

18    As set forth above, an individual is prompted to sign-in after opening the App.  It is only

19    *after* signing into the App and allowing the game to load, that the individual views a screen

20    which has a link to the Terms of Service, which still does not require the individual to view the

21    Terms of Service prior to accepting or declining the terms.  *McGhee v. N. Am. Bancard, LLC*,

22    No. 17-CV-0586-AJB-KSC, 2017 WL 3118799, at *2–3 (S.D. Cal. July 21, 2017), *aff'd,* 755 F.

23    App'x 718 (9th Cir. 2019) ("[a] modified clickwrap agreement is similar to a browsewrap in that

24    the user is not required to scroll through a list of terms and conditions before reaching the 'I

25    Agree' button") (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir.

26    2014)).

27    To the extent that Niantic attempts to argue that an individual is bound by the Terms of

28    Service by downloading the App, despite not having been placed on notice of said contract, such

-20-

1    an argument is legally unsupported.  *See e.g., Specht v. Netscape Communications Corp.*, 306

2    F.3d 17, 30-32, 35 (2nd Cir. 2002) ("where customers are urged to download free software at the

3    immediate click of a button," and there is no "immediately visible notice of the existence of

4    license terms or require unambiguous manifestation of assent to those terms," then a consumer

5    clicking on the download button does not communicate assent to contractual terms")("[w]e hold

6    that a reasonably prudent offeree in plaintiffs' position would not have known or learned, prior to

7    acting on the invitation to download, of the reference to [] license terms.").

8
         **b.    Global++ Software Does Not Circumvent Niantic's Security
                  Encryption**
9

10        In the Lanz Declaration attached to its Reply, Niantic claims the following regarding its

11   efforts to impose "technical measures" and Defendants' thwarting efforts:

12   •    "Niantic has consistently and on an ongoing basis invested considerable
          time and resources trying to implement additional technical measures
13        designed to prevent defendants and the Cheating Programs from […]
          accessing Niantic's computers. These have included adding security
14        measures to Niantic's Client Code when Niantic has released new versions
          of its legitimate apps, which generally occurs every two to three weeks.
15        Those additional security measures are intended to prevent modified
          versions of Niantic's legitimate apps (including the Cheating Programs)
16        from connecting to Niantic's servers." Dkt. 39-1 at ¶ 5.

17
     •    "[D]efendants have acted to evade and thwart these measures by
18        identifying the pieces of Client Code that are intended to prevent modified
          versions of Niantic's Client Code from connecting to Niantic's servers,
19        and either disabling those pieces of Client Code or implementing
          alternative mechanisms to evade that security measure." *Id.* at ¶ 6.
20

21        Niantic's allegations though are not technically feasible.  First, this is because Global++'s

22   software communicates with the user phone's GPS. It is not communicating with Niantic's

23   servers.  Zeidman Decl. at ¶¶ 29, 40.  Further, to the extent that this allegation is intended to be

24   against Signing Services that generate the IPA file, this allegation disregards the extent and level

25   of Niantic's security measures.  *Id.* at ¶¶ 36-39.

26        Defendants are unable to better understand Niantic's claim that Defendants allegedly

27   circumvent Niantic's technical measures since Niantic does not offer any evidentiary support.  In

28   looking at Niantic's Reply and the accompanying Lanz Decl., Niantic fails to offer **any** evidence

1   or exhibits to accompany these declaratory statements.  Zeidman Decl. at ¶ 38; Dkt. 39-1

2   (Second Lanz Decl.) at ¶¶ 5-7. This is far from sufficient to demonstrate that Niantic has a

3   likelihood of success in demonstrating that Global++ is the correct party against which to make

4   such an allegation, much less even if properly alleged against the non-party, Signing Services,

5   that the allegation is technically feasible.

6          **7.    The Material Factual Distinctions Undercut Niantic's Claim To**
              **Likelihood Of Success On The Merits**
7

8          In sum, Global++ was enjoined for actions of independent third parties based upon

9   evidence and arguments which were not set out until Niantic's Reply briefing and which are

10  speculative at best based on a fuller evidentiary record.

11         *Asetek Danmark A/S v. CMI USA Inc* is instructive on why the current factual record is

12  insufficient to enjoin Global++ on the basis of alleged actions of AppHaven, a non-party.  Even

13  though in *Asetek Danmark* there was a fuller evidentiary record before the Federal Circuit, the

14  Federal Circuit still partially vacated the injunction and remanded the case for further

15  proceedings to gain a "fuller picture of the facts" regarding the relationship between the party

16  and non-party in light of the "delicacy of the injunctive authority at issue and the tradition of

17  narrow fact dependent determinations."  *Asetek Danmark A/S*, 852 F.3d at 1369.  One

18  consideration of the Federal Circuit that is germane here is that AppHaven/Signing Services as a

19  non-party has not had its day in court to assert certain arguments – for example, that the Court

20  may lack personal jurisdiction over them, and that they lacked notice and opportunity to be heard

21  on the issues related to the injunction.  *Asetek Danmark A/S*, 852 F.3d at 1364 (listing arguments

22  available to non-parties against being improperly subjected to injunctive obligations); *Delta Ltd.*

23  *v. U.S. Customs and Border Protection Bureau*, 393 F. Supp. 2d 15 (D.D.C. 2005) ("'[w]hile the

24  courts have not defined 'manifest injustice,' it seems clear that injury to innocent third parties

25  would fall beneath the 'manifest injustice' umbrella") (citing *Oneida Indian Nation of N.Y. v.*

26  *County of Oneida,* 214 F.R.D. 83, 98 (N.D.N.Y.2003)).

27         Consequently, Defendants respectfully request that the Injunction Order be lifted as it

28  relates to the actions of independent third parties.  *Asetek Danmark A/S*, 852 F.3d at 1369

-22-

1 ("deferring conclusions until the facts about the relationship of Cooler Master and CMI, both in
2 their businesses and in this litigation, are more fully developed and their legal significance more
3 fully explored") (citing cases).

**8.      Enjoining Defendants For Actions Of Independent Third Parties Has Unfairly Foreclosed Defendants Ability To Make Any Profit**

6      The overarching consequence of the preliminary injunction which is based upon an
7 incomplete factual record, is that Defendants are being enjoined for actions of independent third
8 parties—Signing Services.  It is these non-parties who link Defendants software with Niantic's
9 App and distribute, the actions of which Niantic appears to truly take issue with.  Defendants'
10 software code itself does not (nor has Niantic shown) copy, incorporate, or otherwise modify
11 Niantic's Object Code.

12      As currently written, this injunction prohibits Defendants from any use of their
13 proprietary software which can be used with numerous other programs.  Consequently,
14 Defendants have lost the ability to make any profit off of its software.  Second Hunt Decl. at ¶
15 33. Because Niantic's has not, and cannot, satisfy the fact-intensive standard that Defendants are
16 in "active concert or participation," enjoining Defendants for the actions of third parties results in
17 a manifest injustice for which Defendants respectfully request the injunction to be lifted.

## V.      CONCLUSION

19      Based upon the foregoing, Defendants respectfully request that the Court lift the
20 preliminary injunction.

Dated:  October 24, 2019                    Respectfully Submitted,

POLSINELLI LLP


                                                  */s/ Fabio E. Marino*
                                           By:    Fabio E. Marino

                                           Attorneys for Defendants
                                           RYAN HUNT AND ALEN HUNDUR

MTN TO LIFT PRELIMINARY INJUNCTION
CASE NO. 4:19-cv-03425-JST