Julie E. Schwartz, Bar No. 260624
JSchwartz@perkinscoie.com
Perkins Coie LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300
Facsimile: 650.838.4350

Todd M. Hinnen (admitted *pro hac vice*)
THinnen@perkinscoie.com
Ryan Spear (admitted *pro hac vice*)
RSpear@perkinscoie.com
Perkins Coie LLP
1201 Third Ave., Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for Plaintiff Niantic, Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| NIANTIC, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>GLOBAL++, an unincorporated association; RYAN HUNT, a.k.a. "ELLIOTROBOT," an individual; ALEN HUNDUR, a.k.a. "IOS N00B," an individual; and DOES 1-20,<br><br>Defendants. | Case No. 19-cv-03425-JST<br><br>**NIANTIC, INC.'S OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION UNDER FEDERAL RULE OF CIVIL PROCEDURE 59(e)**<br><br>**Date:** January 29, 2020<br>**Hearing Time:** 2:00 p.m.<br>**Courtroom:** 6, 2nd Floor (Oakland)<br>**Judge:** Hon. Jon S. Tigar |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION AND FACTUAL BACKGROUND .......................................................... 1

II.    ISSUES TO BE DECIDED ...................................................................... 1

III.    LEGAL STANDARD .............................................................................. 1

IV.    ARGUMENT ............................................................................................ 2

    A.    All of Defendants' Arguments and Evidence Should Have Been Raised Before, or Have Already Been Raised and Rejected, and Are Therefore Not Proper Grounds for Reconsideration .......................... 2

        1.    The *hiQ Labs* defense............................................................... 2

            a)    The *hiQ Labs* defense is not a proper ground for reconsideration ................................. 3

            b)    The *hiQ Labs* defense is meritless ............................... 5

            c)    The *hiQ Labs* defense is immaterial................................ 8

        2.    The "innocence" defense................................................... 9

            a)    The "innocence" defense is not a proper ground for reconsideration ................................. 9

            b)    Defendants were not deprived of an opportunity to respond to Niantic's arguments and evidence ............................. 11

            c)    The "innocence" defense is meritless ......................... 13

                (i)    Defendants copied and distributed Niantic's Client Code ................................. 13

                (ii)    Defendants scrape Niantic's game-related data ............... 15

                (iii)    Global++ and AppHaven are "partners".......................... 16

    B.    Defendants Do Not Identify Any Errors of Law or Fact ...................................... 18

    C.    Defendants Do Not Identify Any Manifest Injustice ........................................... 19

V.    CONCLUSION ................................................................................................ 20

1

# TABLE OF AUTHORITIES

2

**Page**

3 **CASES**

4 *Bailey v. Diaz,*
   No. C 12–1414 CRB (PR), 2013 WL 6189183 (N.D. Cal. Nov. 25, 2013)............................ 18

5

6 *Baldonado v. United States,*
   No. 2:06-cv-07266-JHN-RZ, 2011 WL 13213543 (C.D. Cal. Oct. 12, 2011) .................... 1, 2

7

8 *Carroll v. Nakatani,*
   342 F.3d 934 (9th Cir. 2003)......................................................................................................... 2

9 *Clark v. Berryhill,*
   No. 17-cv-00371-JCS, 2019 WL 1274786 (N.D. Cal. Mar. 20, 2019).................................... 4

10

11 *Facebook, Inc. v. Power Ventures, Inc.,*
   844 F.3d 1058 (9th Cir. 2016).......................................................................................... 6, 8, 16

12

13 *hiQ Labs, Inc. v. LinkedIn Corp.,*
   273 F. Supp. 3d 1099 (N.D. Cal. 2017), *aff'd and remanded*, 938 F.3d 985 (9th
   Cir. 2019) ........................................................................................................................................ 3

14

15 *hiQ Labs, Inc. v. LinkedIn Corporation,*
   938 F.3d 985 (9th Cir. 2019)............................................................................................. passim

16

17 *Kona Enters., Inc. v. Estate of Bishop,*
   229 F.3d 877 (9th Cir. 2000)................................................................................................ 2, 3, 4

18 *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
   571 F.3d 873 (9th Cir. 2009)............................................................................................... 10, 11

19

20 *Newmark Realty Capital, Inc. v. BGC Partners, Inc.,*
   No. 16-cv-01702-BLF, 2018 WL 2573183 (N.D. Cal. Mar. 30, 2018)................................ 10

21 *Parrott v. Porter,*
   No. CV 16-04287 SJO, 2016 WL 10957852 (C.D. Cal. Dec. 15, 2016)........................... 5, 13

22

23 *Ridgeway v. Wal-Mart Stores, Inc.,*
   No. 08-cv-05221-SI, 2016 WL 4529430 (N.D. Cal. Aug. 30, 2016) ...................................... 4

24

25 *Rishor v. Ferguson,*
   822 F.3d 482 (9th Cir. 2016).................................................................................... 2, 3, 18, 19

26 *Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.,*
   5 F.3d 1255 (9th Cir. 1993)......................................................................................................... 10

27

28

- ii -

# TABLE OF AUTHORITIES
(continued)

**Page**

*Sec. & Exch. Comm'n v. Sabrdaran*,
    252 F. Supp. 3d 866 (N.D. Cal. 2017) .................................................................. 4

*Smith v. Clark Cty. Sch. Dist.*,
    727 F.3d 950 (9th Cir. 2013).................................................................................. 18

*White v. Square, Inc.*,
    No. 15-cv-04539-JST, 2016 WL 6647927 (N.D. Cal. Nov. 9, 2016).................................. 2, 9

*Zimmerman v. City of Oakland*,
    255 F.3d 734 (9th Cir. 2001).................................................................................. 4

**STATUTES**

17 U.S.C. § 101 ................................................................................................ 13

18 U.S.C. § 1030 ........................................................................................ passim

**RULES**

Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii)................................................................... 11

Northern District of California Local Rule 7-3(d) .................................. 4, 12

Northern District of California Local Rule 7-6.......................................... 12

Fed. R. Civ. P. 59(e)................................................................................ passim

## I.   INTRODUCTION AND FACTUAL BACKGROUND

Plaintiff Niantic, Inc. ("Niantic") alleges that defendants engaged in a sophisticated scheme to steal Niantic's valuable and proprietary software code (the "Client Code") and use that code to create, distribute, and profit from the Cheating Programs—"hacked" versions of mobile applications for playing Niantic's popular augmented reality games. The Court recently held that Niantic is likely to succeed on its claims for copyright infringement, violation of the federal Computer Fraud and Abuse Act, and breach of contract. The Court therefore denied defendants' motion to dismiss and preliminarily enjoined defendants from engaging in their unlawful activities. *See* Dkt. 55 ("PI Order").

