1 Julie E. Schwartz, Bar No. 260624
JSchwartz@perkinscoie.com
2 PERKINS COIE LLP
3150 Porter Drive
3 Palo Alto, CA  94304-1212
Telephone:  650.838.4300
4 Facsimile:  650.838.4350

5 Todd M. Hinnen (admitted *pro hac vice*)
THinnen@perkinscoie.com
6 Ryan Spear (admitted *pro hac vice*)
RSpear@perkinscoie.com
7 1201 Third Ave., Suite 4900
Seattle, WA 98101-3099
8 Telephone: 206.359.8000
Facsimile: 206.359.9000
9

10
Attorneys for Plaintiff Niantic, Inc.
11

12 **UNITED STATES DISTRICT COURT**

13 **NORTHERN DISTRICT OF CALIFORNIA**

14 **OAKLAND DIVISION**

15

16 NIANTIC, INC., a Delaware corporation,          Case No. 19-cv-03425-JST

17          Plaintiff,                            **DECLARATION OF ERIC LANZ IN
                                                  SUPPORT OF NIANTIC, INC.'S**
18     v.                                         **OPPOSITION TO DEFENDANTS'
                                                  MOTION FOR RECONSIDERATION**
19 GLOBAL ++, an unincorporated                   **UNDER FEDERAL RULE OF CIVIL**
association; RYAN HUNT, a.k.a.                    **PROCEDURE 59(e)**
20 "ELLIOTROBOT," an individual;
ALEN HUNDUR, a.k.a. "IOS N00B," an
21 individual; and DOES 1-20,

22          Defendants.

23

24

25

26

27

28

I, Eric Lanz, declare and state as follows:

1.      I am a Senior Software Engineer at Niantic, Inc., a position I have held since February 2018. My responsibilities in this role include writing code for Niantic, analyzing malicious and suspicious applications ("apps"), and designing and implementing code security features to defeat hackers and malicious actors.

2.      This declaration is based on my personal knowledge, investigation, and review of Niantic's business records and is made to the best of my knowledge, information, and belief. If called to testify regarding the facts set forth in this declaration, I could and would testify competently. This declaration incorporates and relies upon earlier declarations that I prepared, which I understand were submitted in connection with Niantic's motion for preliminary injunctive relief (Dockets 7-2 and 39-1).

3.      I understand that the defendants have filed a motion titled "Defendants Ryan Hunt's and Alen Hundur's Motion to Lift the Preliminary Injunction" (the "Motion"). I also understand that the defendants have filed a declaration from defendant Ryan Hunt (the "Second Hunt Declaration"), a declaration from Robert Zeidman (the "Zeidman Declaration"), and exhibits related to those documents. I have reviewed all of these documents and understand them.

4.      For purposes of this declaration, I use the term "Global++" to refer to defendants Ryan Hunt, Alen Hundur, Global++ (an unincorporated association of hackers), and the currently unknown defendants that Niantic has sued as "John Does."

**A.      Global++ and AppHaven**

5.      The Motion states that Global++ is not "in active concert or participation" with AppHaven. Motion at 14. The Motion also states that there is no "affiliation" or "connection" between Global++ and AppHaven. Motion at 17.

6.      As explained in an earlier declaration (Docket 39-1 ¶¶ 14-20), I believe there is substantial evidence that the person or persons who own and operate AppHaven are defendants, defendants' agents, or affiliated parties acting in concert with defendants. In addition, during my

1   investigation, I have encountered statements by Global++ suggesting that Global++ and

2   AppHaven are affiliated entities acting in concert.

3         7.     For example, on or about May 1, 2019, a user identified as "elliotrobot" posted a

4   message on behalf of Global++ on Discord, an online communications platform (the "Discord

5   Message"). Based on my investigation, I conclude that "elliotrobot" is an online moniker used by

6   defendant Ryan Hunt (Docket 7-2 ¶ 21). A true and correct copy of the Discord Message is

7   reproduced below.



8.     According to the Discord Message, Global++ "partnered with App Haven" to

distribute Global++ software. The Discord Message further states that "all Global++ apps"

would be preloaded and updated on the AppHaven app. The Discord Message encourages and

invites users to utilize the AppHaven app.

