FABIO E. MARINO (SBN 183825)
fmarino@polsinelli.com
REBECCA B. HORTON (SBN 308052)
rhorton@polsinelli.com
POLSINELLI LLP
1661 Page Mill Road, Suite A
Palo Alto, CA 94304
T:  650-461-7700
F:  650-461-7701

Phillip Zeeck (*Admitted PHV*)
pzeeck@polsinelli.com
POLSINELLI PC
900 West 48th Place, Ste. 900
Kansas City, MO 64112
T:  816-753-1000
F:  816-753-1536

Attorneys for Defendants
Ryan Hunt and Alen Hundur

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| NIANTIC, INC.,<br><br>            Plaintiff,<br><br>     v.<br><br>GLOBAL++, et al.,<br><br>            Defendants. | Case No. 4:19-cv-03425 JST<br><br>**DEFENDANTS RYAN HUNT'S AND ALEN HUNDUR'S REPLY IN SUPPORT OF ITS MOTION TO LIFT THE PRELIMINARY INJUNCTION**<br><br>Date:    January 29, 2020<br>Time:   2:00 P.M.<br>Ctrm:   6, 2nd Floor<br>Judge:  Honorable Jon S. Tigar |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 1

II. ARGUMENT .................................................................................................................. 2

    A. Ninth Circuit's Decision in *hiQ Labs Inc. v. LinkedIn Corp.* Procedurally and Substantively Merits Reconsideration Under Rule 59(e) ................................................................................................... 2

        1. A Controlling Decision Decided After Briefing is a Valid Basis to Bring Rule 59(e) Motion ......................................................... 2

        2. *HiQ* Decision Renders Certain Facts Material Which were not Previously Considered ................................................................. 4

        3. Whether Allegedly Misappropriated Data is Owned by Niantic is Material to the CFAA Under the *HiQ* Decision ................. 4

        4. Data Alleged to be Misappropriated is not Obtained from Niantic's Server ............................................................................... 6

        5. Facebook v. PowerVentures Case is Not Applicable ......................... 8

        6. Niantic's Terms of Service Do Not Render Scraping Unauthorized .................................................................................... 8

    B. Niantic Alleges Insufficient Facts to Enjoin Defendants for Third Party Actions ................................................................................................. 9

        1. Niantic did not Alleged Any Affiliation until its Reply Brief .................................................................................................. 9

        2. Niantic has had Sufficient Time to Respond to Defendants' Motion ........................................................................ 10

        3. Niantic has not Substantively Established that Defendants are in "Active Concert and Participation" with AppHaven ............... 11

    C. Niantic has Failed to Allege Sufficient Facts that Defendants Directly Copied or Distributed Niantic's Code ........................................... 13

        1. Defendants Never Admitted to Copying or Distributing Niantic's Code ............................................................................... 13

        2. Defendants' DLL File Does Not Copy or Distribute Niantic's Code ............................................................................... 14

III. CONCLUSION ............................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Copper & Brass, Inc. v. Lake City Indus. Prod., Inc.*,
    757 F.3d 540 (6th Cir. 2014) ...................................................................................................3

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
    239 F.3d 1343 (Fed. Cir. 2001)................................................................................................1

*Asetek Danmark A/S v. CMI USA Inc.*,
    852 F.3d 1352 (Fed. Cir. 2017)..................................................................................11, 12, 13

*Bryant v. New Jersey Dep't of Transp.*,
    998 F. Supp. 438 (D.N.J. 1998) ...............................................................................................4

*Comput. Assocs. Int'l, Inc. v. Altai, Inc.*,
    982 F.2d 693 (2d Cir. 1992)...................................................................................................15

*Dupre v. Chevron U.S.A., Inc.*,
    930 F. Supp. 248 (E.D. La. 1996)..........................................................................................10

*Facebook, Inc. v. Power Ventures, Inc.*,
    844 F.3d 1058 (9th Cir. 2016) .................................................................................................8

*Gregg v. Am. Quasar Petroleum Co.*,
    840 F. Supp. 1394 (D. Colo. 1991).........................................................................................3

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    273 F. Supp. 3d 1099 (N.D. Cal. 2017) ...............................................................................3, 8

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    938 F.3d 985 (9th Cir. 2019) ........................................................................................ passim

*Machesney v. Lar-Bev of Howell, Inc.*,
    317 F.R.D. 47 (E.D. Mich. 2016) ............................................................................................3

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) .................................................................................................9

*Salazar v. Buono*,
    559 U.S. 700 (2010)................................................................................................................1

*Sega Enters. Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir.1992) ................................................................................................15

# TABLE OF AUTHORITIES CONTINUED

**Page(s)**

**Cases**

*Sys. Fed'n No. 91 v. Wright*,
    364 U.S. 642 (1961) .................................................................................................................. 2

**Statutues**

Rule 59 .............................................................................................................................................. 9

Rule 59(e) ................................................................................................................................ 2, 3, 10

Rule 65(d) ....................................................................................................................................... 11

## I. INTRODUCTION

Because preliminary injunctive relief is based on a prediction of the likely outcome at trial and not on an actual adjudication on the merits, justice requires that a court revisit its decision when the weight of the evidence shows that the plaintiff is no longer likely to succeed on the merits. *Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) ("'a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an 'instrument of wrong'"); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1351 (Fed. Cir. 2001) (when evidence raises a "substantial question concerning either infringement or validity," and the enjoining party has not proven the evidence "lacks substantial merit," a preliminary injunction should not be issued.").

