FABIO E. MARINO (SBN 183825)
fmarino@polsinelli.com
REBECCA B. HORTON (SBN 308052)
rhorton@polsinelli.com
POLSINELLI LLP
1661 Page Mill Road, Suite A
Palo Alto, CA 94304
T: 650-461-7700
F: 650-461-7701

Phillip J. R. Zeeck (*Admitted PHV*)
pzeeck@polsinelli.com
POLSINELLI PC
900 West 48th Place, Ste. 900
Kansas City, MO 64112
T: 816-753-1000
F: 816-753-1536

Attorneys for Defendants
Ryan Hunt and Alen Hundur

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| NIANTIC, INC.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>GLOBAL++, et al.,<br><br>　　　　　Defendants. | Case No. 3:19-cv-03425 JST<br><br>**DECLARATION OF ROBERT ZEIDMAN IN SUPPORT OF DEFENDANTS RYAN HUNT'S AND ALEN HUNDUR'S REPLY TO DEFENDANTS' MOTION TO LIFT THE PRELIMINARY INJUNCTION**<br><br>Date: January 29, 2020<br>Time: 2:00 P.M.<br>Ctrm: 6, 2nd Floor<br>Judge: Honorable Jon S. Tigar |

# TABLE OF CONTENTS

Contents

I.  NIANTIC DOES NOT ADDRESS THE FOLLOWING FINDINGS FROM MY MOVING DECLARATION (DKT. 63-1) .................................................................... 1

II. PROTOCOL BUFFERS ("PROTOBUF") CODE IS PUBLICLY AVAILABLE ........ 2

III. THE ABSTRACTION-FILTRATION-COMPARISON TEST IS GENERALLY USED TO DETERMINE IF COPYRIGHT INFRINGEMENT HAS OCCURRED OF SOFTWARE PROGRAMS ............................................................... 4

    A.    CodeSuite ................................................................................................ 5

        1.    BitMatch ..................................................................................... 6

        2.    SourceDetective ......................................................................... 8

IV. NIANTIC DID NOT USE A RECOGNIZED PROCESS TO DETERMINE IF ITS CODE HAD BEEN COPIED ............................................................................. 8

    A.    The Proper Source Code Analysis for Detecting Copying ................................. 8

        1.    Third party source code? ............................................................. 9

        2.    Code generation tools? ............................................................... 9

        3.    Commonly used identifier names? ........................................... 10

        4.    Common algorithms? ............................................................... 10

        5.    Common author? ..................................................................... 10

        6.    Copying ................................................................................... 10

    B.    Niantic did not Utilize a Recognized Method to Compare Software Code ............................................................................................ 11

V.  NIANTIC DOES NOT PROVIDE ANY EVIDENCE TO SUPPORT ITS CLAIM THAT THE DEVELOPER CERTIFICATE IT LOCATED MEANS DEFENDANTS CREATED AND DISTRIBUTED POKEGO++ (R88) .................... 11

**EXHIBITS INDEX**

| EXHIBITS | DOCUMENT |
|---|---|
| A | Materials Relied Upon |
| B | Protocol Buffers for Google Developers |
| C | GitHub page for AeonLucid POGOProtos |
| D | GitHub page for AeonLucid POGOProtos License |
| E | AeonLucid POGOProtos-Master Source Code List from GitHub |
| F | Global++ Source Code Header File `PlayerData.pbobjc.h` |
| G | How Apple Developer Enterprise License Works, Computerworld |
| H | Choosing a Membership, Apple Developer Support |
| I | What is a Provisioning Profile & Code Signing in iOS?, Medium |
| J | Re-Signing an iOS App Without Xcode, Float |
| K | Software Pirates Use Apple Tech to Put Hacked Apps on iPhones, Reuters |

I, Robert Zeidman, declare as follows:

1. As set forth in my declaration in support of Defendants' Motion to Lift the Preliminary Injunction, I am an engineer and the founder and president of Zeidman Consulting, which provides engineering consulting to high-tech companies. Among the types of services I provide are hardware and software design. My clients have included Fortune 500 computer and technology companies as well as smaller companies and startups. Dkt. 63-1 at ¶ 1. My full resume can be found at Dkt. 63-2.