Twenty-eight days later, defendants filed their Motion to Lift the Preliminary Injunction (the "Motion") (Dkt. 63). The Motion asks this Court to reconsider and vacate the PI Order, in its entirety, under Federal Rule of Civil Procedure ("Rule") 59(e).

Defendants' Motion is plainly improper under Rule 59(e). "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Baldonado v. United States*, No. 2:06-cv-07266-JHN-RZ, 2011 WL 13213543, at *2 (C.D. Cal. Oct. 12, 2011) (internal quotation marks and citation omitted) (emphasis omitted). But defendants' Motion does *solely* those things. It raises old issues that have already been litigated and may not be rehashed here; it raises new issues that could have been raised months ago and may not be raised for the first time here; and it comes nowhere near establishing any valid basis for reconsideration. Because all of the arguments and evidence in defendants' Motion are procedurally improper, substantively meritless, or both, defendants' Motion should be denied.

## II.   ISSUES TO BE DECIDED

Whether defendants have established valid grounds for reconsideration under Rule 59(e).

## III.   LEGAL STANDARD

The rules governing Rule 59(e) motions are well established. "While Rule 59(e) permits a district court to reconsider and amend a previous order, the rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Carroll v.*

*Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (internal quotation marks and citation omitted).

"Altering or amending a judgment under Rule 59(e) is . . . usually available only when (1) the

court committed manifest errors of law or fact, (2) the court is presented with newly discovered or

previously unavailable evidence, (3) the decision was manifestly unjust, or (4) there is an

intervening change in the controlling law." *Rishor v. Ferguson*, 822 F.3d 482, 491-92 (9th Cir.

2016). "A Rule 59(e) motion may not be used to raise arguments or present evidence for the first

time when they could reasonably have been raised earlier in the litigation." *Kona Enters., Inc. v.*

*Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). Nor may it be used to "rehash arguments or

recapitulate cases already considered by the court." *White v. Square, Inc.*, No. 15-cv-04539-JST,

2016 WL 6647927, at *2 (N.D. Cal. Nov. 9, 2016).

## IV.     ARGUMENT

Defendants argue that the Court should vacate the PI Order on three specific grounds:

evidence and arguments that were supposedly "previously unavailable" to them; purported "errors

of law and fact" in the PI Order; and "manifest injustice." Mot. at 3. While those are valid

grounds for reconsideration, defendants establish none of them. To the contrary, they merely seek

a "second bite at the apple" by "presenting the case under new theories" and "relitigating old

issues." *Baldonado*, 2011 WL 13213543, at *2. That is exactly the sort of gamesmanship that

Rule 59(e) does not tolerate. Defendants' Motion should be denied.

**A.     All of Defendants' Arguments and Evidence Should Have Been Raised Before, or**
**Have Already Been Raised and Rejected, and Are Therefore Not Proper Grounds**
**for Reconsideration**

### 1.     The *hiQ Labs* defense

Much of defendants' Motion is devoted to a convoluted argument based on the Ninth

Circuit's recent decision in *hiQ Labs, Inc. v. LinkedIn Corporation* ("*hiQ Labs*"), 938 F.3d 985

(9th Cir. 2019). According to defendants, *hiQ Labs* establishes that scraping (that is, stealing)

Niantic's game-related data is not a violation of the Computer Fraud and Abuse Act ("CFAA")

because Niantic does not own some of the scraped data and because some of the scraped data is

not "private." *See, e.g.*, Mot. at 4-5. On that basis, defendants ask the Court to vacate the

provision of the PI Order barring defendants from "[e]xtracting, scraping, or indexing data about

1    points of interest or spawning locations within Niantic's games, including names, descriptions,

2    photographs, game states, and precise coordinates of those points of interest." PI Order at 16.

3        Defendants' reading of *hiQ Labs* is wrong. So too are defendants' legal and factual claims

4    about Niantic's data and how defendants steal it. *See infra* at 13-18. But the Court need not

5    untangle those issues at this stage because defendants' new argument could have been raised—

6    and should have been raised—long before now. It should therefore be disregarded.

7        a)    **The *hiQ Labs* defense is not a proper ground for reconsideration**

8        As the Ninth Circuit has explained, "[a] Rule 59(e) motion may not be used to raise

9    arguments or present evidence for the first time when they could reasonably have been raised

10   earlier in the litigation." *Kona Enters.*, 229 F.3d at 890. Thus, defendants may not rely on their

11   new *hiQ Labs* defense unless it could not have been raised earlier. But it most certainly could

12   have been raised earlier. Defendants do not argue that the Ninth Circuit's decision amounted to an

13   "intervening change in the controlling law" for purposes of Rule 59(e), nor could they. *Rishor*,

14   822 F.3d at 491-92. Moreover, the district court decision that the Ninth Circuit affirmed has been

15   on the books since August 14, 2017—almost two years before Niantic filed this lawsuit. *See hiQ*

16   *Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099 (N.D. Cal. 2017), *aff'd and remanded*, 938

17   F.3d 985 (9th Cir. 2019). It follows that defendants could have articulated their *hiQ Labs* defense

18   from the outset of this case many months ago, including in their motion to dismiss and in their

19   opposition to Niantic's motion for preliminary injunctive relief. They chose not to do so.