9.     In addition, on or about May 1, 2019, a user identified as "i0s N00b" posted a

message on behalf of Global++ on Twitter (the "Twitter Message"). Based on my investigation, I

conclude that "i0s N00b" is an online moniker used by defendant Alen Hundur (Docket 7-2 ¶

21). A true and correct copy of the Twitter Message is reproduced below.

1



2

3

4

5

6

7

8

9   10.   Like the Discord Message, the Twitter Message announces the AppHaven service

10  and encourages Global++ customers to use AppHaven. Notably, the Twitter Message refers to

11  Global++ and AppHaven, collectively, as "we" and "us."

12  11.   In addition, Mr. Hundur's YouTube page (i0S n00b), which was devoted mainly

13  to Global++, included a video titled "How to Install AppHaven." A true and correct copy of an

14  excerpt from Mr. Hundur's YouTube page, which I understand was captured on or about June

15  14, 2019, is reproduced below.

16



17

18

19

20

21

22

23

24

25

26

27

28

12.     Before it was disabled, Global++'s website (www.globalplusplus.com) enabled and encouraged users to download the AppHaven "Direct Install Utility." A true and correct copy of an excerpt from the Global++ website, which I understand was captured on or about June 14, 2019, is reproduced below.



13.     Similarly, as noted in an earlier declaration (Docket 39-1 ¶ 15), the owners and operators of AppHaven used their Twitter account (@apphaven1) to advertise all three of the Cheating Programs created by Global++.

14.     Based on these and other facts, I conclude that the person or persons who own and operate AppHaven are likely defendants, or defendants' agents, or affiliated parties acting in concert with defendants.

**B.     Niantic's Game-Related Data**

15.     As explained in an earlier declaration (Docket 7-2 ¶ 51), my analysis of the Cheating Programs indicates that, while they are running, they access and obtain valuable and proprietary data about points of interest within Niantic's games (e.g., PokéStops), including names, descriptions, photographs, game states, and precise coordinates for those points of interest. Niantic refers to this data as point-of-interest data ("POI Data").

16.     In addition, my analysis indicates that the Cheating Programs access and obtain valuable ephemeral game information, such as the type and value of particular Pokémon appearing in precise locations. Niantic refers to this data as "Spawn Data."

17.     My investigation also indicates that the Cheating Programs then upload the POI Data and the Spawn Data from defendants' customers' devices to servers controlled by defendants.

18.     For purposes of this declaration, I refer to POI Data and Spawn Data collectively as "game-related data."

19.     The Motion states that "there are two types of POI data at issue by nature of Niantic's allegations—(1) POI data that is generated by a user by, for example, encountering a Pokémon at a particular GPS location ('User-generated POI'), and (2) POI data which is stored on Niantic's server ('Server POI')." Motion at 6.

20.     The terminology and classifications used by defendants to describe Niantic's game-related data, including the terminology and classifications in the preceding paragraph, are inaccurate and misleading.

21.     Generally, Niantic's game-related data falls into two categories: "fixed" and "dynamic" data. Fixed data corresponds to stable features of Niantic's games. Examples include GPS coordinates and photographs for points of interest (e.g., PokéStops in Pokémon GO). Dynamic data corresponds to variable features of Niantic's games. Examples include the "game state" of points of interest, including, in Pokémon GO, whether they are PokéStops or Gyms, and data about Pokémon "spawning" (i.e., appearing) when a user is in certain locations.

22.     None of the dynamic data is developed by users.

23.     Some (but not all) of the fixed data that is used in Niantic's games is submitted by Niantic users. For example, a user may "nominate" a location to be used as a PokéStop in the Pokémon GO game, which Niantic may or may not incorporate into the game. A user nominating a location will typically submit a photograph of such a location, which Niantic may or may not use. I understand that under Niantic's Terms of Service, those users may retain some intellectual property rights in some of the fixed data they submit to Niantic, such as photographs that they submit.

24.     Both types of data are stored and/or generated on Niantic's servers. When users successfully play Niantic's games, some of the data is sent to users' mobile devices. However,

-5-

1   all of the data that is sent to users' mobile devices originates from Niantic's servers in the first

2   instance.

3       25.    Only users with valid Niantic accounts who use legitimate Niantic apps are

4   authorized to access Niantic's servers and obtain game-related data from Niantic's servers.