Defendants demonstrated in their opening brief that Niantic is no longer likely to succeed on the merits of its claims at trial. Dkt. 63 ("Motion"). First, the CFAA does not encompass scraping of data which is not owned by Niantic and is otherwise publicly available. *Id.* at 4-11. Second, Niantic's evidence set forth in its Reply was insufficient to show Defendants should be enjoined for the actions of third parties. *Id.* at 11-22. Unlike Plaintiff's original Preliminary Injunction Motion ("PI Mot."), Defendants supported their Motion with numerous exhibits and an extremely detailed report by one of the country's most respected authorities in software copyright investigations. Dkt. 63-1 (Zeidman Decl.) Niantic's opposition failed to even attempt to rebut Defendants' evidence showing that Niantic's allegations, on which the Court relied for granting the preliminary injunction ("PI Order"), are contrary to the evidence. Instead, Niantic simply raised procedural arguments and, once again, relied on the least trustworthy form of evidence: a declaration by its own employee offering lay opinions unsupported by actual evidence. Dkt. 71-2 (Third Lanz Decl.) The Court need not give any weight to this unsupported opinion but, in any event, Defendants' expert explains in detail that, even taken at face value, Niantic's contentions fall far short of rebutting his detailed explanation of the relevant facts.

Niantic's procedural arguments fare no better. It is black letter law that an intervening development in the law, particularly on an issue of first impression, is a proper basis for this

-1-

DEFENDANTS' REPLY TO DEFS MTN TO
LIFT THE PRELIM. INJUNCTION
CASE NO. 4:19-cv-03425-JST

1  Court to reconsider its Order. *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 647 (1961) ("sound
2  judicial discretion may call for the modification of the terms of an injunction decree if the
3  circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new
4  ones have since arisen."). Similarly, the Court is well within its rights to consider evidence that
5  rebuts evidence Niantic first presented in its Reply brief to the PI Motion, further elaborated on
6  at the hearing, and to which Defendants were not permitted to present rebuttal evidence. Dkt.
7  63-18 (Sept. 11, 2019 Hrg. Tr.) at 57. Defendants submit that justice requires the Court to
8  consider the detailed evidence presented by Defendants that stands largely unrebutted by
9  Plaintiff and shows that the PI Order should be lifted.[1]

## II. ARGUMENT

### A. Ninth Circuit's Decision in *hiQ Labs Inc. v. LinkedIn Corp.* Procedurally and Substantively Merits Reconsideration Under Rule 59(e)

Defendants' Rule 59(e) motion is procedurally proper because the Ninth Circuit's decision in *hiQ* came down after the close of briefing on Niantic's PI Motion and was the first time the Ninth Circuit had addressed the specific issue of whether scraping of publicly-available data not owned by the alleged victim violates the CFAA. Defendants' motion substantively establishes that the injunction should be lifted because facts deemed material by the Ninth Circuit, and which formed the basis of its finding that the CFAA does not apply, are present here.

#### 1. A Controlling Decision Decided After Briefing is a Valid Basis to Bring Rule 59(e) Motion

The *hiQ* decision constitutes a significant development in the law because the Ninth Circuit's decision carved out an exception to the CFAA that is now controlling law. Further, the Ninth Circuit's 18-page decision considers additional facts material to its decision, which the District Court did not reference in its decision and which are parallel to the facts present here. Lastly, because this development in law occurred after the parties concluded briefing on the

---

[1] Defendants' Motion sets forth how each argument corresponds to an enjoined action in the PI Order and ultimately demonstrates that the entire PI Order should be lifted. Dkt. 63 at 4-5, 14.

-2-
DEFENDANTS' REPLY TO DEFS MTN TO
LIFT THE PRELIM. INJUNCTION
CASE NO. 4:19-cv-03425-JST

1  motions for preliminary injunction and dismissal, this case merits reconsideration.

2        A motion for reconsideration pursuant to Rule 59(e) is proper where there is a change or
3  significant development in case law. *Gregg v. Am. Quasar Petroleum Co.*, 840 F. Supp. 1394,
4  1401 (D. Colo. 1991) ("motion for reconsideration is proper when […] there has been a
5  significant change or development in the law or facts since submission of the issues to the
6  court"). Here, the Ninth Circuit's decision in *hiQ* is precedential and binding in recognizing an
7  exception to the CFAA. Prior to *hiQ*, there was no Ninth Circuit authority addressing this
8  specific issue. As such, it constitutes a significant development in law and merits
9  reconsideration of the instant preliminary injunction. This standard, a development or change in
10 law, includes when a circuit court affirms a district court decision. *See e.g.*, *Machesney v. Lar-*
11 *Bev of Howell, Inc.,* 317 F.R.D. 47, 54 (E.D. Mich. 2016) (holding that the Sixth Circuit decision
12 in *Am. Copper & Brass, Inc. v. Lake City Indus. Prod., Inc.*, 757 F.3d 540 (6th Cir. 2014), which
13 affirmed a district court decision, was a valid basis upon which to bring, and grant, a motion for
14 reconsideration). Thus, Niantic's argument that because there was a district court decision in
15 *hiQ* as of August 14, 2017, that Defendants should have "articulated their *hiQ* defense from the
16 outset of this case many months ago," is not persuasive. Dkt. 71 (Opp.) at 3. Further, the Ninth
17 Circuit considered additional facts material which the District Court did not address in its
18 decision—for example, that "LinkedIn specifically disclaims ownership of information users
19 post to their profiles." *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 1003–04 (9th Cir. 2019)
20 at * 2, 14 ("data hiQ seeks is not owned by LinkedIn"); *see generally*, *hiQ Labs, Inc. v. LinkedIn*
21 *Corp.,* 273 F. Supp. 3d 1099 (N.D. Cal. 2017) (not considering the User's Agreement in reaching
22 its decision). As such, even had the legal theory been generally raised, the significance and
23 weight of certain facts present here—for example that Niantic expressly disclaims any right to
24 user-generated data and users are free to "exploit" that data— would have only come to light
25 after the close of briefing when the Ninth Circuit handed down its decision.