2. I have reviewed and considered Niantic's Opposition to Defendants' Motion to Lift the Preliminary Injunction (Dkt. 71), the supporting Declaration of Ryan Spear (Dkt. 71-1) and third Declaration of Eric Lanz (Dkt. 71-2).

3. I submit this declaration in support of Defendants' Reply to the Motion to Lift the Preliminary Injunction.

I. **NIANTIC DOES NOT ADDRESS THE FOLLOWING FINDINGS FROM MY MOVING DECLARATION (DKT. 63-1)**

4. Upon my review of the Third Declaration of Eric Lanz, and Niantic's Opposition Motion, Niantic does not appear to rebut the following facts set forth in my Declaration attached to the Motion to Lift the Preliminary Injunction.

5. An individual can download Niantic's Apps and access Niantic's code without having to agree to Niantic's Terms of Service. Dkt. 63-1 at ¶¶ 27-28.

6. The "DLL file does not become part of the app to which it is linked," as set forth in my Declaration. Dkt. 63-1 at ¶¶ 31-34.

7. Defendants' DLL file does not change Niantic's game code. Dkt. 63-1 at ¶¶ 21, 31.

8. Defendants' DLL file cannot and does not communicate with Niantic's servers due to their "state-of-the-art encryption." Dkt. 63-1 at ¶¶ 36-40.

9. Defendants' DLL file "sits between the iOS operating system and the app it is linked to" and "reads the data that is generated on the user's phone" as set forth in my

-1-

Declaration. Dkt. 61-1 at ¶¶ 29, 40. Specifically, Niantic does not appear to rebut the fact that Defendant's DLL file "does not access Niantic's servers, or intercept data sent to Niantic's server, to obtain POI data." *Id.* at ¶ 29.

## II.   PROTOCOL BUFFERS ("PROTOBUF") CODE IS PUBLICLY AVAILABLE

10.   Niantic contends that the protobuf code in *PokeGo++ version R109* is "virtually identical to protobuf created by Niantic for use in Niantic's legitimate mobile apps." Dkt. 71-2 (Third Lanz Decl.) at ¶ 48. However, this is not surprising because Google supplies protobuf code to developers on its website for developers. *See* Protocol Buffers, Google Developers Website, attached as Exhibit B. The fact that Niantic did not properly filter out unprotectible code from its comparison of Global++ and Niantic code confirms that Niantic did not use a proper method for determining software copyright infringement. Had Niantic used a proper procedure, the publicly available protobuf code would have been filtered out.

11.   Furthermore, Niantic does not offer any evidence or exhibits in support of Mr. Lanz's statement that he "saw no difference between Niantic's protobuf code in PokeGo++ version R109 and the protobuf code in version 0.137.2 of Pokémon GO." Dkt. 71-2 (Third Lanz Decl.) at ¶ 50. While any similarities are almost surely due to the use of Google's code, Niantic does not provide any code examples that I can examine or consider.

12.   Niantic also does not offer any evidence or exhibits in support of Mr. Lanz's statement that "many code elements—including classes, functions, and properties—[] have the exact same names and levels, in the same order, as in Niantic's code." Dkt. 71-2 (Third Lanz Decl.) at ¶ 52. Had Niantic provided such examples, I would be able to analyze the examples using a proper methodology and either confirm or refute Niantic's conclusion of copying.

13.   Because Niantic has not provided any evidence in support of these statements, I cannot meaningfully consider or address Mr. Lanz's specific analysis other than to show that the methodology he used was seriously flawed.