20       Even if the clock started ticking when the Ninth Circuit issued its decision, defendants'

21   tardiness is still inexcusable. Again, the Ninth Circuit issued its decision in *hiQ Labs* on

22   September 9, 2019. If defendants truly believed that decision exonerated them, then they should

23   have brought it to the Court's attention before the September 11 hearing on defendants' motion to

24   dismiss and Niantic's motion for preliminary injunctive relief. *See* Dkt. 37. It is true that briefing

25   on the parties' motions was complete on September 9. *See* Mot. at 2. But the Local Rules

26   expressly authorize a party to file "a Statement of Recent Decision" at any point "[b]efore the

27   noticed hearing date" if the "relevant judicial opinion [was] published after the date the

28

1    opposition or reply was filed." *See* L.R. 7-3(d)(2). Thus, defendants cannot argue that they had no

2    opportunity to bring *hiQ Labs* to this Court's attention before the September 11 hearing.

3          Alternatively, defendants could have brought the Ninth Circuit's decision to this Court's

4    attention after the motions hearing (on September 11) but before the Court issued the PI Order

5    (on September 26)—a period spanning more than two weeks. *See, e.g., Sec. & Exch. Comm'n v.*

6    *Sabrdaran*, 252 F. Supp. 3d 866, 877 (N.D. Cal. 2017) (considering notices of supplemental

7    authority submitted after oral argument); *Ridgeway v. Wal-Mart Stores, Inc.*, No. 08-cv-05221-SI,

8    2016 WL 4529430, at *14 (N.D. Cal. Aug. 30, 2016) (same). Again, for reasons only they know,

9    defendants chose not to do so.

10         In short, defendants could have and should have raised this new defense long ago, and

11   certainly before the Court issued the PI Order. As a result, it cannot be considered in the context

12   of a Rule 59(e) motion. *See, e.g., Clark v. Berryhill*, No. 17-cv-00371-JCS, 2019 WL 1274786, at

13   *2 (N.D. Cal. Mar. 20, 2019) (denying Rule 59(e) motion as "procedurally improper, because

14   each argument raised therein . . . could have been raised" in earlier briefing).

15         The same analysis applies to the facts that defendants cite in support of their *hiQ Labs*

16   defense, none of which were raised earlier. Those purported facts include inaccurate descriptions

17   of Niantic's game-related data, all of which appear to be based exclusively on the say-so of

18   defendants' counsel, *see* Mot. at 6; cherry-picked snippets from Niantic's terms of service, which

19   defendants misrepresent and misconstrue, *see id.* at 7; and unverifiable assertions about conduct

20   by unknown third parties, which have nothing to do with Niantic's claims against these

21   defendants, *see id.* at 8.

22         Again, the law is clear: defendants may raise new facts now only if they could not have

23   raised them earlier. *See Kona Enters.*, 229 F.3d at 890; *see also Zimmerman v. City of Oakland*,

24   255 F.3d 734, 740 (9th Cir. 2001) ("[A] party that fails to introduce facts in a motion or

25   opposition cannot introduce them later in a [Rule 59(e) motion] by claiming that they constitute

26   'newly discovered evidence' unless they were previously unavailable."). Defendants do not make

27   that showing, nor could they, because all of the alleged facts they cite in support of their *hiQ Labs*

28

1    defense were plainly available to them before the PI Order issued. It follows that defendants' new

2    facts must be rejected.

3                        **b)      The *hiQ Labs* defense is meritless**

4            In addition to being procedurally improper, defendants' *hiQ Labs* defense is

5    "substantively meritless" and should be disregarded for that reason as well. *Parrott v. Porter*, No.

6    CV 16-04287 SJO (GJSx), 2016 WL 10957852, at *2 (C.D. Cal. Dec. 15, 2016) (denying

7    reconsideration based on arguments that were procedurally improper and "substantively

8    meritless"). In fact, if anything, *hiQ Labs* supports Niantic's position—not defendants'.

9            The *hiQ Labs* case involved a dispute between LinkedIn, the operator of a professional

10   networking website, and *hiQ Labs*, a data-analytics company that used automated "bots" (i.e.,

11   computer programs) to scrape publicly available information from LinkedIn's website. Unlike

12   some of the information published on LinkedIn's website, the information that hiQ scraped was

13   not subject to any access controls; it was "available for viewing by anyone with a web browser."

14   *hiQ Labs*, 938 F.3d at 989. Thus, as the Ninth Circuit made clear, the case dealt "only with

15   profiles made visible to the general public." *Id.* at 990.

16           LinkedIn objected to the scraping and sent hiQ a cease-and-desist letter. *See id.* at 992. In

17   response, hiQ sued LinkedIn and sought a preliminary injunction to prevent LinkedIn from

18   blocking hiQ's access to LinkedIn's website. The district court granted the preliminary

19   injunction, and LinkedIn appealed. *See id.* On appeal, LinkedIn argued that hiQ could not

20   establish a likelihood of success supporting the preliminary injunction because (1) hiQ's scraping

21   constituted unauthorized access to LinkedIn's computers in violation of the CFAA, and (2) the

22   CFAA preempted hiQ's state-law claims. *See id.* at 999. The Ninth Circuit rejected that argument,

23   reasoning that "the CFAA's prohibition on accessing a computer 'without authorization' is

24   violated when a person circumvents a computer's generally applicable rules regarding access

25   permissions, such as username and password requirements, to gain access to a computer." *Id.* at

26   1003. In contrast, "when a computer network generally permits public access to its data, a user's

27   accessing that publicly available data will not constitute access without authorization under the

28   CFAA." *Id.* Based on those principles, the Ninth Circuit held that hiQ's access to the public

1  portions of LinkedIn's website—the portions that anyone could access at any time—probably was

2  not "unauthorized" under the CFAA. *Id.* at 1003-04.

3        This case is nothing like *hiQ Labs*. Unlike the public portions of LinkedIn's website, the

4  servers used to play Niantic's games are "demarcated . . . as private using . . . an authorization

5  system," *id.*, and they are not "available to anyone with an Internet connection," *id.* at 1002. More

6  specifically, the servers used to play Niantic's games are accessible only to those who (1) create

7  valid Niantic game accounts and (2) download, install, and use Niantic's *legitimate* mobile apps.