5   **C.**    **Copying, Distribution, and Use of Niantic's Client Code**

6       26.    The Motion states that defendants "do not link [their] Dynamic Libraries to Apps,

7   nor distribute the linked Apps." Motion at 13. Similarly, the Second Hunt Declaration asserts

8   that defendants "do[] not create" and "do[] not distribute" IPA files containing Niantic's Client

9   Code. Second Hunt Declaration ¶¶ 14-15.

10      27.    An IPA file is an iOS application archive file. It is denoted by the suffix ".ipa."

11  Generally, an IPA file includes the binary computer code for an app that runs on an Apple

12  device, signed with a certificate (explained below). IPA files may be used to distribute copies of

13  apps to users.

14      28.    I interpret the statements in defendants' Motion and in the Second Hunt

15  Declaration to mean that, according to defendants, Global++ did not create IPA files that

16  included Niantic's copyrighted Client Code and did not distribute IPA files that included

17  Niantic's copyrighted Client Code.

18      29.    As explained in more detail below, my investigation indicates that defendants did

19  create IPA files that included Niantic's copyrighted Client Code. My investigation also indicates

20  that defendants distributed those IPA files by enabling users to download the IPA files via the

21  Global++ website from an online location associated with and likely controlled by Global++.

22      30.    As part of my investigation into Global++, I regularly monitored Global++'s

23  now-disabled website, www.globalplusplus.com. That website enabled users to download copies

24  of defendants' Cheating Programs. Over the course of my investigation, I downloaded nearly

25  every release (or new version) of each of the Cheating Programs.

26      31.    For example, on or around September 27, 2018, I downloaded version R88 of

27  defendants' PokeGo++ Cheating Program from the Global++ website. ("R" stands for "release"

28  in Global++'s versioning system.)

-6-

32.     After downloading the IPA file for PokeGo++ (R88), I examined it. During that examination, I learned that the IPA file for PokeGo++ (R88) contained Niantic's Client Code. That finding was consistent with my analysis of IPA files for other versions of defendants' Cheating Programs, including, for example, Version 0.133.0 of PokeGo++ and Version r1a of Ingress++, both of which contained more than 99% of the Client Code from the corresponding versions of Niantic's legitimate apps (Docket 7-2 ¶¶ 37-41).

33.     I also learned that the IPA file for PokeGo++ (R88) contained an "embedded.mobileprovision" file. An embedded.mobileprovision file is a text file added to an IPA file and generated by xcode, which is a tool that developers use to create IPA files.

34.     The embedded.mobileprovision file contains copies of the digital signing certificate issued by Apple, which is the public portion of an SSL (Secure Socket Layer) certificate issued by Apple to each registered developer. Generally, the digital signing certificate indicates the author or creator of the IPA file by including the verified email address the developer used to interact with Apple.

35.     The embedded.mobileprovision file in the IPA archive for PokeGo++ (R88) contained a digital signing certificate that included the email address elliotrobot20@gmail.com, which indicates that the owner of the email address elliotrobot20@gmail.com was the person who created the IPA file for PokeGo++ (R88).

36.     Based on my investigation, I conclude that the elliotrobot20@gmail.com address belongs to Mr. Hunt.

37.     Based on the fact that Mr. Hunt appears to have signed the IPA file for PokeGo++ (R88), I conclude that Mr. Hunt likely created the IPA file for PokeGo++ (R88).

38.     I also analyzed the IPA files for several other versions of defendants' Cheating Programs, and some of those other versions included the same email address in the digital signing certificate, indicating that Mr. Hunt created other IPA files that were available for download from the Global++ website.

39.     On or about March 15, 2019, I downloaded version R108 of defendants' Cheating Program PokeGo++ from the Global++ website. I downloaded PokeGo++ (R108) by visiting

1   www.globalplusplus.com and clicking on a button titled "Download IPA." A true and correct

2   copy of an excerpt from the Global++ website, which I understand was captured on or about

3   March 18, 2019, is reproduced below. The excerpt of the Global++ website shown below enables

4   users to download R108a of PokeGo++, but the website appeared substantially the same when I

5   visited it to download R108 of PokeGo++.

6

7   

8

9

10

11

12

13

14

15

16

17         40.      After downloading the IPA file for PokeGo++ (R108), I examined it. During that

18   examination, I learned that the IPA file for PokeGo++ (R108) contained Niantic's Client Code.