26       To the issue of timing, Courts look to whether the pertinent court decision occurred <u>after</u>
27 the close of briefing, a fact which Niantic does not dispute. *Gregg*, 840 F. Supp. at 1401

28

-3-

DEFENDANTS' REPLY TO DEFS MTN TO
LIFT THE PRELIM. INJUNCTION
CASE NO. 4:19-cv-03425-JST

1  ("significant change or development in the law or facts **since submission of the issues to the**
2  **court**") (emphasis added).  Instead, Niantic argues that because there were procedural avenues
3  by which Defendants could have brought the case to the Court's attention post-briefing and prior
4  to its order, the failure to do so forecloses Defendants' motion lacks any support.  Dkt. 71 (Opp.)
5  at 3-4.  Niantic does not cite to a case where the Court required a party to pursue these
6  procedural avenues, nor does it appear that a Court has denied reconsideration on this basis.

### 2. *HiQ* Decision Renders Certain Facts Material Which were not Previously Considered

Niantic contends that the Court should disregard the facts that Defendants present on the basis that they existed at the time of the underlying briefing and thus should have been raised. Dkt. 71 at 4.  But, courts will consider facts or legal theories, even if they existed at the time of the underlying briefing, if the development in case law renders them significant.  *Bryant v. New Jersey Dep't of Transp.,* 998 F. Supp. 438, 443 (D.N.J. 1998) ("on a motion for reconsideration, 'where 'a previously ignored legal theory takes on new importance due to an intervening development in the law, it is appropriate ... to exercise ... discretion to allow a party to revive that theory'"). In light of the Ninth Circuit's in *hiQ*, this rendered significant certain legal theories and facts which are parallel in our case— for example: (1) Niantic cannot de-authorize access to data which it disclaims ownership of (*i.e.*, user-generated data); and (2) Niantic cannot de-authorize access to data which itself and third-parties make publicly available.  Dkt. 63 (Mot.) at 6-10.  Thus, Niantic's contention that these facts and theory existed at the time of the underlying briefing, but were not raised, does not void their significance now.[2]

### 3. Whether Allegedly Misappropriated Data is Owned by Niantic is Material to the CFAA Under the *HiQ* Decision

Niantic's arguments that the instant case is "nothing like *hiQ Labs*," since "ownership" of

---

[2] Indeed, because these specific facts were not raised in the underlying briefing cuts against Niantic's overall argument that Defendants are merely attempting to relitigate the same facts and legal theories as the underlying briefing.  Dkt. 71 (Opp.) at 1.

-4-

the data was not a consideration in the *hiQ* decision and is immaterial to its CFAA claim, are both meritless. Dkt. 71 (Opp.) at 6-7. In fact, both these issues are exactly what calls into serious question Niantic's likelihood of success on its CFAA claim.

The Ninth Circuit held the following in *hiQ*:

> It is likely that when a computer network generally permits public access to its data, a user's accessing that publicly available data will not constitute access without authorization under the CFAA. **The data hiQ seeks to access is not owned by LinkedIn and has not been demarcated by LinkedIn as private using such an authorization system.** HiQ has therefore raised serious questions about whether LinkedIn may invoke the CFAA to preempt hiQ's possibly meritorious tortious interference claim

*hiQ Labs*, 938 F.3d at 1003–04 (emphasis added).

In so holding, the Ninth Circuit expressly considered the fact that LinkedIn did not own the data which it alleged was misappropriated in reaching its holding. Here too it is material that Niantic does not own the data it alleges Defendants have misappropriated. Defendants introduced numerous facts explaining why the data is not proprietary. Dkt. 63 (Mot.) at 6-10. Niantic's rebuttal was not to specifically address Defendants' arguments, and instead muddy the waters and create new classifications of data[3] and contend that "Niantic alleges that defendants [] scrape fixed and dynamic data from Niantic's servers without authorization," and conveniently ignore the fact that Niantic has not once made reference to "fixed and dynamic data," prior to its Opposition. *Compare* Dkt. 71 (Opp.) at 7, n. 1 *with* Dkt. 1 (Complaint), Dkt. 7 (PI Mot.) and Dkt. 39 (PI Reply). Regardless, the central issue at this point is what constitutes User Content (in additional to what data is already publicly available and thus Niantic cannot restrict access to under the CFAA)—which, by the express language of Niantic's Terms of Service, has a very broad definition. Dkt. 63 (Mot.) at 7 ("any Content a user of a Service provides to be made available through Services.") On its face, User Content exceeds just "photographs," which Niantic appears to argue it is limited to. Dkt. 71 (Opp.) at 7. Niantic bears the burden on

---

[3] In addition to "POI Data," and "Spawn Data," which Niantic contends is proprietary, Niantic now asserts additional classifications, "fixed" and "dynamic" data. Dkt. 71 (Opp.) at 7, n. 1.