14.   I have nonetheless attempted to substantively evaluate Niantic's contentions. According to Google, "Protocol buffers are Google's language-neutral, platform-neutral,

1  extensible mechanism for serializing structured data." *See* Protocol Buffers, Google Developers

2  Website, attached as Exhibit B. Google makes protobuffer code available for developers to use

3  freely. The specific protobuffer code for Pokémon GO can be found on the publicly accessible

4  GitHub webpage. *See* GitHub page for AeonLucid POGOProtos, attached as Exhibit C. This

5  code is distributed as open source code under the MIT license:

> MIT License
>
> Copyright (c) 2016 AeonLucid
>
> **Permission is hereby granted, free of charge, to any person obtaining a copy of this software** and associated documentation files (the "Software"), **to deal in the Software without restriction, including without limitation the rights to use, copy, modify, merge, publish, distribute, sublicense, and/or sell copies of the Software**, and to permit persons to whom the Software is furnished to do so, subject to the following conditions:
>
> The above copyright notice and this permission notice shall be included in all copies or substantial portions of the Software.
>
> THE SOFTWARE IS PROVIDED "AS IS", WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT. IN NO EVENT SHALL THE AUTHORS OR COPYRIGHT HOLDERS BE LIABLE FOR ANY CLAIM, DAMAGES OR OTHER LIABILITY, WHETHER IN AN ACTION OF CONTRACT, TORT OR OTHERWISE, ARISING FROM, OUT OF OR IN CONNECTION WITH THE SOFTWARE OR THE USE OR OTHER DEALINGS IN THE SOFTWARE.

*See* AeonLucid POGOProtos license (emphasis added), attached as Exhibit D.

15.   I downloaded AeonLucid POGOProtos-master source code from the GitHub site, attached as Exhibit E. I also obtained a copy of the Global++ source code header file `PlayerData.pbobjc.h` from Ryan Hunt, attached as Exhibit F. This header file contains declarations for the protobuf classes used in the Global++ source code. I then searched for the protobuf declarations in the header file within the POGOProtos code and found these declarations matched classes in the open source, publicly available POGOProtos code, shown in **Table 1**.

-3-

| Global++ class in PlayerData.pbobjc.h | POGOProtos file |
|---|---|
| `BuddyPokemon` | `POGOProtos\Data\BuddyPokemon.proto` |
| `CombatPlayerPreferences` | `POGOProtos\Combat\CombatPlayerPreferences.proto` |
| `ContactSettings` | `POGOProtos\Data\Player\ContactSettings.proto` |
| `DailyBonus` | `POGOProtos\Data\Player\DailyBonus.proto` |
| `EquippedBadge` | `POGOProtos\Data\Player\EquippedBadge.proto` |
| `PlayerAvatar` | `POGOProtos\Data\Player\PlayerAvatar.proto` |
| `SocialPlayerSettings` | `POGOProtos\Data\Player\SocialPlayerSettings.proto` |
| `TeamChangeInfo` | `POGOProtos\Data\Player\TeamChangeInfo.proto` |

**Table 1. Global++ protobuf classes found in POGOProtos**

16. My investigation confirms that the protobuf references used in the Global++ software is openly available for any programmer to use and thus is not a sign of copying as claimed by Niantic.

### III. THE ABSTRACTION-FILTRATION-COMPARISON TEST IS GENERALLY USED TO DETERMINE IF COPYRIGHT INFRINGEMENT HAS OCCURRED OF SOFTWARE PROGRAMS

17. In the Third Declaration of Mr. Lanz, Niantic alleges that the protobuf code contained in Niantic's Pokémon GO version 0.137.2 is "virtually identical" to PokeGo++ version R109. Dkt. 71-2 (Third Lanz Decl.) at ¶ 50. Mr. Lanz indicates that he reached this conclusion by "examining" the two protobuf code but does not otherwise disclose his method of examination. Dkt. 71-2 (Third Lanz Decl.). at ¶ 48. Based upon my 24 years serving as an expert or consultant, the abstract-filtration-comparison test is used in order to determine whether the nonliteral elements of two software programs are "substantially similar" in order to constitute copyright infringement, especially when source code is not available.