8  *Id.* at 1003. "All other means" of accessing Niantic's servers and thereby obtaining Niantic's

9  game-related data, including through unauthorized third-party software like defendants' Cheating

10  Programs, "are prohibited." Dkt. 7-2 at 1 (Decl. of Eric Lanz). Requiring users to access Niantic's

11  servers through legitimate apps, and in conjunction with password-protected accounts, serves at

12  least two purposes: it provides an authentication system that limits access to authorized Niantic

13  users, and it helps protect Niantic's servers from unauthorized access and abuse. Those are

14  precisely the sort of "generally applicable rules regarding access permissions" contemplated by

15  the Ninth Circuit in *hiQ Labs*. 938 F.3d at 1003. And defendants' conduct—i.e., using

16  unauthorized programs to access Niantic's servers and interfere with normal game-play—"is

17  analogous to 'breaking and entering.'" *Id.* at 1001.

18        *Facebook, Inc. v. Power Ventures, Inc.*, cited favorably in *hiQ Labs*, is also instructive.

19  844 F.3d 1058 (9th Cir. 2016). In that case, defendant Power Ventures obtained Facebook user

20  credentials from Facebook users and used those credentials to obtain data from Facebook's

21  website for Power's commercial purposes. Facebook demanded that Power stop accessing its

22  servers, and Power refused. *See id.* at 1063. The Ninth Circuit held that Power accessed

23  Facebook's servers without authorization in violation of the CFAA. *See id.* at 1067-68. There, as

24  here, the key was that the plaintiff "tried to limit and control access to" it servers, and the

25  defendant purposely defeated those access controls. *Id.* at 1063. The fact that Power accessed

26  Facebook's servers using Facebook users' valid credentials was no matter, the Ninth Circuit

27  explained, because "[o]nce permission has been revoked, technological gamesmanship or the

28  enlisting of a third party to aid in access will not excuse liability." *Id.* at 1067.

- 6 -

1    Hoping to avoid that conclusion, defendants focus on what they stole (Niantic's data)

2    rather than how they stole it (unauthorized access). Specifically, defendants point out that Niantic

3    allows users to retain rights in some data (e.g., photographs) that they submit as part of the

4    process for "nominating" real-life places to be points of interest in Niantic's games. *See* Mot. at

5    6-7. Next, defendants observe that some of Niantic's game-related data has leaked to the Internet

6    and is therefore now "publicly available" on third parties' websites. *See id.* at 9. Finally, seizing

7    on stray language from *hiQ Labs*, defendants argue that Niantic cannot assert a CFAA claim

8    based on defendants' scraping of those subsets of data because the first subset is "not owned by"

9    Niantic and the second subset is no longer "private." *hiQ Labs*, 938 F.3d at 1003-04. That

10   argument fails for a variety of reasons.

11   **First**, Niantic does not allege that defendants' scraping was limited to data submitted by

12   users or leaked data. Rather, Niantic contends that defendants scraped all kinds of game-related

13   data stored on and generated by Niantic's servers. Thus, even if defendants' argument were

14   correct (it is not), it would apply to a narrow slice of the conduct at issue here—as defendants

15   themselves seem to acknowledge. *See* Mot. at 7 (arguing that Niantic "does not have rights over

16   *certain POI data* for which it alleges Global++ improperly scrapes") (emphasis added). [1]

17   **Second**, defendants' creative interpretation of *hiQ Labs* is simply wrong. That case does

18   not hold that a computer owner must own the data stored on its computer to seek relief for

19   unauthorized access to that computer. Nor could the CFAA bear that reading. The CFAA allows

20

---

21   [1] Although the Court need not delve into the minutiae of Niantic's game-related data to resolve
     the Motion, it is worth nothing that defendants often misrepresent the nature of that data. *See,*
22   *e.g.*, Mot. at 6 (asserting, wrongly, that Niantic characterizes its data as "User-generated POI" and
     "Server POI"). For the sake of clarity, Niantic's game-related data generally falls into two
23   categories: "fixed" and "dynamic" data. Fixed data corresponds to stable features of Niantic's
     games. Examples include GPS coordinates and photographs for PokéStops in Pokémon GO.
24   Dynamic data corresponds to variable features of Niantic's games. Examples in Pokémon GO
     include the "game state" of points of interest, such as whether they are PokéStops or Gyms, and
25   data about Pokémon "spawning" in certain locations. Some (but not all) of the fixed data is
     submitted by Niantic users. None of the dynamic data is developed by users. Both types of data
26   are stored and generated on Niantic's servers and may only be accessed by users with valid
     Niantic accounts using legitimate Niantic apps. *See* Decl. of Eric Lanz in Supp. of Niantic's Opp.
27   to Mot. for Reconsideration ("Lanz Decl.") ¶¶ 21-25. Niantic alleges that defendants use the
     Cheating Programs to scrape fixed and dynamic data from Niantic's servers without
28   authorization.

"[a]ny person who suffers damage or loss" to sue when information is obtained through unauthorized access. 18 U.S.C. § 1030(g) (emphasis added). It does not require that person to be the owner of the stolen information. And imposing such an "owner requirement" would have absurd results. For example, it would mean that the CFAA would not protect companies that store data on behalf of others—i.e., almost every company, including banks and health care providers. Fortunately, that is not the law. *See, e.g., Power Ventures*, 844 F.3d at 1068 ("[F]or Power to continue . . . using Facebook's computers, it needed authorization both from individual Facebook users (who controlled their data and personal pages) and from Facebook (which stored this data on its physical servers).").

It is equally absurd to suggest, as defendants do, that *hiQ Labs* stands for the proposition that if Party A leaks a company's proprietary data to the public, then Party B is free to scrape that same data from the company's computers merely because the data is no longer "private." *See* Mot. at 9. Nothing in the language or reasoning of *hiQ Labs* hints at that result, and adopting that reading would eviscerate the CFAA.

Rather, in *hiQ Labs*, the Ninth Circuit simply held that hiQ probably did not access LinkedIn's servers without authorization because there was no "authorization system" controlling access to the LinkedIn servers that hiQ accessed, and no other indication that LinkedIn's public data was off-limits to the general public. *Id.* at 1003-04. Here, in contrast, Niantic employs a robust authorization system limiting access to its servers, and defendants circumvented that system to gain unauthorized access to Niantic's servers and obtain game-related data. That is a quintessential CFAA violation.

c)       **The *hiQ Labs* defense is immaterial**

Lastly, even if defendants could somehow overcome the procedural and substantive flaws above, their argument based on *hiQ Labs* would not justify any revisions to the PI Order.