19   Again, that finding was consistent with my analysis of the IPA files for other versions of

20   defendants' Cheating Programs, including, for example, Version 0.133.0 of PokeGo++ and

21   Version r1a of Ingress++, both of which contained more than 99% of the Client Code from the

22   corresponding versions of Niantic's legitimate apps (Docket 7-2 ¶¶ 37-41).

23         41.      When I clicked on the "Download IPA" button on the Global++ website, my

24   computer was redirected to an online location that contained a copy of PokeGo++ (R108), and

25   my computer then downloaded that copy of PokeGo++ (R108) to my computer.

26         42.      I preserved the Uniform Resource Locator ("URL") to which my computer was

27   redirected to obtain a copy of PokeGo++ (R108). That URL, which is no longer functional, is:

28

-8-

1    https://globalplusplus.wetransfer.com/downloads/adf262b5d63b32c4cecbccddbb4508872019030

2    9061602/d7ea9d. For purposes of this declaration, I refer to that URL as the "Global++ URL."

3           43.     The Global++ URL points to an online location made available by the

4    WeTransfer service, which is a service that allows WeTransfer users to make files available for

5    download.

6           44.     I conclude that the WeTransfer online location accessible via the Global++ URL

7    was likely associated with and controlled by Global++ for two main reasons. First, the Global++

8    URL includes the text "globalplusplus." Second, during the course of my investigation of

9    Global++, I have seen Mr. Hunt repeatedly encourage users to download the Cheating Programs

10   using the WeTransfer service.

11          45.     Based on the fact that I was able to download the IPA file for PokeGo++ (R108)

12   from an online location that was likely associated with and controlled by Global++, I conclude

13   that Global++ distributed the IPA file for PokeGo++ (R108).

14          46.     I have no reason to believe that Global++ did not distribute other IPA files in the

15   same or substantially the same manner.

16          47.     As explained in earlier declarations, I have examined multiple versions of the

17   Global++ code that defendants describe in their Motion as their "dynamic libraries." (I adopt that

18   terminology solely for convenience and solely for purposes of this declaration. In adopting that

19   language, I do not mean to suggest that I agree with defendants' statements about dynamic

20   libraries in general or defendants' statements about their Dynamic Libraries specifically.)

21          48.     Every example of defendants' dynamic libraries that I have examined contains

22   protocol buffer (or "protobuf") code that is virtually identical to protobuf code created by Niantic

23   for use in Niantic's legitimate mobile apps.

24          49.     Protocol buffers are mechanisms that allow different systems to work together by

25   structuring data in a standardized manner. Protobuf code, in this context, is Niantic-created code

26   that conforms to Google's protocol buffer language specifications. Niantic creates different

27   versions of its protobuf code for each of Niantic's games, and each version of those games.

28

-9-

50.     In examining defendants' dynamic libraries within the IPA files that Global++ distributed, I did not identify any differences between the protobuf code in those dynamic libraries and Niantic's corresponding protobuf code. For example, I compared the protobuf code in Global++'s Cheating Program, PokeGo++ version R109, which corresponds to version 0.137.2 of Niantic's legitimate program, Pokémon GO. I saw no difference between Niantic's protobuf code in PokeGo++ version R109 and the protobuf code in version 0.137.2 of Pokémon GO.

51.     Based on the fact that defendants' dynamic libraries include protobuf code that is virtually identical to Niantic's protobuf code, I conclude that defendants copied Niantic's protobuf code from Niantic's Client Code and included it in their dynamic libraries.

52.     Additionally, each version of defendants' dynamic libraries that I have examined contains many code elements—including classes, functions, and properties—that have the exact same names and labels, in the same order, as in Niantic's code.

53.     Notably, some of the classes, functions, and properties used in Niantic's code utilize names and labels that are unique to Niantic's games and have never been publicly disclosed. It is therefore highly unlikely that those names and labels would appear in any third party's code (including defendants' dynamic libraries) unless they were copied from Niantic's code.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on $\text{Nov } 19^{\text{th}}$, 2019 in the City of Los Angeles, State of California.

ERIC LANZ

DECLARATION OF ERIC LANZ
Case No. 19-cv-03425-JST