-5-
DEFENDANTS' REPLY TO DEFS MTN TO
LIFT THE PRELIM. INJUNCTION
CASE NO. 4:19-cv-03425-JST

defending its claim that the data is proprietary, and the confusion that Niantic has now introduced by providing even more categorizations of data should bear against Niantic.

Further, whether the data alleged to be misappropriated is in fact proprietary[4], *i.e.*, owned by Niantic, was material to the Court's preliminary injunction order.  As set forth in the Motion, Niantic's argument to date has been that the data alleged to be improperly obtained is "proprietary."  Dkt. 63 (Mot.) at 5.[5]  The Court then relied upon this representation by Niantic that the misappropriated data was "proprietary" in determining that Niantic was likely to succeed on the merits for its CFAA claim.  Dkt. 55 (Order) at 11 ("Defendants' Cheating Programs obtain proprietary data from Niantic's computers involving points of interest within Niantic's games ('POI data') and ephemeral game information").  It is too late now for Niantic to argue that whether or not Niantic owned the data is immaterial to its CFAA claim.  In sum, under the Ninth Circuit's decision in *hiQ*, whether a party owns the data is material to a CFAA claim, and that Niantic cannot, and appears to no longer claim, that all the misappropriated data is "proprietary," means that there is significant doubt whether Niantic can show success on its CFAA claim and the related injunction orders should be lifted.

### 4. Data Alleged to be Misappropriated is not Obtained from Niantic's Server

As set forth in the Motion, the data that Defendants' DLL file obtains is on the user's phone, not Niantic's servers.  Dkt. 63-1 (Zeidman Decl.) at ¶ 29.  Indeed, it is neither technically feasible nor actually occurs that Defendant's DLL file interacts with Niantic's servers. This is both due to the fact that Defendants' DLL file communicates with the user phone's GPS, not Niantic servers, and the high-level of encryption of Niantic's servers.  Dkt. 63 (Mot. to Lift PI) at 21-22; Dkt. 63-1 (Zeidman Decl.) at ¶¶ 29, 36-40.  Niantic does not address, much less rebut,

---

[4] To the extent there could be any confusion, "proprietary" means "of, relating to, or holding as property."  "PROPRIETARY", Black's Law Dictionary (11th ed. 2019).

[5] Further, the proprietary nature of the data formed the basis of Niantic's argument that it has suffered irreparable harm—"[t]he Cheating Programs scrape valuable and proprietary game-related information from Niantic's servers, including POI Data.  Niantic has invested many hours, at great cost, to develop, curate, and protect its POI Data."  Dkt. 7 (PI Mot.) at 18.

1 these facts in its Opposition.  Zeidman Decl. at ¶¶ 8-9.

2       In apparent recognition of this fact, Niantic has shifted its argument.  In Niantic's
3 Complaint and Motion for Preliminary Injunction, it unequivocally claimed that Defendants
4 obtained the data directly from Niantic's servers.  Dkt. 1 (Compl.) at ¶¶ 86-87; Dkt. 7 (PI Mot.)
5 at 14 ("when the Cheating Programs access Niantic's Computers, they obtain information from
6 Niantic's Computers, including (but not limited to) valuable and proprietary POI Data and
7 Spawn Data").  But in light of the above facts, Niantic has been forced to admit that at the very
8 least "some of the data is sent to users' mobile devices," which means that said data is not
9 obtained from Niantic's servers.  Dkt. 71-2 (Third Lanz Decl.) at ¶ 24.  Niantic therefore
10 attempts to shift its CFAA argument to instead contend that the allegedly misappropriated data
11 "originates from Niantic's servers, in *some* fashion." Dkt. 71 (Opp. at 16); Dkt. 71-2 (Third Lanz
12 Decl.) at ¶ 24 ("all of the data sent to users' mobile devices originates from Niantic's servers in
13 the first instance").  It is here that Niantic's CFAA argument falls apart – it has conceded that the
14 data is not obtained from Niantic's servers, and Niantic cannot control or restrict access to a
15 user's phone (that falls within the purview of a user).  Further, the data that is located on a user's
16 phone arguably constitutes "User Content," which a user is free to "exploit."  Dkt. 7-8 (Terms of
17 Service) at § 5.1.  Thus, like *hiQ*, Defendants are not "circumvent[ing] a computer's generally
18 applicable rules regarding access permissions [] to gain access to a [Niantic] computer" in order
19 to obtain the data.  *hiQ Labs, Inc*., 938 F.3d at 1003–04.[6]

20       Niantic does not explain how the CFAA applies to scraping of publicly available data, or
21 "User Content" which users are free to "exploit," and instead conclusory states that defendants'
22 arguments are incorrect.  Dkt. 71 (Opp.) at 7 (with the caveat that if Defendants' arguments were
23 true, "it would apply to a narrow slice of the conduct at issue").  Therefore, contrary to Niantic's
24 contention that Defendants only focused on the nature of the data stolen, rather than how it was
25 stolen, Defendants have persuasively established that both the location and characteristics of the

26

27 [6] Not to mention that the data is also otherwise available on third-party sites, which Niantic
28 cannot control or restrict access to.  Dkt. 63 (Mot.) at 8-10.