18. In the case of *Computer Associates Intern., Inc. v. Altai, Inc.*, 982 F.2d 693 (2nd Cir. 1992), the court created a test to determine whether there was "substantial similarity" between the non-literal elements of two programs, a requirement for finding copyright infringement. The test is called the abstraction-filtration-comparison test.

19. The abstraction-filtration-comparison test has three parts. The first part of the test involves "abstracting" the source code into a representation of a higher level of functionality than just the individual lines of code. The second part of the test involves filtering out unprotectable elements of the code from protectable elements. Such unprotectable elements include those

required by efficiency (e.g., known optimization techniques), elements required by external factors (e.g., interfacing with an operating system), and elements taken from the public domain (e.g., open source functions). In the third step, a comparison is performed between the high-level functional representations that remain after filtering. If there is similarity between these abstract, filtered functions, copyright infringement is determined to have occurred even though none of the source code statements may match between the two programs.

### A.   CodeSuite

20.   There are accepted methods by which one can apply the abstraction-filtration-comparison test. One such method is using software identified as CodeSuite. CodeSuite is a suite of patented tools for comparing computer source code and executable code to detect plagiarism, pinpoint copyright infringement, highlight trade secret theft, and measure intellectual property. It can also be used to track software development changes through numerous revisions. CodeSuite incorporates the BitMatch®, CodeCLOC®, CodeCross®, CodeDiff®, CodeMatch®, FileCount™, FileIsolate™, and SourceDetective® as well as sophisticated post-process database filtering.

21.   Use of CodeSuite and its functions, as set forth below, have been accepted by courts throughout the nation and around the world. The patented tools have been used over 100 times in court and have withstood every challenge. The algorithms have been described in a number of peer-reviewed journals and the seminal textbook on software forensics, *The Software IP Detective's Handbook*. Over 40 experts worldwide have been trained and certified in the use of CodeSuite and the methodologies for using it to determine whether copyright infringement occurred. Some of the notable cases where CodeSuite has been used include:

1. *Oracle America, Inc. v. Google Inc.*, Civil Action No. 10-03561-WHA (N.D. Cal.)
2. *ConnectU, Inc. v. Facebook, Inc.*, Civil Action No. 04-11923-DPW (D. Mass)
3. *Brocade Communications Systems v. A10 Networks, Inc.*, Civil Action No. 5:10-cv-03428-LHK (N.D. Cal.)
4. *SplitFish AG v. Bannco Corp.*, Civil Action No. 1:10CV297-TSE (E.D. Va.)

5. *Veritas Software Corp., Symantec Corp. (Successor in Interest) v. C.I.R.*, Civil Action No. 12075-06 (U.S. Tax Ct.)

6. *Sarine Technologies v. Diyora & Bhanderi Corp.*, Civil Appeal Nos. 7304-7305 of 2018 (Sup. Court of India)

22. I have also been appointed by several courts to serve as a neutral expert where I used CodeSuite and its functions to opine on whether copyright infringement of computer source code has occurred. These cases include: *Sarine Technologies v. Diyora & Bhanderi Corp.*, Civil Appeal Nos. 7304-7305 of 2018 (Sup. Court of India); and *Kenneth C. Henry v. Petrolink v. Digital Well File*, Civil Action No. 2010-08178 (Harris County, TX). *See* Dkt. 63-2 (Resume).

### 1. BitMatch

23. BitMatch® is a function of CodeSuite that calculates object code correlation by using a combination of two algorithms to find copying: String Matching and Identifier Matching. Each algorithm is useful in finding different clues to copying that the other algorithms may miss. By using both algorithms, chances of missing copied code are significantly diminished.

24. BitMatch exhaustively compares object code files in multiple directories and subdirectories to other executable binary files or source code files to determine which files are the most highly correlated. BitMatch compares every file in one directory with every file in another directory, including all subdirectories if requested, and produces a database that can then be exported to an HTML basic report that lists the most highly correlated pairs of files. BitMatch examines all text strings, comments, and identifier names that it can find in the object code files in order to determine copying. If a specific user message or a unique subroutine name is found in two files, there is a strong possibility that one was copied from the other.