At most, defendants' argument is relevant to whether Niantic is likely to prevail under the CFAA. *See* Mot. at 4 (arguing that "Scraping Publicly-Available Data Is Not a Violation Of The CFAA"). But the Court has also found that Niantic is likely to prevail under its Terms of Service. *See* PI Order at 12. And, as defendants know, Niantic's Terms of Service prohibit defendants

- 8 -

from scraping Niantic's game-related data. *See* Decl. of Steven VanDeBogart in Supp. of Niantic, Inc's Mot. for Prelim. Inj., Exs. A-G (Dkts. 7-7, 7-8). Thus, even if the Court agrees with defendants' *hiQ Labs* argument, the provision of the PI Order prohibiting defendants from scraping Niantic's data would still be appropriate and necessary.

### 2.  The "innocence" defense

The balance of defendants' lengthy Motion is devoted to arguing that Niantic is not likely to succeed on its claims because (1) defendants do not copy or distribute Niantic's copyrighted Client Code, (2) defendants do not scrape Niantic's data, and (3) defendants are not "in active concert or participation" with any of the third party "Signing Services" (principally, AppHaven) that do engage in such conduct. *See* Mot. at 11-23; *see also id.* at 13-14 (arguing that it is "App Haven . . . which has taken Global++'s Dynamic Library, linked it to Niantic's App, thereby creating an IPA File, and then is allegedly distributing the IPA File"). The upshot of this defense is that defendants did not do anything wrong and should not be preliminarily enjoined based on the acts of others, especially AppHaven. *See id.* at 12 ("Defendants . . . respectfully request that the Court lift the PI and not enjoin Defendants for the actions of independent third parties."). Like the *hiQ Labs* defense, this defense fails procedurally and substantively.

### a)  The "innocence" defense is not a proper ground for reconsideration

As a preliminary matter, defendants may not argue that they did not infringe Niantic's rights and did not act in coordination with AppHaven. Those issues were squarely addressed, over the course of several months, in the parties' extensive briefing on defendants' motion to dismiss and Niantic's motion for preliminary injunctive relief. *See generally* Dkts. 7, 26, 32, 33, 38, 39; *see also* Dkt. 47 (defendants arguing that "Defendants explained these critical disputes [about how Global++ software works] in detail" in prior briefing). Those issues were also addressed at length by both parties and this Court during the hearing on the parties' motions, which lasted nearly 90 minutes. *See generally* Tr. of Motions Hearing ("Tr.") (Sept. 11, 2019) (attached as Exhibit A to the Declaration of Ryan Spear ("Spear Decl.")). Again, a Rule 59(e) motion may not be used to "rehash arguments . . . already considered by the court." *White*, 2016 WL 6647927, at *2. All defendants' arguments on this score should be rejected for that reason.

1    Defendants' reliance on new facts and evidence to support these old arguments is equally

2    improper. In an effort to show that they did not infringe Niantic's rights or coordinate with others

3    who did, defendants rely heavily on three new documents:

4    ● The "Declaration of Robert Zeidman" (Dkt. 63-1) (the "Zeidman Declaration"). The
5    Zeidman Declaration is a dense, technical, 15-page report that purports to offer expert
     testimony about the nature and functionality of Global++ code and how that code interacts
6    with Niantic's code and Niantic's servers, among other things. It includes 15 exhibits,
     many of which are also dense and technical. The purported facts in the Zeidman
7    Declaration were not raised previously.

8    ● The "Second Declaration of Ryan Hunt" (Dkt. 63-20) (the "Second Hunt Declaration").
9    Over the course of eight pages, the Second Hunt Declaration recites purported facts about
     Global++'s code and defendants' conduct. Among other things, it denies that Global++ is
10   associated with certain third parties, including AppHaven, Takumi, and the (unnamed)
     party behind the "iSpoofer" software. It also incorporates screenshots from social media
11   platforms and other online platforms that, according to Mr. Hunt, support those denials.
     As noted above, issues related to Global++'s code and Global++'s relationship with third
12   parties were addressed at length in the parties' earlier briefing and at the September 11
     motions hearing. The other purported facts in the Second Hunt Declaration were not
13   raised previously.

14   ● The "Declaration of Rebecca B. Horton" (Dkt. 63-17) (the "Horton Declaration"). The
15   Horton Declaration incorporates screenshots from the Apple App Store, Niantic's mobile
     apps, and social media platforms, among other things. The purported facts in the Horton
16   Declaration were not raised previously.

17    Defendants could have submitted all those documents, and all the purported facts in those

18   documents, long before now. They are therefore irrelevant at the Rule 59(e) stage. *See, e.g.,*

19   *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009)

20   (district court properly disregarded "expert declaration" and "additional declaration" submitted in

21   support of motion to reconsider preliminary injunction because "[e]ach of these pieces of

22   evidence could have been introduced earlier in the litigation"); *Sch. Dist. No. 1J, Multnomah Cty.,*

23   *Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) ("The overwhelming weight of authority

24   is that the failure to file documents [earlier] does not turn the late filed documents into 'newly

25   discovered evidence.'") (collecting cases); *Newmark Realty Capital, Inc. v. BGC Partners, Inc.*,

26   No. 16-cv-01702-BLF, 2018 WL 2573183, at *3 (N.D. Cal. Mar. 30, 2018) ("A party moving

27

28

- 10 -

under Rule 59(e) may not rely on preexisting evidence that was available and discoverable by reasonable diligence when seeking reconsideration.").