-7-

1   data demonstrate why the PI should be lifted as it relates to Niantic's CFAA-based claims under

2   the Ninth Circuit's decision in *hiQ*. Dkt. 71 (Opp.) at 7.

3         **5.     Facebook v. PowerVentures Case is Not Applicable**

4         Niantic argues that the *Facebook v. PowerVentures* case is more analogous to the facts

5   here.  Yet, in that case, the defendant was "circumvent[ing] IP barriers" of Facebook by signing

6   into users' password-protected Facebook member profiles to access the data on Facebook's

7   server, data which was not otherwise publicly available and which it does not appear that

8   *Facebook* disclaimed rights to.  *Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1068

9   (9th Cir. 2016).  As set forth above, there are a number of distinctions between *Facebook* and the

10  instant case. First, there is no circumvention of Niantic's security measures to gain access to

11  Niantic's servers – Defendants' DLL file communicates with an individual's GPS system and

12  circumventing Niantic's security measures is not technically feasible.  Second, the data being

13  accessed by Defendants' DLL file resides on the user's phone, and arguably constitutes "User

14  Content," which users are free to "exploit."  Third, the data is also otherwise publicly available

15  via third-party sites which Niantic cannot restrict access to.  In sum, contrary to Niantic's

16  contention, this case and the pertinent facts are parallel to those in *hiQ*, including being

17  distinguishable from the *Power Ventures* case.  *hiQ Labs, Inc.*, 938 F.3d at 1002.

18        **6.     Niantic's Terms of Service Do Not Render Scraping Unauthorized**

19        Niantic contends that even if the Court is persuaded by *hiQ*, that it is saved by its Terms

20  of Service which "prohibit defendants from scraping Niantic's game-related data."  Dkt. 71 at 8-

21  9.  First, "Niantic's Terms of Service in and of themselves do not establish liability under the

22  CFAA.  *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) ("a

23  violation of the terms of use of a website—without more—cannot establish liability under the

24  CFAA").  Second, Niantic has not explained how Defendants' aggregation of data is dependent

25  upon, or at all tied to, Defendants' status as a Niantic user. *hiQ Labs, Inc. v. LinkedIn Corp.,* 273

26  F. Supp. 3d at 1107, n. 4 (N.D. Cal. 2017), *aff'd and remanded,* 938 F.3d 985 (9th Cir. 2019).

27  For example, Niantic has failed to show how Defendants' aggregation of data from publicly-

28

-8-

1  available third party sites or sources is subject to Niantic's Terms of Service.  Nor could Niantic.
2  Niantic's Terms of Service "governs the use of the Apps and Platform," but does not, and
3  cannot, govern use outside the Apps, such as how a user uses its personal device.  Dkt. 7-8 at § 1.
4  Because Defendants' DLL file interacts with a user's cell phone, not Niantic's servers, and only
5  obtains data on a user's phone or via other third-party sources, this falls outside the scope of "use
6  of the Apps and Platform."  Third, even if Defendants' aggregation of data was subject to
7  Niantic's Terms of Service, the "Conduct, General Prohibitions" section is specifically limited
8  by the following language—"unless applicable law mandates that you be given the right to do
9  so."  Dkt. 7-8 at § 6.  By the express terms, Niantic cannot prohibit acts which are authorized by
10 "applicable laws," including exceptions to the CFAA, Niantic's Terms of Service do not salvage
11 Niantic's CFAA claim. Thus, contrary to Niantic's contention, if this Court does agree with the
12 *hiQ* case, Niantic's Terms of Service argument does not salvage Niantic's CFAA claim.

### B. Niantic Alleges Insufficient Facts to Enjoin Defendants for Third Party Actions

#### 1. Niantic did not Alleged Any Affiliation until its Reply Brief

As set forth in the Motion, Niantic did not argue that Defendants were responsible for third-party AppHaven's actions until its Reply. Dkt. 63 (Mot.) at 12.  Indeed, Niantic did not make a single reference to AppHaven or Matthew Johnson in its Complaint or PI Motion.  *See generally*, Dkt. 1 (Compl.) and Dkt. 7 (PI Mot.)  The Court then relied upon Niantic's Reply motion and the Second Decl. of Eric. Lanz in granting the Preliminary Injunction. Dkt. 55 (Order) at 13.  But "new evidence presented in a reply […] should not [be] considered without giving the [non-movant] an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).  Since Defendants were not afforded an opportunity to respond to the evidence in Niantic's Reply, Defendants properly brought a Rule 59 motion with the rebuttal evidence which undercuts Niantic's attempt to enjoin Defendants for the actions of third parties.