#### a. String matching

25. The BitMatch String Matching algorithm compares strings from both files. Sequences of whitespace are converted to single spaces so that the syntax structure of the line is preserved. This algorithm yields a correlation score representing the percentage of matching strings in the two files.

### b. Identifier matching

26. For each file pair, the BitMatch Identifier Matching algorithm counts the number of matching identifiers in order to find matching function names, variable names, and other identifiers. This algorithm also examines each identifier in the binary code of one file and finds all identifiers that match a sequence within one or more identifiers in the other file. For example, if identifier `abc` is found in one file and the identifiers `aabc`, `abc1111111`, and `abcxxxyz` are found in anther file, then there is a partial match for the identifier `abc`. Partial matching finds common function names, variable names, and other identifiers where someone has attempted to disguise the identifiers in a fairly basic way. This algorithm yields a correlation score representing the percentage of matching and partially matching identifiers in the two files.

### c. Correlation score

27. Finally, a single correlation score is given for the similarity of the file pairs. If a file pair has a higher score, it implies that these files are more similar and may be copied from each other or from a common third file. There are many kinds of copying and many ways of fooling copy detection programs. For this reason, BitMatch produces an HTML output report with a list of file pairs ordered by their total match scores. The user can click on a file pair hyperlink to bring up a detailed HTML report showing exact matches that occurred between the selected file pairs. In this way, experts are directed to suspicious similarities and allowed to make their own judgments. BitMatch is not a tool for precisely pinpointing copied code, but rather a tool to assist an expert in finding copied code. BitMatch reduces the effort needed by the expert by allowing him to narrow his focus from hundreds of thousands of lines of code in hundreds of files to dozens of lines of code in dozens of files.

28. Note that a negative result from BitMatch does not mean that copying has not occurred because many signs of copying will be removed during the compilation process. However, a positive result from BitMatch, after review and filtering by an expert, is a strong sign that copying occurred and that the source code of the programs should be compared to come to a definitive conclusion.

### 2. SourceDetective

29. The SourceDetective® function of CodeSuite® automatically counts the number of times each identifier, comment, string, and statement can be found on the Internet (referred to as "hits") as determined by the Microsoft Bing search engine. These hits can be used to filter the correlation results of the CodeMatch® or BitMatch® functions of CodeSuite. This is important to determine whether the code correlation measured by these two functions are due to copying or to one of the other reasons for correlation: third party code, code generation tools, commonly used identifier names, common algorithms, or common author. If matching code elements in the code of two different programs are found extensively on the Internet, they can be explained by one of these reasons. However, if matching code elements are not found on the Internet, or rarely found on the Internet, then they are more likely to be explained only by copying from one program to the other.

## IV. NIANTIC DID NOT USE A RECOGNIZED PROCESS TO DETERMINE IF ITS CODE HAD BEEN COPIED

### A. The Proper Source Code Analysis for Detecting Copying

30. Although it is not a requirement to use the CodeSuite® tool from my software company SAFE Corporation, it is the only commercially available tool for the purpose of finding or excluding software copyright infringement. The BitMatch® function of CodeSuite performs an exhaustive comparison of two code bases, and the SourceDetective function of CodeSuite performs an exhaustive search of the Internet to exclude reasons for correlation that are not due to copying. While other tools can be used to perform similar functions, these functions must be performed to accurately find any copyright infringement. The process described here incorporates the Abstraction-Filtration-Comparison Test.

31. To compare two sets of source code for detecting or excluding copying, I utilize an iterative step-by-step method to evaluate the correlations identified by CodeMatch. The steps of this filtering process are summarized in Figure 1.



**Figure 1. Correlation filtering method**

### 1. *Third party source code?*

32. In order to determine whether any of the correlations could be attributed to third-party source code, I look for copyright notices or references to third parties within the code. I also use SourceDetective to search the Internet for references to the comments, strings, and identifiers that were found in the code. SourceDetective tests each code element that has been identified as matching in both files against the those found on the Internet. If these code elements can be found in third-party code, SourceDetective will find references to them, and I then filter these code elements out of the results. This test allows me to eliminate correlations that were the result of using third-party code. Any correlations that remain are not due to code from third-party sources.