Defendants' reliance on the Zeidman Declaration is especially improper. Defendants could have relied on Mr. Zeidman's testimony long before now, and certainly before the Court issued the PI Order. They failed to do so. Indeed, defendants did not even disclose Mr. Zeidman in their initial disclosures. *See* Spear Decl., Ex. B. Instead, defendants revealed Mr. Zeidman and his opinions, for the first time, 28 days after the Court issued the PI Order. The Court should not permit Niantic to be sandbagged in that manner. It would be unfair and prejudicial to allow defendants to benefit from expert testimony without allowing Niantic to evaluate and respond to it with the help of Niantic's own expert or experts, who are not due to be disclosed for several more months. *See* Dkt. 57. And it would be particularly unfair given the Zeidman Declaration's obvious procedural and substantive shortcomings. For example, much of Mr. Zeidman's testimony is impossible to evaluate at this stage because defendants have not disclosed all the factual matters on which Mr. Zeidman relied, including the Global++ source code, as required by the Federal Rules. *See* Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). Moreover, to the extent that Mr. Zeidman's testimony is intended to suggest that the defendants do not copy and distribute Niantic's code, scrape Niantic's data, and otherwise infringe Niantic's rights, it is contradicted by the record evidence and defendants' prior admissions and is therefore not credible. *See infra* at 13-18.

In short, the Zeidman Declaration should be ignored at this stage because it could have been submitted long ago. *See Marlyn Nutraceuticals*, 571 F.3d at 881. At the very least, if the Court is inclined to consider the Zeidman Declaration, then Niantic respectfully requests that the Court defer consideration of defendants' Motion until after the parties have completed expert discovery so that Niantic has an opportunity to test and respond to defendants' expert testimony.

### b)    Defendants were not deprived of an opportunity to respond to Niantic's arguments and evidence

Perhaps realizing that their reliance on entirely new evidence is improper, defendants try to pin the blame on Niantic and the Court. According to defendants, "Niantic first alleged and

- 11 -

1    presented evidence that Global++ was affiliated with . . . AppHaven" when Niantic filed its reply

2    in support of its motion for preliminary injunctive relief. Mot. at 12. Thus, defendants argue, they

3    were "foreclosed from responding to and correcting" Niantic's arguments before the Court issued

4    the PI Order. *Id.* Defendants also complain that the Court declined to allow Mr. Hunt to testify at

5    the September 11 hearing. Mot. at 2. Both arguments are unpersuasive.

6         **First**, the Court was completely justified in declining to hear testimony from Mr. Hunt at

7    the September 11 hearing. Local Rule 7-6 provides that "[n]o oral testimony will be received in

8    connection with any motion, unless otherwise ordered by the assigned Judge." Thus, if defendants

9    wished to introduce testimony from Mr. Hunt at the hearing, then they should have asked for

10   permission to do so before the hearing. They did not; instead, they sprung the request on the

11   Court at the conclusion of the hearing. *See* Tr. at 57:7-8 ("THE COURT: I am not going to

12   entertain that request at 3:24 on the day of the hearing. The request is denied."). Also notable:

13   Defendants sought to introduce testimony from Mr. Hunt after representing to Niantic that they

14   did not intend to provide live testimony at the hearing—a representation on which Niantic relied

15   in preparing for the hearing. *See* Spear Decl., Ex. D (message memorializing parties' meet and

16   confer, including the parties' agreement "that they will not present live testimony at the

17   September 11 hearing unless the Court orders such testimony").

18        **Second**, nothing prevented defendants from responding to Niantic's reply brief after that

19   brief was filed. Local Rule 7-3(d)(1) provides that, if new evidence has been submitted in a reply

20   brief, then the opposing party may file an objection to the evidence. (To be clear, Niantic does not

21   concede that its reply brief raised "new" evidence or was otherwise improper. Niantic's reply

22   brief merely responded to defendants' misleading arguments and evidence, which is the purpose

23   of reply briefs.) In addition, defendants could have sought permission to file a surreply to respond

24   to Niantic's reply brief. Here again, defendants chose to forego the procedural remedies available

25   to them.

26        **Third**, the gravamen of defendants' argument is that they were deprived of an opportunity

27   to dispute evidence of an affiliation between Global++ and AppHaven. *See* Mot. at 12. But the

28   extensive new evidence submitted by defendants in support of their Motion sweeps far more

- 12 -

broadly than that, and includes (but is not limited to) a 15-page expert report addressing the

content, architecture, and functionality of Global++ software and "dynamic libraries"; evidence

about the process for downloading Niantic's mobile apps; Niantic's code-based security

measures; Niantic's server-based security measures; and myriad assertions about the conduct of

unnamed third parties who are not before this Court in any capacity. Defendants do not even try

to explain why they should be allowed to introduce new evidence on those and other topics that

have no bearing on the relationship between Global++ and AppHaven.

### c)   The "innocence" defense is meritless

Even if the Court entertains this defense on the merits, it should be rejected. The record

already includes overwhelming evidence that defendants violated Niantic's rights. And there is no

genuine dispute that Global++ and AppHaven are (at least) affiliated and acting in coordination.

Thus, defendants' protestations of innocence are just as "substantively meritless" as their *hiQ*

*Labs* defense. *Parrott*, 2016 WL 10957852, at *2.

### (i)   Defendants copied and distributed Niantic's Client Code

Niantic supported its motion for preliminary injunctive relief with uncontested evidence

showing that defendants copied and distributed Niantic's Client Code in violation of the federal

Copyright Act. *See* PI Order at 9-10. Defendants failed to provide any contrary evidence in

response, so the Court rightly treated the matter as conceded in the PI Order. *See id*. at 10.[2]

Defendants now seem to deny that they copied or distributed Niantic's code, asserting that

third parties (such as AppHaven) copied Niantic's code, "linked" it with Global++'s code, and

then distributed Niantic's code alongside Global++'s code. *See, e.g.*, Mot. at 13-14. That

argument fails for at least two reasons.

**First**, it is impossible to square with defendants' earlier admissions. For example, at the

September 11 motions hearing, defendants submitted to the Court and relied upon a 35-page

---

[2] The Court did not address Niantic's claim that defendants modified Niantic's code because it
was unnecessary to do so given defendants' concession that they unlawfully copied and
distributed the code. *See* PI Order at 10 n.1. But the Court correctly noted that Niantic had
"alleged and submitted supporting declarations which show that" defendants "infringed its
copyright" by "creat[ing] unauthorized derivative versions of Niantic's Client Code," *id*. at 9, and
Niantic maintains that defendants unlawfully modified its code.