In opposition, Niantic declares that the issue of Defendants' relationship to AppHaven has been "squarely addressed," yet only generally cites to the motion to dismiss and preliminary

1 injunction briefing and does not point to **where** this issue was squarely addressed. Dkt. 71 (Opp.)
2 at 9.  This is because such a citation could only be to Niantic's Reply to the Preliminary
3 Injunction.  Alternatively, Niantic contends that Defendants had procedural avenues by which to
4 attempt to respond to the new arguments set forth in its Reply—filing an objection to the new
5 evidence prior to the hearing or requesting oral testimony in advance of the hearing. Dkt. 71
6 (Opp.) at 12.  Yet, Niantic fails to cite to any case law that requires the wronged party to
7 undertake such affirmative actions if new evidence has been improperly included in a reply.  And
8 further, Defendants did attempt other procedural avenues in order to rebut Niantic's Reply prior
9 to the Court's order, by either submitting oral testimony or additional briefing, which were
10 denied.  Dkt. 63 (Mot.) at 2.  Niantic claims that the Court was entitled to decline to hear
11 testimony at the hearing, but that does not right the wrong committed by Niantic in relying on
12 new evidence in its Reply and the resulting injustice suffered by Defendants if prevented from
13 having an opportunity to rebut Niantic's evidence.  *Dupre v. Chevron U.S.A., Inc.,* 930 F. Supp.
14 248, 250 (E.D. La. 1996) (allowing evidence in under Rule 59(e) because "[t]he Court is
15 reluctant to exclude evidence that will allow it to fully consider the facts of the case.").

16       **2.**     **Niantic has had Sufficient Time to Respond to Defendants' Motion**

17 Niantic now contends that it itself is the wronged party, and would be unfairly prejudiced,
18 since it has not had sufficient time to response to Defendants' Motion to Lift the PI.  Dkt. 71
19 (Opp.) at 11.  As it relates to timing, Niantic first raised its claim that Defendants are affiliated
20 and thus liable for the actions of non-party, AppHaven, in its Reply which was filed on August
21 14, 2019. Dkt. 39 (Reply).  Thus, Niantic had been investigating this new claim for at least 97
22 days prior to the date by which it had to file its Opposition to this Motion.  Dkt. 71 (Opp.) (filed
23 Nov. 19, 2019).  Further, Niantic requested additional time in order to respond to Defendants'
24 Motion, thus Niantic had 26 days (as opposed to the standard 14) to file its response. Dkt. 68
25 (Order granting an extension for Niantic's Opposition). In short, Niantic had sufficient time to
26 defend its allegation that Defendants and AppHaven are affiliated.  Niantic also claims its limited
27 time to respond prevented it from obtaining an expert–as set forth above, Niantic had more than
28

-10-
DEFENDANTS' REPLY TO DEFS MTN TO
LIFT THE PRELIM. INJUNCTION
CASE NO. 4:19-cv-03425-JST

1 sufficient time to obtain an expert and its strategy call not to do so is no fault of Defendants.

2 Niantic's general claim that it has been prevented access to the evidence that Mr.
3 Zeidman relies upon is untrue. Dkt. 71 (Opp.) at 11. Mr. Zeidman's declaration specifically
4 identified each piece of evidence he relied upon, and attached this evidence as exhibits. Dkt. 63-
5 3 (Exhibit B: Materials Relied Upon).[7] The materials not attached, Niantic had access to prior to
6 serving its Opposition. *Id.* at § 1-6 (briefing in this case); § 20 (Pokemon++ IPA file contents)
7 (Niantic has admitted it has reviewed this IPA file at Dkt. 71-2 (Third Lanz Decl.) at ¶ 38).
8 Perhaps that is why although Niantic makes a general claim that it has not had access to the
9 evidence Mr. Zeidman relies upon, it can only provide as an example the Global++ source code.
10 Yet this too was made available to Plaintiff for inspection. Ex. L, Horton Decl.[8] Further, Mr.
11 Zeidman only relies upon his review of the source code for one paragraph confirming that
12 Defendants' tweak "does not connect to Niantic's servers" and that it accesses data from the
13 user's phone, points which Niantic do not appear to contest. Dkt. 63-1 (Zeidman Decl.) at ¶ 40.

14 **3.  Niantic has not Substantively Established that Defendants are in "Active Concert and Participation" with AppHaven**
15

16 As set forth in the Motion, the determination of whether a party and non-party are "in
17 active concert or participation" under Rule 65(d), is a "highly fact-specific" inquiry where courts
18 are hesitant to "make punishable the conduct of persons who act independently and whose rights
19 have not be adjudged according to law." *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352,
20 1369 (Fed. Cir. 2017). In the *Asetek Danmark* case, the Federal Circuit considered what sort of
21 evidence would satisfy the "active concert or participation" requirement, which includes whether
22 the non-party abets the liable party, or is legally identifiable with them. *Id.* at 1365. Niantic has
23 not clearly articulated the theory for which it believes non-party AppHaven is in "active concert
24 or participation" with Defendants, much less clearly explained how AppHaven "abets" or is

25

---

26 [7] Unlike Mr. Lanz, who attached <u>no</u> exhibits to his Declaration. Dkt. 71-2 (Third Lanz Decl.).
27 [8] Niantic did not serve discovery to obtain Defendants' source code until Oct. 18, 2019, to which Defendants served its responses on Nov. 18, 2019 indicating that the source code was available
28 for inspection. Niantic has not contacted Defendants' counsel in order to view the source code.