### 2. *Code generation tools?*

33. To further determine whether any of the correlations can be attributed to code generation tools, I look for specific identifiers within the code. Code generation tools typically have very specific identifier naming conventions that are recognizable. This test allows me to eliminate correlations that were the result of using code generation tools. Any correlations that remain are not the result of code generation tools.

### 3. *Commonly used identifier names?*

34. In order to determine whether any of the correlations can be attributed to commonly used identifier names, I look for identifier names that I have come across in my own experience as a software developer. SourceDetective is efficient at determining identifier names that appear often on the Internet, and I also use this information to filter out any commonly used identifier names. This test allows me to eliminate correlations that were the result of common identifier names. Any correlations that remain are not due to commonly used identifiers.

### 4. *Common algorithms?*

35. Common algorithms are very difficult to identify in binary code, and so this step cannot be accurately performed until source code is obtained.

### 5. *Common author?*

36. A common author can be a reasonable explanation for some correlated identifiers, strings, comments, or coding styles. For instance, developers may have a particular coding notation that they use to create identifier names. There are several well-known notations, such as Hungarian and Camel notation, that developers use to make identifier names more descriptive. A particular developer is more likely to use the same notation and therefore create the same or similar identifier names in two independently developed programs. A particular author may also write strings in a particular way, using certain unusual words or unusual spellings.

37. This test allows me to eliminate correlations that were the result of common authors. Any correlations that remain are not due to common algorithms.

### 6. *Copying*

38. After filtering out correlations caused by the reasons discussed above and summarized in Figure 1, the only reasonable explanation for any remaining correlation is that code was copied. If a methodology such as described here is not followed, and reasons besides copying are not considered and filtered out, then the Abstraction-Filtration-Comparison Test has not been implemented and the results are unreliable.

### B. Niantic did not Utilize a Recognized Method to Compare Software Code

39. Niantic has not indicated that it performed any such rigorous process to justify its conclusion that Global++ copied Niantic's code.

40. I understand that Niantic uses very strong encryption to encrypt its binary code to prevent disassembly, decompilation, or other means for examining the code. However, I have been informed that Global++ uses a basic encryption that protects against individuals from reading raw strings of code but would not impede the use of code comparison tools. In this case, Niantic could have used the BitMatch function of CodeSuite (or some other code comparison tool) to compare its own source code with the binary code from Global++, which is accessible to anyone who downloads a Global++ app.

41. Niantic claims that the use of Google's protocol buffer code ("protobuf") in Niantic apps and Global++ apps is an indication of copying. In fact, this claim confirms that Niantic did not use a proper method for determining copyright infringement because if it had, it would have found that the protobuf code is accessible by any party, via the web, for inclusion in commercial code, as I describe below.

### V. NIANTIC DOES NOT PROVIDE ANY EVIDENCE TO SUPPORT ITS CLAIM THAT THE DEVELOPER CERTIFICATE IT LOCATED MEANS DEFENDANTS CREATED AND DISTRIBUTED POKEGO++ (R88)

42. Niantic claims that because it observed that "a digital signing certificate" with an email address "elliotrobot20@gmail.com" was found in in a text file, `embedded.mobileprovision`, for PokeGo++ (R88), this means that Defendant Hunt "likely created the IPA file." Dkt. 71-1 (Third Lanz Decl.) at ¶¶ 33-37.

43. Other than Niantic's declaratory statements, Niantic does not provide any exhibits or evidence in support of these statements by Mr. Lanz. For example, Niantic also does not indicate whether the referenced Digital Signing Certificate was the <u>only</u> certificate found in the text file, or if there were others. Dkt. 71-1 (Third Lanz Decl.) at ¶¶ 33-37.