1    PowerPoint presentation outlining their legal and factual positions. *See* Tr. at 3:19-4:7; *see also*

2    Spear Decl., Ex. C (the "Position Paper"). The Position Paper admits that "***the same, exact***

3    ***Niantic code*** that [appears in Niantic's legitimate apps] *is present in Global++*." Position Paper

4    at 27 (first emphasis in original, second emphasis added). The Position Paper also argues that

5    "*copying copyrighted code*" was held to be fair use in two earlier cases, and then states—in no

6    uncertain terms—that "[*t*]*he same is true here*." *Id*. at 25 (emphasis added). Finally, the Position

7    Paper concedes that defendants distributed Niantic's code by arguing that "*distributing the*

8    *unmodified Niantic code* with the Global++ code [was] technically necessary to achieve

9    interoperability." *Id*. (emphasis added). In other words, defendants unequivocally admitted

10   copying and distribution when it suited their litigation strategy. They cannot now ignore those

11   admissions just because their strategy has changed.

12         **Second**, even if defendants could argue around their admissions, they cannot argue around

13   the facts. And the facts thoroughly undermine defendants' denials.

14         With respect to copying, for example, defendants now insist that the Global++ code is

15   "entirely unique" and distinct from Niantic's code. Hunt Decl. ¶ 12; *see also id*. ¶ 11 (arguing that

16   the Global++ code "do[es] not copy or combine code from any App"). In fact, however, even the

17   code that defendants expressly admit developing—the "Dynamic Library" code, in defendants'

18   parlance—contains significant portions of Niantic's protocol buffer (or "protobuf") code, which

19   is part of Niantic's Client Code. *See* Lanz Decl. ¶¶ 48-51. The Global++ code also incorporates

20   certain code elements—namely, "classes, functions, and properties"—that "have the exact same

21   names and labels, in the same order, as Niantic's code." *Id*. ¶ 52. That is telling because "some of

22   the classes, functions, and properties used in Niantic's code utilize names and labels that are

23   unique to Niantic's games and have never been publicly disclosed." *Id*. ¶ 53. It is virtually

24   impossible that those matching names and labels would appear in defendants' code unless they

25   were copied from Niantic's code.

26         With respect to distribution, defendants insist that they "do[] not create" and "do[] not

27   distribute" IPA files, which are files used to distribute the Cheating Programs and the Niantic

28   code incorporated in the Cheating Programs. Hunt Decl. ¶¶ 14-15. But defendants fail to inform

- 14 -

1    the Court that Global++ customers were able to download IPA files containing Niantic's code

2    from Global++'s now-defunct website—by clicking buttons titled "Download IPA."



12   *See* Lanz Decl. ¶ 39-45. Nor can defendants pin the blame for those IPA files on others. When

13   Niantic analyzed IPA files downloaded from the Global++ website, Niantic discovered that the

14   files were digitally signed with a developer certificate traceable to Mr. Hunt. *See id.* ¶ 33-38.

15   Thus, even at this early stage of the case, the evidence strongly suggests that Mr. Hunt himself

16   created the IPA files that were ultimately distributed via the Global++ website. *Id.*

17                **(ii)    Defendants scrape Niantic's game-related data**

18            Just as Niantic's motion for preliminary injunctive relief provided uncontested evidence

19   that defendants copied and distributed Niantic's code, so too it provided uncontested evidence

20   that defendants used the Cheating Programs to scrape Niantic's game-related data. *See* PI Order at

21   10-11. There again, defendants did not "acknowledge Niantic's core allegations," so the Court

22   treated the issue as conceded in the PI Order. *Id.* at 11.

23            Defendants now seem to argue that they do not scrape data in violation of the CFAA, for

24   two reasons. **First**, defendants argue that *hiQ Labs* makes their scraping lawful. As explained

25   above, that is incorrect. *See supra* at 5-9.

26            **Second**, defendants seem to argue that their conduct does not violate the CFAA because

27   Global++ software obtains data from *users' mobile devices*, not from *Niantic's servers*. *See* Mot.

28   at 7 n.1; *see also* Zeidman Decl. ¶ 29 (claiming that Global++ software "reads the data that is

                                                - 15 -

1    generated on the user's phone . . . ."); *id*. ¶ 40 (claiming that Global++ software "does not connect

2    to Niantic's servers," but rather "connects to the user's phone and intercepts and modifies the

3    GPS data that is communicated to . . . a Niantic game").

4         But even assuming that is true—a point Niantic does not concede—it is legally irrelevant.

5    Defendants do not deny that Global++ software obtains Niantic's game-related data, which

6    originates from Niantic's servers, in *some* fashion. *See supra* at n. 2. Nor do they deny that, after

7    Global++ software obtains Niantic's data, it uploads the data to external servers controlled by

8    defendants—presumably so defendants can exploit Niantic's data for their own commercial

9    purposes. *See* Dkt. 7-2 ¶ 51 (Niantic engineer explaining that the Global++ software "upload[s]

10   the POI Data and the Spawn Data from defendants' customers' devices to servers controlled by

11   defendants"). Instead, defendants simply argue that this case falls outside the scope of the CFAA

12   because their code steals Niantic's data after it has been transferred from Niantic's servers to

13   users' devices, not before. Defendants are wrong. As the Ninth Circuit has made clear,

14   "technological gamesmanship or the enlisting of a third party to aid in access will not excuse

15   liability" under the CFAA. *Power Ventures, Inc.*, 844 F.3d at 1067. That rule applies with full

16   force here and forecloses defendants' argument.

17                          **(iii)    Global++ and AppHaven are "partners"**

18        Lastly, defendants' attempt to distance themselves from AppHaven is not convincing.

19   Defendants argue that "Niantic is not entitled to any inference or speculation of an association

20   between the two entities." Mot. at 16. But there is no need to speculate. Just a few months ago,

21   Mr. Hunt took to the online platform Discord and, using his "elliotrobot" moniker, announced

22   that Global++ had "partnered with App Haven" to distribute "all Global++ apps":

23

24

25

26

27

28



See Lanz Decl. ¶¶ 7-8. Mr. Hundur made a similar announcement about the partnership on the

Twitter platform, using his online moniker "i0s N00b":

See Lanz Decl. ¶¶ 9-10. Notably, Mr. Hundur refers to Global++ and AppHaven, collectively, as

"we" and "us"—not as distinct and separate entities.