-11-
DEFENDANTS' REPLY TO DEFS MTN TO
LIFT THE PRELIM. INJUNCTION
CASE NO. 4:19-cv-03425-JST

1   otherwise "legally identifiable" with Defendants.  At best, Niantic may be contending that
2   AppHaven is a "successor" of Defendants, yet does not address whatsoever the evidence
3   Defendants introduced undermining this theory, and only cites to undated social media posts, or
4   that dated from over seven months ago, in support of its theory. This falls far short of providing
5   this Court with sufficient evidence to make the "narrow fact-dependent determinations" to enjoin
6   Defendants' for the acts of a third party.

7   Niantic does not address whatsoever the August 2019 discord post in which AppHaven
8   discusses Global++ as a third party, and that it cannot remedy its customers' frustrations in not
9   being able to access IPA files with Defendants' DLL file.  *Compare* Dkt. 63 (Mot.) at 17 *with*
10  Dkt. 71 (Opp.).  Similarly, Niantic does not explain, much less reconcile, the fact that a
11  "Matthew Johnson" is the domain registrant for over a 1,000 other unrelated websites squares
12  with its conclusion that because a "Matthew Johnson" registered both AppHaven and Niantic's
13  sites, this is proof positive of an affiliation.  *Compare* Dkt. 63 (Mot.) at 15 *with* Dkt. 71 (Opp.)
14  *with* Dkt. 71 (Opp.). Nor does Niantic address the fact that AppHaven distributes hundreds of
15  other IPA files which are not alleged to be related to this litigation, some of which in fact directly
16  compete with Defendants' DLL file.  *Compare* Dkt. 63 (Mot.) at 18 *with* Dkt. 71 (Opp.).

17  Instead, Niantic attempts to divert the attention. First, Niantic points to an undated post
18  which states that Global++ "partnered" with AppHaven, but does not state that AppHaven is
19  somehow a "successor" of Global++ or is otherwise legally identified with Global++.  Dkt. 71
20  (Opp.) at 17.  Second, Niantic points to a Twitter post from over seven months ago which states
21  that there is a "new way to sign your apps." *Id.*  These two posts are far from sufficient—in
22  *Asetek*, there was evidence of actual contractual relations between the two parties ("an
23  exclusivity agreement") and that the two parties "jointly developed the infringing products," in
24  addition to other evidence, and the Federal Circuit still vacated the injunction finding that the
25  current evidentiary record was insufficient. *Asetek Danmark A/S*, 852 F.3d at 1368.  The sparse
26  evidence Niantic has presented in support of its theory is insufficient, and as the Federal Circuit
27  did in *Asetek*, the injunction should be vacated. *Asetek Danmark A/S*, 852 F.3d at 1369 (vacating
28

-12-
DEFENDANTS' REPLY TO DEFS MTN TO
LIFT THE PRELIM. INJUNCTION
CASE NO. 4:19-cv-03425-JST

the injunction because "[b]oth the delicacy of the injunctive authority at issue and the tradition of narrow fact-dependent determinations whether to invoke it argue for deferring conclusions until the facts about the relationship of Cooler Master and CMI, both in their businesses and in this litigation, are more fully developed and their legal significance more fully explored").

### C. Niantic has Failed to Allege Sufficient Facts that Defendants Directly Copied or Distributed Niantic's Code

#### 1. Defendants Never Admitted to Copying or Distributing Niantic's Code

Niantic's claim that Defendants have admitted to copying Niantic's code is incorrect. Dkt. 71 (Opp.) at 13-14. Niantic cites to the powerpoint presentation which Defendants brought to the preliminary injunction, yet do not indicate that the referenced slides were introduced or discussed at the hearing. Had the specific slides been discussed, Niantic could not misconstrue them—the referenced slides relate to the IPA file distributed by Signing Services such as AppHaven which combine Defendants DLL file with Niantic's App. Dkt. 71-1 (Defs. Powerpoint Presentation) at 24. This is consistent with Defendants' Motion, which fully explain how Signing Services such as AppHaven link Defendants' DLL file to third party Apps, such as Niantic's, creating an IPA file which is distributed. Dkt. 63 (Mot.) at 13-14. When this linking occurs, the IPA file contains both Defendants' DLL file and "the same, exact Niantic code," and Defendants' DLL file "does not supplant the Niantic code." *Id.* ("the Global++ software once linked to an App works as an overlay to the App").