44. The text file that Niantic identifies, the `embedded.mobileprovision` file, is in reference to the Provisioning Profile that is created during code development. Dkt. 71-2 (Third

1  Lanz Decl.) at ¶ 33.  A Provision Profile is created when a developer wants to test code:

> Also within this file is a file named **embedded.mobileprovision**. This is the provisioning profile that was originally packaged with the application. iOS automatically installs this provisioning profile on the device when installing the application (if the provisioning profile doesn't already exist on the device). The provisioning profile is a plist file that **specifies a handful of permissions for your app–most notably, the devices that it is provisioned to run on (for development** or ad-hoc releases).

*See* Re-Signing an iOS App Without Xcode, attached as Exhibit J (emphasis added).

45.   The profile contains three items, Development Certificates, Unique Device Identifiers and an Apple ID.  *See* What is a Provisioning Profile & Code Signing in iOS, attached as Exhibit I.  The Development Certificates are for the developers that want to test the code on a physical device while writing the code.  The Unique Device Identifiers list the limited devices that the code/app are approved to run on.  The app/code cannot be run on any other devices.  Niantic did not provide any exhibits in support of the observations made by Mr. Lanz regarding the Development Certificate identified in the Provisioning Profile – *e.g.*, produce the Development Certificate itself or the Unique Device Identifiers—in order to enable further investigation, including a review of which specific devices the code was approved to run on.

46.   A Digital Signing Certificate is used in a number of circumstances, and not only when a developer creates a mobile app.  For example, a Digital Signing Certificate is used when a developer creates a DLL file or an Apple Resource Bundle. *See* How Apple Developer Enterprise license works, attached as Exhibit G.

47.   There are also two types of Digital Signing Certificates, a Developer Certificate and an Enterprise Certificate.  A Developer Certificate only allows distribution of an App on the Apple App Store, whereas an Enterprise Certificate is required to distribute IPA files without the Apple App Store. *See* Choosing a Membership, Apple Developer Support, attached as Exhibit H.

48.   Niantic only alleges that it found a "developer certificate" in the `embedded.mobileprovision` file Mr. Lanz reviewed for PokeGO++ R88, and also contends

-12-

that this IPA file was found via a link[1] on the now-defunct Global++ website (*i.e.*, not distributed on the Apple App Store). Dkt. 71 (Opp.) at 15; Dkt. 71-2 (Third Lanz Decl.) at ¶ 33. Because, as Niantic acknowledges, the PokeGO++ (R88) was **not** distributed via the Apple App Store, the distributing party must have an Enterprise Certificate. Niantic does not claim nor provides any evidence that Defendants have an Enterprise certificate.

49. Consistent with my moving Declaration, it is Signing Services, who have obtained Apple's Enterprise Certificates, that distribute the IPA files via third-party (non-Apple App Store) sites which contain modified versions of well-known Apps, such as Pokémon GO. Dkt. 63-1 (Zeidman Decl.) at ¶ 26; *see also*, Software Pirates use Apple Tech to Put Hacked Apps on iPhones, attached as Exhibit K.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and this declaration was made this 4th day of December 2019 in Cupertino, California.

By: _____
Robert Zeidman

---

[1] It is not clear whether Niantic discloses the actual URL where Mr. Lanz downloaded PokeGo++ R88. Dkt. 71-2 (Third Lanz Decl.) at ¶¶ 39-44 ("Global++ URL points to an online location made available by the WeTransfer service"). Because Mr. Lanz does not attach any exhibits, I am unable to investigate Niantic's speculation that the WeTransfer online location is "likely associated with and controlled by Global++." Dkt. 71-2 (Third Lanz Decl.) at ¶ 44. Generally, just because a URL includes a company name, *e.g.*, Global++, it does not confirm an affiliation between that company and the URL. Mr. Lanz does not provide any exhibits in support of his statement that "Mr. Hunt repeatedly encourage[d] users to download the Cheating Programs using the WeTransfer service." Dkt. 71-2 (Third Lanz Decl.) at ¶ 44.