        That evidence of coordination and cooperation is consistent with other undisputed

evidence that Niantic brought to the Court's attention earlier, including evidence showing that (1)

the same person who registered the domain name for the Global++ website also registered the

domain name for the AppHaven website and (2) AppHaven distributed Global++'s Cheating

Programs via the AppHaven website and AppHaven app. See Dkt. 39-1 ¶¶ 14-20 (Second Decl.

of Eric Lanz). It is also worth noting that Mr. Hundur advertised AppHaven on his YouTube

page. See Lanz Decl. ¶ 11. As this Court rightly noted, it would be "a heck of a coincidence" if

facts like these did not reflect an affiliation between Global++ and AppHaven. See Tr. 21:22-24.

1   In short, defendants are not being candid when they insist that there is no "affiliation" or

2   "connection" between Global++ and AppHaven. Mot. at 17. In fact, there is already substantial

3   evidence that Global++ and AppHaven formed a "partnership" (in Mr. Hunt's words), and

4   Niantic expects discovery to shed further light on their coordinated efforts to violate Niantic's

5   rights.

6   **B.   Defendants Do Not Identify Any Errors of Law or Fact**

7   Defendants also argue that the Court should grant reconsideration to correct "manifest

8   errors of law or fact." *Rishor*, 822 F.3d at 491-92; *see also* Mot. at 3. Defendants fail to establish

9   that ground for relief as well.

10   Clear error occurs when "the reviewing court on the entire record is left with the definite

11   and firm conviction that a mistake has been committed." *Smith v. Clark Cty. Sch. Dist.*, 727 F.3d

12   950, 955 (9th Cir. 2013) (internal quotation marks and citation omitted). "A district court does not

13   commit clear error warranting reconsideration when the question before it is a debatable one."

14   *Bailey v. Diaz*, No. C 12–1414 CRB (PR), 2013 WL 6189183, at *1 (N.D. Cal. Nov. 25, 2013).

15   Here, defendants do not identify any clear legal errors. As explained above, they do argue

16   that *hiQ Labs* undermines Niantic's CFAA claim. But they do not argue that denying their

17   Motion notwithstanding that case would be a clear error. Nor could they, both because *hiQ Labs*

18   is so easily distinguishable and because the argument is procedurally barred. *See supra* at 3-9.

19   Defendants also argue that the PI Order "is premised upon an incorrect factual basis,"

20   namely, an affiliation between Global++ and AppHaven. Mot. at 1, 14-18. The new arguments

21   and evidence that defendants raise here should be rejected, and not just because they are

22   procedurally improper. *See supra* at 1. The PI Order does not enjoin defendants based on the

23   conduct of any third party, including AppHaven. Rather, it enjoins defendants based on evidence

24   about their own acts. *See* PI Order at 10-12. In any case, the "partnership" between Global++ and

25   AppHaven is amply supported even at this early stage of the case. Thus, it would be perfectly

26   appropriate to enjoin defendants based on evidence related to AppHaven.

27   The final few pages of defendants' Motion raise a series of loosely connected arguments

28   and assertions regarding the security measures that Niantic has implemented to protect its code

- 18 -

1   and servers. *See* Mot. at 18-22. The gist seems to be that defendants disagree with Niantic's

2   description of its security measures and how defendants defeated those security measures. But

3   defendants do not argue that *the Court* committed a clear legal or factual error with respect to

4   these issues, nor could they—the Court's PI Order does not address any of those issues. Those

5   arguments are therefore irrelevant.

6   **C.      Defendants Do Not Identify Any Manifest Injustice**

7          Lastly, defendants argue that reconsideration is warranted because the PI Order is

8   "manifestly unjust." *Rishor*, 822 F.3d at 491-92. According to defendants, the PI Order is unjust

9   for two reasons: (1) defendants are being "unfairly enjoined for the actions of independent third

10  parties," and (2) defendants are being "robbed of any ability to use [the Global++] software,

11  substantially impairing [their] business." Mot. at 1. Both arguments fail.

12         **First**, as noted above, the PI Order preliminarily enjoins the defendants based on their

13  own conduct, not the conduct of others. *See* PI Order at 10-12. Any argument to the contrary

14  cannot be squared with the plain language of the PI Order.

15         **Second**, defendants should not be heard to complain about purported harms to their

16  business interests. Before the Court issued the PI Order, defendants never suggested that a

17  preliminary injunction would harm them economically. Instead, they argued (unconvincingly)

18  that a preliminary injunction would cause "severe reputational harm." PI Order at 14. Further, at

19  the September 11 motions hearing, "Global++ [was] at pains to deny that it currently engages in

20  the enjoined activity, *and state[d] no present desire or intention to resume that activity*." PI Order

21  at 15 (emphasis added). Assuming those representations were true, then it is difficult to see how

22  the PI Order—which merely prohibits activities that defendants have "no present desire or

23  intention to resume"—works even a mild hardship.

24         **Third**, defendants fail to explain how the PI Order "robs" them of the ability to engage in

25  legitimate commercial activities. The plain language of the PI Order prohibits *unlawful* activity,

26  e.g., copying Niantic's copyrighted code without permission; accessing Niantic's computers

27  without authorization; and violating Niantic's Terms of Service. *See* PI Order at 16-17. Thus, it

28  imposes no burdens whatsoever on defendants' lawful commercial activities.

- 19 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.   CONCLUSION

Defendants' Motion does not establish a single valid ground for the extraordinary remedy of reconsideration. The Court should deny the Motion in its entirety.


DATED:  November 19, 2019                    **PERKINS COIE LLP**


                                             By:   */s/ Ryan Spear*
                                                   Ryan Spear
                                                   RSpear@perkinscoie.com

                                             Attorneys for Plaintiff Niantic, Inc.

- 20 -