Niantic claims that Defendants distribute the IPA file by pointing to links on the shutdown Global++ website, a developer certificate, and powerpoint slides from the September 11, 2019 hearing. As it relates to the website, first, as Niantic acknowledges, the alleged evidence is from March 2019 and was pulled from "Global++'s now-defunct website"—*i.e.*, the website that was shut down upon receipt of Niantic's June 6, 2019 Letter. Dkt. 71 (Opp.) at 15; Dkt. 71-2 (Third Lanz Decl.) at ¶ 39. Second, the URL link which Niantic identifies as evidence is also "no longer functional." Dkt. 71-2 (Third Lanz Decl.) at ¶ 42. Third, Niantic seems to indicate that there is a third "online location" which individuals were required to go to in order to

-13-
DEFENDANTS' REPLY TO DEFS MTN TO
LIFT THE PRELIM. INJUNCTION
CASE NO. 4:19-cv-03425-JST

1  download the IPA file, but does not disclose the URL.  Dkt. 71-2 (Third Lanz. Decl.) at ¶ 43;
2  Zeidman Decl. at ¶ 48, n. 1.  Fourth, the fact that a portion of a URL contains a company name is
3  not proof of an affiliation, and Niantic does not provide any evidence to support its claim that
4  Defendant Hunt is affiliated with WeTransfer.  *Compare* Dkt. 71-2 (Third Lanz Decl.) at ¶ 44-
5  45; Zeidman Decl. at ¶ 48, n. 1.
6       Niantic claims that because the IPA file contained "developer certificate" for an email
7  address it alleges is affiliated with Defendant Hunt, this is proof that Defendants' created the IPA
8  file.  Dkt. 71 (Opp.) at 15; Dkt. 71-2 (Third Lanz Decl.) at ¶¶ 34-36.  There are numerous holes
9  in Niantic's claims.  First, Niantic does not provide <u>any</u> exhibits in support of these allegations.
10 Zeidman Decl. at ¶ 42.  Second, Niantic does not claim that this was the only signing certificate
11 that was included in the IPA file.  Dkt. 71-2 at ¶ 35 ("contained **a** digital signing certificate.").
12 Third, the Developer Certificate identified was found in a Provision File of the IPA file, which
13 only relates to when a developer is seeking to test code, such as a DLL file, and only allows very
14 limited distribution.  Zeidman Decl. at ¶ 44-46.  Fourth, Niantic contends that the IPA file was
15 distributed via a link on a non-Apple App Store site (the former Global++ website)—but a
16 Developer certificate only allows distribution on the Apple App Store, there must be an
17 Enterprise certificate in order to distribute on a third-party site.  *Id*. at ¶ 44-46.  Fifth, Niantic
18 presents no evidence that Defendants possess an Enterprise certificate. *Id.* at ¶ 48.  Sixth, it is
19 Signing Services that are known to possess Enterprise certificates which enable them to link
20 DLL files to Apps and distribute the IPA files via third-party sites.  *Id.* at ¶ 49.  Niantic's focus
21 on a slide from the September 11, 2019 hearing is also misplaced—the slide merely states that
22 "distributing the unmodified Niantic code with the Global++ code is technically necessary to
23 achieve interoperability"—this is consistent with Defendants' motion that a third unrelated party
24 does this distribution.  Dkt. 71-1 (Defs. Powerpoint Presentation) at 23 (Niantic also does not
25 show that this slide was actually introduced at the hearing).
26      **2.**     **Defendants' DLL File Does Not Copy or Distribute Niantic's Code**
27      In light of the evidence that Defendants should not be held liable for the actions of third
28

-14-

1   parties, Niantic shifts its argument to instead contend for the first time that Defendants' DLL file
2   contains Niantic's protobuf code.  As set forth below, this does not constitute protectable work
3   since Niantic has not obtained a copyright for this code and it is publicly accessible.
4       When considering copyright infringement of computer code, courts generally use the
5   Second Circuit's abstraction-filtration-comparison test.  *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*,
6   982 F.2d 693 (2d Cir. 1992); *Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1525 (9th
7   Cir.1992) ("in light of the essentially utilitarian nature of computer programs, the Second
8   Circuit's approach is an appropriate one."). This test is composed of three parts:  (1) break down
9   the allegedly infringed program into its structural parts; (2) distinguish between what is non-
10  protectable material from the creative expression; and (3) comparison of the creative expression
11  with the allegedly infringing program.  *Altai, Inc.*, 982 F.2d at 706.  Here, the Court need only
12  focus on factor two, since Niantic's protobuf code does not constitute protectable material.
13      Niantic's protobuff code is not protectable because it is in the public domain.  As part of
14  the filtration step, courts remove "elements that are taken from the public domain" since this
15  constitutes "non-protectable material."  *Altai, Inc.,* 982 F.2d at 706.  As an initial matter, Niantic
16  does not offer any evidence other than a declaratory statement that the protobuff codes are
17  "virtually identical."  Dkt. 71-2 (Third Lanz. Decl.) at ¶¶ 50, 52.  Regardless, it is clear that the
18  protobuff code that Niantic alleges is "virtually identical" between Niantic's App and
19  Defendants' DLL file is in the public domain.   Dkt. 71-2 (Third Lanz Decl.) at ¶ 48; Zeidman
20  Decl. at ¶¶ 10-16.  Because this protobuff code is "Google's language-neutral, platform-neutral,
21  extensible mechanism for serializing structured data," available from the GitHub site, a
22  subsidiary of Microsoft, and distributed as an open source, it is not protectable material.  *Id*.

### III.    CONCLUSION

24      For the foregoing reasons, Defendants respectfully request that the Court grant its motion
25  to lift the preliminary injunction.

-15-

Dated: December 4, 2019

Respectfully Submitted,

POLSINELLI LLP

By: */s/ Fabio E. Marino*
Fabio E. Marino

Attorneys for Defendants
RYAN HUNT AND ALEN HUNDUR